# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JULIEN GIRAUD, JR., JULIAN GIRAUD III, CESAR HUMBERTO PINA

Defendants-Appellees.

———————————

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:24-cr-768, 2:25-cr-436 (Brann, C.J. (M.D. Pa.))

———————————

## BRIEF FOR APPELLANT

———————————

PAMELA J. BONDI
  *Attorney General*

TODD BLANCHE
  *Deputy Attorney General*

HENRY C. WHITAKER
  *Counselor to the Attorney General*

ALINA HABBA
  *Acting U.S. Attorney*
  *Special Attorney*

MARK E. COYNE
  *Supervisory Assistant U.S. Attorney*
  *Chief, Appeals Division*
  *District of New Jersey*

MATTHEW R. GALEOTTI
  *Acting Assistant Attorney General*

KATHERINE TWOMEY ALLEN
  *Criminal Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-1935*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF JURISDICTION ............................................................................. 4

STATEMENT OF THE ISSUES ................................................................................... 5

STATEMENT OF RELATED CASES ......................................................................... 5

STATEMENT OF THE CASE ...................................................................................... 6

    A.    Statutory Background .................................................................................. 6

    B.    Factual Background ...................................................................................... 8

    C.    Prior Proceedings ...................................................................................... 11

SUMMARY OF ARGUMENT ................................................................................... 13

STANDARD OF REVIEW ......................................................................................... 15

ARGUMENT ................................................................................................................ 16

I.    Ms. Habba Is Validly Serving As Acting U.S. Attorney ................................. 16

    A.    Under The FVRA, Ms. Habba Is The Acting U.S. Attorney Because The Office Of U.S. Attorney Is Vacant And She Has Been Designated As The First Assistant To That Office ................................... 16

    B.    The District Court Erred In Holding That Ms. Habba Cannot Serve As Acting U.S. Attorney Because She Was Not The First Assistant When The Vacancy First Arose .................................................. 18

    C.    The Defendants' Alternative Argument That Ms. Habba Cannot Serve As Acting U.S. Attorney Because Of Her Withdrawn Nomination To Be U.S. Attorney Misreads The Statute ......................... 25

II.    Ms. Habba Was Validly Delegated Authority To Supervise The U.S. Attorney's Office ................................................................................. 27

    A.    The Attorney General Possesses Authority To Conduct And Supervise Proceedings In The District of New Jersey, And She Delegated That Authority To Ms. Habba ................................................. 28

    B.    The District Court Erred In Holding That The FVRA's Exclusivity Provision Prohibits Delegating Powers Shared By A Vacant Office To A Non-Acting Official ............................................................. 33

        1.    The FVRA Does Not Limit the Exercise of Lawfully Delegated Powers ................................................................. 33

        2.    The District Court's Contrary Conclusion Misreads the FVRA and Conflicts With Multiple Court of Appeals Decisions .......................................................................... 40

    C.    The District Court Erred In Holding That The Attorney General's Delegation Of Authority Conflicts With The Specific Statutes Governing The Office Of U.S. Attorney ...................................... 46

CONCLUSION ................................................................................... 49

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

## Cases

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
35 F.4th 1328 (Fed. Cir. 2022) ................................................ 32, 38-39, 43-45

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ...................................................................................24

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ...................................................................................24

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) ............................................................................ 19, 26

*Edmond v. United States*,
520 U.S. 651 (1997) ...................................................................................48

*Fleming v. Mohawk Wrecking & Lumber Co.*,
331 U.S. 111 (1947) ...................................................................................44

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*,
107 F.4th 1064 (9th Cir. 2024) ................................................... 32, 39, 41, 43

*Hewitt v. United States*,
145 S. Ct. 2165 (2025) ...............................................................................26

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
816 F.3d 550 (9th Cir. 2016) .....................................................................33

*Kajmowicz v. Whitaker*,
42 F.4th 138 (3d Cir. 2022) .......................................... 32, 35, 38-39, 41, 44-45

*Louisiana Forestry Ass'n Inc. v. Secretary U.S. Dep't of Labor*,
745 F.3d 653 (3d Cir. 2014) .......................................................................44

*Nichols v. United States*,
578 U.S. 104 (2016) ............................................................................ 19, 26

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ...................................................................................19

*NLRB v. SW General, Inc.,*
    580 U.S. 288 (2017) ................................................................. 26, 33

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................................19

*Schaghticoke Tribal Nation v. Kempthorne,*
    587 F.3d 132 (2d Cir. 2009) .................................................. 32, 39

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) .......................................................................8

*Stand Up for Cal.! v. U.S. Dep't of Interior,*
    298 F. Supp. 3d 136, 150 (D.D.C. 2018) ...................................40

*Stand Up for Cal.! v. U.S. Dep't of Interior,*
    994 F.3d 616 (D.C. Cir. 2021) .....................................................40

*United States v. Bruno,*
    897 F.2d 691 (3d Cir. 1990) ........................................................47

*United States v. Hilario,*
    218 F.3d 19 (1st Cir. 2000) .........................................................46

*United States v. Junius,*
    86 F.4th 1027 (3d Cir. 2023) .......................................................15

*United States v. Mangan,*
    575 F.2d 32 (2d Cir. 1978) ..........................................................44

*United States v. Weyhrauch,*
    544 F.3d 969 (9th Cir. 2009) .......................................................44

*United States v. Whittaker,*
    268 F.3d 185 (3d Cir. 2001) ..........................................................5

**Statutes and Regulations**

5 U.S.C. § 101 ................................................................................ 6, 17

5 U.S.C. § 105 ................................................................................ 6, 17

5 U.S.C. § 3345............................................................... 1, 3, 8-9, 11-14, 16-27, 33-34

5 U.S.C. § 3346...................................................................................................8

5 U.S.C. § 3347............................................. 4, 8, 13, 15, 33-35, 37-38, 40-43

5 U.S.C. § 3348.............................................................................. 36, 39-40

5 U.S.C. § 3349.................................................................................................20

5 U.S.C. § 9807.................................................................................................37

7 U.S.C. § 7996.................................................................................................37

10 U.S.C. § 2014.................................................................................................37

18 U.S.C. § 3731.................................................................................................44

22 U.S.C. § 2651a.................................................................................................22

26 U.S.C. § 6103.................................................................................................44

28 U.S.C. § 501.................................................................................................6

28 U.S.C. § 503.............................................................................................6, 28

28 U.S.C. § 504.................................................................................................6

28 U.S.C. § 504a.................................................................................................6

28 U.S.C. § 505.................................................................................................6

28 U.S.C. § 506.................................................................................................6

28 U.S.C. § 507.................................................................................................6

28 U.S.C. § 507A.................................................................................................6

28 U.S.C. § 508.................................................................................................42

28 U.S.C. § 509............................................................... 6, 10, 28, 40, 46-47

28 U.S.C. § 510................................................................... 7, 10, 29, 34, 47

28 U.S.C. § 515 ................................................................. 6, 7, 11, 28-29, 40, 46-47

28 U.S.C. § 516 ........................................................................ 6, 28-29, 40, 46-47

28 U.S.C. § 517 ........................................................................ 6, 28-29, 40, 46-47

28 U.S.C. § 518 ...................................................................... 6-7, 28-29, 40, 46-47

28 U.S.C. § 519 ............................................................................ 6-7, 28, 40, 46-47

28 U.S.C. § 533 .................................................................................................. 6, 29, 47

28 U.S.C. § 541 ....................................................................... 6-8, 13, 17, 46-47

28 U.S.C. § 542 .................................................................................... 6, 11, 29, 47

28 U.S.C. § 543 ............................................................................................... 6, 29, 47

28 U.S.C. § 546 .................................................................. 1, 2, 7-10, 17, 47

28 U.S.C. § 547 ............................................................................................................. 7

28 U.S.C. § 1291 ......................................................................................................... 4

31 U.S.C. § 1344 ....................................................................................................... 37

35 U.S.C. § 3 ................................................................................................................ 38

41 U.S.C. § 3304 ....................................................................................................... 37

Pub. L. No. 111-8 123 Stat. 524 (2009) ................................................. 37

28 C.F.R. § 0.137 .......................................................................................... 11, 17

## Other Authorities

Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613 (2020) ................... 30

Center for Presidential Transition, Presidential Transition Guide (2023) ..................... 22

D.N.J. Standing Order 2025-03 ........................................................... 10

*Designating an Acting Attorney General*, 42 Op. O.L.C. 182 (2018) ....................................23

*Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177 (2001) ......................21

*Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C.
    60 (1999) ........................................................................................... 30, 36

Letter from Gary L. Kepplinger, General Counsel, GAO, to U.S. Senators
    Richard J. Durbin, Russell D. Feingold, and Edward M. Kennedy (Jun.
    13, 2008)........................................................................................31-32

Letter from Victor S. Rezendes, Managing Director, Strategic Issues, GAO
    to U.S. Senators Joseph I. Lieberman and Dan Burton (Dec. 7, 2001)...................21

S. Rep. No. 105-250 (1998)...........................................................24, 32, 43-44

## INTRODUCTION

There are approximately 1,000 offices in the Executive Branch that require appointment by the President and confirmation by the Senate ("PAS" offices). Congress has recognized the importance of the functioning of the Executive Branch and has authorized multiple ways for the continued exercise of the powers of PAS offices when they are vacant. These provisions are critical to the functioning of the government and apply in varied circumstances, including Presidential transitions, unexpected death or illness, and Senate inaction. Over many years, Congress has repeatedly refined the balance between the important roles for the President and Senate and the ability of the Executive Branch to operate in times of vacancies. This case concerns how these provisions apply to the currently vacant office of the U.S. Attorney for the District of New Jersey.

Congress has provided three methods for the continued exercise of the powers of a vacant U.S. Attorney position: acting service under the generally applicable Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345; interim service under the U.S. Attorney-specific vacancy statute, 28 U.S.C. § 546; and the delegation of nonexclusive duties in accordance with relevant statutes. Each of these methods has precise rules, benefits, and drawbacks. It is typically up to the President, or the principal officers acting on his behalf, to decide which method is best suited to the circumstances. Those methods generally supplement—rather than displace—each other.

This case involves an unusual situation where one method—an interim appointment under § 546—proved unworkable when the district court and President could not agree on the best person for the job. Accordingly, the Executive Branch used a different method of dealing with vacancies and installed Alina Habba as Acting U.S. Attorney under the FVRA. As a backstop, and independent of the FVRA, the Attorney General also delegated to Ms. Habba authority to conduct and supervise legal proceedings in the District of New Jersey. In taking both of those steps, the government followed the rules in the FVRA and acted in accordance with longstanding executive practice to remove any doubt that Ms. Habba is fully empowered to supervise criminal prosecutions in the District of New Jersey while the office of U.S. Attorney is vacant.

The district court erred in holding that neither of those sources of authority permits Ms. Habba to perform those functions. The district court agreed that the FVRA is available to address U.S. Attorney vacancies, in addition to § 546. But it then adopted an unprecedentedly narrow view of *who* can serve as an acting official under the FVRA. And it exacerbated that error by holding that the Attorney General also cannot delegate her concurrent or independent authority to conduct and supervise criminal proceedings in the U.S. Attorney's Office to a different attorney within the Department of Justice (DOJ). The district court thus erroneously disqualified Ms. Habba from participating in or supervising these prosecutions.

First, Ms. Habba is lawfully serving as Acting U.S. Attorney. The Attorney General appointed Ms. Habba as a Special Attorney in DOJ and designated her as the First Assistant U.S. Attorney for the District, so by automatic application of § 3345(a)(1) of the FVRA, she is currently serving as the Acting U.S. Attorney. Contrary to the district court's view, the FVRA does not require that only a first assistant who was serving at the time the vacancy arose can serve as the acting official under the default provision of the FVRA. On the contrary, § 3345(a)(1) is applicable to "the first assistant to *the office* of such officer"—not the first assistant to any particular officer. Moreover, the structure of the statute indicates that eligibility for service under § 3345(a)(1) is based on the first assistant's current (not past) status, because it uses the present tense, whereas other provisions use backward looking language. The district court's contrary conclusion would mean that every presidential administration for more than two decades has unlawfully installed dozens of acting officials—a consequence that the district court openly embraced.

Second, even if Ms. Habba were not the Acting U.S. Attorney, she could still participate in and supervise the work of the U.S. Attorney's Office. The Attorney General has delegated to Ms. Habba the power to conduct and supervise prosecutions in the District of New Jersey. Ms. Habba can continue to exercise that delegated authority in her capacity as a Special Attorney and First Assistant U.S. Attorney. Despite recognizing—as numerous courts have agreed—that the Attorney General can delegate her prosecutorial authority to Assistant U.S. Attorneys (AUSAs), the district

court held that the Attorney General's delegation here was prohibited by the exclusivity provision of the FVRA (§ 3347). The court misinterpreted § 3347 and failed to appreciate the difference between an acting official, who may perform all the functions of an office, and a non-acting official who is merely exercising those functions that lawfully may be delegated. The district court's holding also conflicts with longstanding executive practice that has been accepted by every branch of the federal government and would cripple the functioning of government when a PAS office is vacant and no acting official may lawfully serve.

It is important that a DOJ component is overseen by someone who has the support of the Executive Branch, and that a U.S. Attorney's Office can continue to function even when there is no Senate-confirmed or interim U.S. Attorney. The district court's contrary holdings misread the FVRA and would upend widespread and longstanding executive practice across the federal government. The district court's disqualification orders should be reversed.

## STATEMENT OF JURISDICTION

The United States appeals the orders of the district court disqualifying Acting U.S. Attorney Habba from participating in the prosecution of the defendants or supervising any AUSA prosecuting the defendants. *See* Appx105-106, 108-109. The district court, sitting by designation pursuant to this Court's order, Appx37-38, entered the disqualification orders on August 21, 2025. Those orders are immediately appealable under 28 U.S.C. § 1291 pursuant to the collateral-order doctrine. *See, e.g.,*

*United States v. Whittaker*, 268 F.3d 185, 191-93 (3d Cir. 2001). The United States filed timely notices of appeal on August 25, 2025. *See* Appx107, 110.

## STATEMENT OF THE ISSUES

I.      Whether Ms. Habba is validly serving as Acting U.S. Attorney for the District of New Jersey pursuant to the FVRA, because the office is vacant and she is the First Assistant U.S. Attorney for the District of New Jersey. *See* Appx137-150, 192-204, 385-389 (government briefs); Appx48-75, 98-99 (district court opinion).

II.      Whether Ms. Habba can participate in and supervise the prosecution of the defendants pursuant to the Attorney General's express delegation of that authority to Ms. Habba in her capacity as Special Attorney and First Assistant U.S. Attorney for the District of New Jersey. *See* Appx150-154, 172-181, 205-215, 389-394 (government briefs); Appx75-98 (district court opinion).

## STATEMENT OF RELATED CASES

These cases have not previously been before this Court. The following cases in the District of New Jersey are just some of many presenting similar issues: *United States v. Lyons*, No. 22-cr-623-03; *United States v. Mayse*, No. 20-cr-236; *United States v. Mickel*, No. 23-cr-355; *United States v. Santos Munoz*, No. 24-cr-102; *United States v. Whitehead and Lott*, No. 22-cr-382; and *United States v. Williams*, No. 24-mj-11136.

# STATEMENT OF THE CASE

## A.    Statutory Background

The Department of Justice is an executive department of the United States.  28 U.S.C. § 501; 5 U.S.C. §§ 101, 105.  The Attorney General "is the head of the Department of Justice."  28 U.S.C. § 503.  Congress has vested the Attorney General with "[a]ll functions" of the other officers, agencies, and employees of DOJ, with narrow exceptions not relevant here.  *Id.* § 509.  Those subordinate officers include the Deputy Attorney General, *id.* § 504, the Associate Attorney General, *id.* § 504a, the Solicitor General, *id.* § 505, twelve Assistant Attorneys General, *id.* §§ 506-507A, and United States Attorneys who conduct litigation in each judicial district, *id.* § 541.  Congress also has vested the Attorney General with authority to conduct any legal proceeding that a U.S. Attorney may conduct.  *Id.* § 515(a).  In addition, Congress has vested the Attorney General with general authority to conduct and supervise all litigation on behalf of the United States.  *See id.* §§ 516-519.

Congress also has authorized the Attorney General to appoint various attorneys to carry out DOJ's functions, including special attorneys and special assistants to the Attorney General, *id.* § 515(a), AUSAs, *id.* § 542, special attorneys to assist U.S. Attorneys, *id.* § 543, and "officials" to "detect and prosecute crimes against the United States," *id.* § 533(1).  Congress authorized the Attorney General to delegate her authority by "mak[ing] such provisions" as are "appropriate authorizing the performance" of any of her functions by "any other officer, employee, or agency of the Department of

Justice." *Id.* § 510. Similarly, Congress provided that the Attorney General may "specifically direct[]" any DOJ officer or other "attorney specially appointed" by her to "conduct any kind of legal proceeding, civil or criminal, … which United States attorneys are authorized by law to conduct." *Id.* § 515(a); *see also id.* § 518(b).

Like the Attorney General, Congress broadly vested each U.S. Attorney with authority to conduct litigation on behalf of the United States, but only within her district. *Id.* § 547. U.S. Attorneys are appointed by the President, subject to the advice and consent of the Senate, *id.* § 541(a), for a "term of four years," plus continuing service until a successor is appointed and takes office, *id.* § 541(b). U.S. Attorneys are subject to the "direct[ion]" of the Attorney General in the discharge of their duties, *id.* § 519, and are "subject to removal by the President," *id.* § 541(c).

Congress has provided multiple avenues for the continued functioning of U.S. Attorneys' Offices when the office of U.S. Attorney is vacant. As described, the Attorney General has overlapping authority to conduct and supervise litigation on behalf of the United States and the power to delegate that authority to others in DOJ. Congress also has provided statutory mechanisms to enable someone to temporarily serve as an interim or Acting U.S. Attorney. First, in 28 U.S.C. § 546, Congress authorized the Attorney General to "appoint a United States attorney for the district in which the office of United States attorney is vacant" to serve on an interim basis for up to 120 days or until a presidentially appointed U.S. Attorney takes office. *Id.* § 546(a), (c). The Attorney General may not appoint someone whose nomination has been

rejected by the Senate, but a pending nominee may serve as interim U.S. Attorney. *Id.* § 546(b). If an interim appointment expires after 120 days, and the vacancy has not otherwise been filled, the district court may appoint an interim U.S. Attorney, *id.* § 546(d), whom the President may remove, *see id.* § 541(c); *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020).

Second, in the generally applicable FVRA, 5 U.S.C. § 3345 *et seq.*, Congress has authorized certain officers to temporarily perform the duties of a vacant PAS office "in an acting capacity," *id.* § 3345(a), subject to specified time limits, *id.* § 3346. The default rule is that the "first assistant" to the vacant office serves as the acting officer, *id.* § 3345(a)(1), but the President may instead designate certain other officers or long-serving employees to serve in that role, *id.* § 3345(a)(2)-(3). The FVRA generally prohibits acting service if the person did not serve as the first assistant for at least 90 days within the year preceding the vacancy *and* the President "submits a nomination of such person to the Senate for appointment to such office." *Id.* § 3345(b)(1). The FVRA is the "exclusive means" for authorizing an "acting official" to temporarily perform the duties of a vacant PAS office, unless Congress has expressly provided otherwise or the President makes a recess appointment. *Id.* § 3347(a).

### B.    Factual Background

In November 2024, a federal grand jury in New Jersey returned a three-count indictment charging Giraud Jr. and Giraud III with drug-trafficking and firearms

offenses.  Appx30.  Then-U.S. Attorney Philip R. Sellinger, who was confirmed by the Senate in 2021, signed the indictment.  *Id.*

On January 8, 2025, Mr. Sellinger resigned as U.S. Attorney.  The then-First Assistant U.S. Attorney Vikas Khanna automatically became Acting U.S. Attorney under the FVRA, 5 U.S.C. § 3345(a)(1), and served in that role until March 3, 2025, when the Attorney General appointed John Giordano as interim U.S. Attorney under 28 U.S.C. § 546.  Appx30-31.[1]

On March 24, 2025, President Trump announced that Ms. Habba would replace Mr. Giordano as interim U.S. Attorney "effective immediately."  Appx31.  In accordance with that direction, on March 27, 2025, the Attorney General appointed Ms. Habba as interim U.S. Attorney under § 546(a), effective March 28, 2025. Appx157.  The Attorney General later extended Ms. Habba's interim appointment through July 25, 2025.  Appx158.  That date reflected that Ms. Habba's interim appointment would have expired under § 546(c)(2) at 12:00am on July 26, 2025, which was 120 days after her initial appointment.  On June 30, 2025, while Ms. Habba was serving as interim U.S. Attorney, the President nominated her to be the U.S. Attorney. Appx32.

---

[1] On January 27, 2025, then-Acting Attorney General James McHenry purported to appoint a third person as interim U.S. Attorney, but that person declined the appointment a few days later.  Appx203 n.5.

On July 7, 2025, also while Ms. Habba was serving as interim U.S. Attorney, a federal grand jury returned a six-count indictment charging Cesar Pina with wire fraud, money laundering, and bribery offenses.  Appx32.  Supervisors in the U.S. Attorney's Office approved the indictment prior to its submission to the grand jury and, consistent with ordinary practice, affixed Ms. Habba's signature to it.  Appx32, 102.

On July 22, 2025—120 days from the President's announcement that Ms. Habba would be interim U.S. Attorney—the U.S. District Court for the District of New Jersey purported to appoint Desiree Grace, the then-First Assistant U.S. Attorney, as interim U.S. Attorney under § 546(d).  *See* D.N.J. Standing Order 2025-03.  The court made Ms. Grace's appointment effective July 22, 2025, or upon the expiration of 120 days after the Attorney General's appointment of Ms. Habba, whichever was later.  *Id.*

Notwithstanding the district court's desire to install Ms. Grace as U.S. Attorney, the President and the Attorney General determined that Ms. Habba remained the best person to lead the U.S. Attorney's Office.  Accordingly, before Ms. Habba's interim appointment expired, the Executive Branch used the FVRA to make Ms. Habba the Acting U.S. Attorney, subject to the FVRA's statutory eligibility and timing restrictions for such service.

On July 24, 2025, to comply with the FVRA's requirements governing acting service by pending nominees, the President withdrew Ms. Habba's nomination, which the Senate had never acted upon, by 3:02pm.  Appx34.  The same day, the Attorney General exercised her authority under multiple statutes (including 28 U.S.C. §§ 509, 510,

10

and 515) to appoint Ms. Habba as a Special Attorney and designate her as First Assistant U.S. Attorney for the District of New Jersey, effective upon Ms. Habba's resignation as interim U.S. Attorney. Appx165, 218, 161-162, 163-164.[2] The appointment documents specified that, as Special Attorney, Ms. Habba could "conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, … which United States Attorneys are authorized to conduct." Appx161. The same day, Ms. Habba resigned her position as interim U.S. Attorney, effective at 5:00pm. Appx160.

Upon her resignation as interim U.S. Attorney and designation as First Assistant U.S. Attorney, Ms. Habba became the Acting U.S. Attorney under the default provision of the FVRA, 5 U.S.C. § 3345(a)(1), because the office of U.S. Attorney was vacant and Ms. Habba had been designated the First Assistant in writing in accordance with DOJ regulations, 28 C.F.R. § 0.137(b). To remove any lingering doubt, however, the President formally removed Ms. Grace from her purported position as court-appointed interim U.S. Attorney on July 26, 2025. Appx36, 220-221.

## C.  Prior Proceedings

On July 27, 2025, the Girauds moved to dismiss their indictments and to enjoin Ms. Habba and any AUSA acting under her authority from prosecuting them, on the ground that Ms. Habba lacked authority to prosecute them. Appx36-37. Pina

---

[2] The First Assistant U.S. Attorney position had been vacant since July 22, 2025, when Ms. Grace was removed from her position as AUSA (and thus First Assistant U.S. Attorney). Appx33-35, 99-100, 159; *see* 28 U.S.C. § 542(b).

subsequently filed a similar motion. Appx38. Both cases were reassigned to Chief Judge Brann of the Middle District of Pennsylvania. Appx37-38. The government explained that Ms. Habba was validly serving as interim U.S. Attorney from March 28, 2025, until her resignation on July 24, 2025, when she began validly serving as Acting U.S. Attorney under the FVRA. *See, e.g.*, Appx128-150. At minimum, the government argued, Ms. Habba had authority to conduct and supervise the prosecutions of the defendants in her capacity as Special Attorney and First Assistant U.S. Attorney pursuant to the Attorney General's express delegation of authority to her. *See, e.g.*, Appx150-155. And, in all events, the government explained that dismissal of the indictments was improper. *See* e.g., Appx150-155, 394-397.

The district court denied both motions to dismiss the indictments. Appx10-17; Appx37, 100-103. But the court granted the defendants' requests to disqualify Ms. Habba from participating in their prosecutions and from supervising any AUSA prosecuting them. Appx104, 105-106. The district court determined that Ms. Habba is ineligible to serve as Acting U.S. Attorney under § 3345(a)(1) of the FVRA because she was not the first assistant at the time the vacancy arose—*i.e.*, when the President Biden-appointed U.S. Attorney resigned on January 8, 2025. Appx61-75.

The court also rejected the government's alternative argument that even if Ms. Habba is not validly serving as Acting U.S. Attorney, she can still conduct and supervise the defendants' prosecutions in her capacity as Special Attorney and First Assistant U.S. Attorney pursuant to the Attorney General's delegation of authority to her. Appx75-

100.  The court reasoned that the FVRA's exclusivity provision, 5 U.S.C. § 3347, prohibits the delegation of *all* the delegable powers of a vacant PAS office to a "single person."  Appx75-95.  The court also concluded that such delegation would conflict with 28 U.S.C. § 541's requirements of Presidential appointment and Senate confirmation for service as a four-year-term U.S. Attorney.  Appx96-98.

The government has appealed the orders disqualifying Ms. Habba, Appx107, 110, and this Court has recognized that this appeal is limited to those prospective disqualification orders.  *See* Order, No. 25-2635, Dkt. 23 (3d Cir. Sept. 9, 2025).  The district court stayed the effects of its orders pending appeal, Appx106, but district courts in New Jersey have adjourned numerous criminal trials and sentencing hearings, and some courts are refusing to proceed with guilty plea hearings, which has created a backlog of stalled criminal cases in the District of New Jersey.  *See supra* at 5.

## SUMMARY OF ARGUMENT

**I.**     Ms. Habba is validly serving as the Acting U.S. Attorney for the District of New Jersey under the FVRA.  The office of U.S. Attorney is currently vacant, and Ms. Habba is currently serving as the First Assistant U.S. Attorney for the District.  Accordingly, under the default provision of the FVRA, 5 U.S.C. § 3345(a)(1), she is the Acting U.S. Attorney.

The district court erred in concluding that Ms. Habba is not validly serving under § 3345(a)(1) because she was not the first assistant at the time that the vacancy first arose during the previous Presidential administration.  That requirement appears

nowhere in the statute. The statute instead provides that the first assistant is the person who is the "first assistant to *the office* of such officer"—not the first assistant to the particular *officer* who was serving at the time the vacancy arose. 5 U.S.C. § 3345(a)(1) (emphasis added). The district court's contrary interpretation conflicts with the structure of the statute and widely accepted Executive Branch practice over the last two decades, and would hamstring incoming presidential administrations in designating acting officers of their choice.

Although the district court did not reach the issue, Ms. Habba also is not precluded from serving as Acting U.S. Attorney because of her withdrawn nomination for U.S. Attorney. The FVRA's prohibition on certain officials serving if the President "submits" their nomination, 5 U.S.C. § 3345(b)(1)(B), does not prohibit service by individuals who do not have a nomination currently pending. The statute's use of the present tense, and the purpose of the prohibition, do not apply to officials who are not currently nominated.

**II.** In any event, Ms. Habba may participate in and supervise the defendants' prosecutions in her capacity as Special Attorney and First Assistant U.S. Attorney based on the Attorney General's delegation of authority to her. That delegation followed well-established practice that has been uniformly recognized by all three branches of government. In particular, even when an individual is no longer eligible to serve as an acting officer under the FVRA, the official may continue to perform the functions and duties of the vacant office that were lawfully delegated to them.

The district court erroneously held that the FVRA's exclusivity provision, 5 U.S.C. § 3347, prohibits delegating the powers of a vacant office to a non-acting official. As courts of appeals have concluded, the FVRA does not preclude the exercise of delegated functions by a non-acting official. The FVRA's exclusivity provision governs only temporary service by *acting* officials, who exercise both delegable and non-delegable functions. Furthermore, as the district court and this Court have recognized, the FVRA's remedy provision is limited to *non*-delegable functions and duties, underscoring that the FVRA's exclusivity provision does not preclude delegations.

Finally, the district court erred in holding that Ms. Habba's exercise of delegated powers that overlap with the U.S. Attorney's powers conflicts with the specific statutes governing U.S. Attorneys. There is no conflict. The delegation does not conflict with the statutes establishing the offices of the U.S. Attorneys because a Senate-confirmed U.S. Attorney has broader authority than an individual wielding only delegated powers. The government's interpretation harmonizes the statutes, rather than nullifying the delegation statutes as applied to U.S. Attorneys.

## STANDARD OF REVIEW

This Court reviews questions of statutory interpretation *de novo*. *See, e.g.*, *United States v. Junius*, 86 F.4th 1027, 1030 (3d Cir. 2023).

**ARGUMENT**

**I.    Ms. Habba Is Validly Serving As Acting U.S. Attorney**

**A.    Under The FVRA, Ms. Habba Is The Acting U.S. Attorney Because The Office Of U.S. Attorney Is Vacant And She Has Been Designated As The First Assistant To That Office**

1.    The FVRA is one of several means by which the President or the Attorney General can designate someone to run a U.S. Attorney's Office when there is no Senate-confirmed U.S. Attorney.  Under the FVRA, when a PAS office is vacant because of the death, resignation, or inability of the incumbent officeholder, another official may perform the functions and duties of that office on an acting basis.  *See* 5 U.S.C. § 3345(a).

Section 3345(a) identifies three categories of individuals who may serve as acting officials, subject to time limits in § 3346.  The default rule is that the "first assistant to the office" shall "perform the functions and duties of the office temporarily in an acting capacity."  5 U.S.C. § 3345(a)(1).  Alternatively, the President may designate another PAS officer under § 3345(a)(2) or certain other senior agency officers or employees under § 3345(a)(3) to serve in an "acting capacity."  *Id.* § 3345(a)(2)-(3).

The FVRA contains a restriction on who may serve in an acting capacity:  5 U.S.C. § 3345(b)(1).  If the person did not serve as the first assistant for at least 90 days within the year preceding the vacancy and the President "submits a nomination of such person to the Senate for appointment to such office," then the person "may not serve as an acting officer for [that] office."  *Id.*  That restriction does not apply if the person

16

is currently serving as the first assistant pursuant to a PAS appointment.  *Id.* § 3345(b)(2).

2.    Ms. Habba is the Acting U.S. Attorney under the default provision of the FVRA.  *See id.* § 3345(a)(1).

It is undisputed that the U.S. Attorney for the District of New Jersey is a PAS office in the Executive Branch subject to the FVRA, *see* 28 U.S.C. § 541(a); 5 U.S.C. §§ 101, 105, and that it is vacant.   The last Senate-confirmed U.S. Attorney, Philip R. Sellinger, resigned on January 8, 2025, Appx30, 99, and no one is currently serving as interim U.S. Attorney under 28 U.S.C. § 546.[3]

Nor did the district court dispute that Ms. Habba is currently serving as the First Assistant U.S. Attorney for the District of New Jersey.  Every PAS office within DOJ must have "a First Assistant within the meaning of the [FVRA]."  28 C.F.R. § 0.137(b). "Where there is a position of Principal Deputy to the PAS office, the Principal Deputy shall be the First Assistant.  Where there is no position of Principal Deputy to the PAS office, *the First Assistant shall be the person whom the Attorney General designates in writing*."  *Id.* (emphasis added).  The district court acknowledged that, on July 24, 2025, following

---

[3] The district court wrongly concluded that Ms. Habba's interim appointment expired on July 1, 2025, and that Ms. Grace therefore became the interim U.S. Attorney pursuant to the district court appointment on July 22, 2025.  Appx99.  But that timing dispute is not relevant to this appeal of the district court's orders prospectively disqualifying Ms. Habba: the defendants have not disputed, and the district court accepted, that the President validly removed Ms. Grace as interim U.S. Attorney on July 26, 2025, pursuant to 28 U.S.C. § 541(c) and Article II, Appx35-36, 60, 100, so there is no dispute that Ms. Grace is not currently serving as U.S. Attorney.  The office is vacant.

the withdrawal of Ms. Habba's nomination to be U.S. Attorney, the Attorney General appointed Ms. Habba to a position within DOJ (Special Attorney) and designated her in writing as the First Assistant U.S. Attorney for the District of New Jersey. Appx34-35, 100-101, 165-169.[4]

Ms. Habba is therefore serving as the First Assistant. Under the default provision of the FVRA, then, she "shall perform the functions and duties of the office" of U.S. Attorney "in an acting capacity," subject to the time limits of the FVRA. 5 U.S.C. § 3345(a)(1). She has validly served in that capacity since at least July 26, 2025.

## B. The District Court Erred In Holding That Ms. Habba Cannot Serve As Acting U.S. Attorney Because She Was Not The First Assistant When The Vacancy First Arose

Contrary to the district court's conclusion, the FVRA does not require a first assistant to be the incumbent at the time the vacancy first arose in order to serve as an acting PAS officer under the default provision in § 3345(a)(1).

1. First, consider the statutory text. The statute does not say that only the first assistant *at the time the vacancy arose* shall be the default acting officer under § 3345(a)(1). Rather, it says that "[i]f" a PAS officer "dies, resigns, or *is* otherwise unable to perform the functions and duties of the office," "the first assistant *to the office* of such officer shall perform" those functions and duties in an acting capacity. 5 U.S.C. § 3345(a)(1) (emphases added). Because a vacancy is "a continuing state," *NLRB v. Noel Canning*,

---

[4] The First Assistant position had been vacant since July 22, 2025. *Supra* at n.2.

573 U.S. 513, 539 (2014), § 3345(a)(1) requires determining who the first assistant is at the point in time when a PAS officer "is" unable to perform, not just when a PAS officer first became unable to perform. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (when a statutory provision is "expressed in the present tense," it requires consideration of the status at the time of the covered action, not before); *Nichols v. United States*, 578 U.S. 104, 109-10 (2016) (same). That is confirmed by the statute's reference to the first assistant "to the office of such officer" (which can be different people over time), rather than the first assistant to a particular PAS officeholder at a particular time.

Next, consider § 3345's structure. Elsewhere in the same section, Congress *did* include backward-looking language that makes eligibility for acting service for certain individuals depend on the state of affairs during the time preceding the vacancy. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).

Two paragraphs later, for instance, Congress made ineligible for a presidential acting designation certain officials who had not served in the agency for at least 90 days in the year preceding when the vacancy arose. *See* 5 U.S.C. § 3345(a)(3)(A). In the next subsection of the statute, Congress lifted the general prohibition on having an acting official also be the nominee for anyone who had served as first assistant for at least 90

days prior to the vacancy arising. *See id.* § 3345(b)(1)(A). No such backward-looking eligibility requirement, however, applies to an official who is appointed first assistant under § 3345(a)(1) and is not the nominee for the position in question. To the contrary, the general prohibition in § 3345(b)(1)(A) expressly contemplates that a first assistant *may* serve as an acting official even if she "did not serve in the position of first assistant" prior to the vacancy, so long as she is not also the nominee. *Id.*

Finally, consider longstanding Executive Branch practice. Administrations of both parties have routinely, at the start of a new Administration, temporarily filled PAS positions that become vacant *before* noon on Inauguration Day by appointing new first assistants *at or after* noon on Inauguration Day. Those first assistants, by automatic operation of § 3345(a)(1), then serve in an acting capacity, subject to the FVRA's time constraints. There are numerous examples of this practice, including, as explained at the district court hearing, Sarah Harris's service as Acting Solicitor General at the beginning of the current Administration, Brian Boynton's service as Acting Assistant Attorney General for the Civil Division at the beginning of the Biden Administration, and David Barron's service as the Acting Assistant Attorney General for the Office of Legal Counsel at the beginning of the Obama Administration. Appx278, 326.

The Government Accountability Office (GAO)—a component of the Legislative Branch statutorily charged with monitoring FVRA compliance, *see* 5 U.S.C. § 3349(b)—agrees with that longstanding practice. *See* Letter from Victor S. Rezendes, Managing Director, Strategic Issues, GAO to U.S. Senators Joseph I. Lieberman and

Dan Burton (Dec. 7, 2001), *available at* https://www.gao.gov/assets/gao-02-272r.pdf. So does DOJ's Office of Legal Counsel (OLC). *See Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 179-81 (2001).

2. All of this shows that someone whom the Attorney General designates as the First Assistant U.S. Attorney after the prior Senate-confirmed U.S. Attorney steps down can serve under the FVRA as the Acting U.S. Attorney for the specified time period during the vacancy in that PAS office. Although the district court offered several justifications for its contrary reading of the statute, none withstands scrutiny.

First, the district court emphasized that § 3345(a)(1), unlike § 3345(a)(2) and (a)(3), is automatic: the first assistant becomes the acting officer without any need for further action by the President or anyone else. Appx63-64. But the automatic nature of the provision does not suggest that it "trigger[s]" only once—at "the moment that the vacancy occurs." Appx64. On the contrary, because a vacancy is a continuing state of affairs, the automatic nature of § 3345(a)(1)'s default rule and the "use of present tense," Appx64, establish that whoever is serving as the first assistant at a particular moment in time during the vacancy becomes the acting official. If only the first assistant who was in office when the vacancy arose could serve, then § 3345(a)(1) could not automatically apply once that first assistant left office. Section 3345(a)(1) is an automatic default rule—it applies to first assistants precisely because an agency head can often ensure that there is a first assistant in place and the President therefore does

not have to personally fill every PAS vacancy that arises.  The rule makes sense because

there are approximately 1,000 PAS officials in the Executive Branch.[5]

Second, the district court asserted (Appx65-67) that allowing new first assistants

to become acting officials under § 3345(a)(1) would render the limits in § 3345(a)(2) and

(a)(3) mostly superfluous, because if the President's choice for an acting officer does

not satisfy the § 3345(a)(2) and (a)(3) criteria, he can simply direct the agency head to

appoint that person as the first assistant under (a)(1).  That is wrong.

There are at least two significant circumstances where the President cannot rely

on subsection (a)(1) to select an acting officer and thus subsections (a)(2) and (a)(3)

continue to play an important role.  When the first assistant position is itself a PAS

office, (a)(1) is unavailable because the Executive Branch cannot appoint a first assistant

without Senate confirmation.  Instead, the President must use (a)(2) or (a)(3).  That is

often the case for the highest positions in agencies.  *See, e.g.*, 22 U.S.C. § 2651a(a)(2)

(both Secretary of State and Deputy Secretary are PAS offices).  Subsections (a)(2) and

(a)(3) also play a distinct role when the President wants to leave the current first assistant

in place and appoint someone else to be the acting officer—*e.g.*, because the individual

serving as first assistant is the best suited to perform the important second-in-command

functions of a first assistant.  *See, e.g., Designating an Acting Attorney General*, 42 Op. O.L.C.

---

[5] *See* Center for Presidential Transition, Presidential Transition Guide (2023), 93, *available at* https://presidentialtransition.org/wp-content/uploads/sites/6/2023/11/2023-Presidential-Transition-Guide.pdf (compiling data from the 2016 United States Government Policy and Supporting Positions (Plum Book)).

182 (2018) (discussing the designation of Matthew Whitaker as Acting Attorney General under § 3345(a)(3)).

The district court never addressed the second circumstance. And it erroneously speculated that the first circumstance would be "unusual" because it would only occur where the first assistant position is both a PAS office *and* vacant at the time the primary office becomes vacant. Appx68. It is not unusual for PAS offices to be vacant. And even when a PAS first assistant office is already filled, the Executive Branch cannot rely on (a)(1) to designate a different first assistant without Senate confirmation, and instead must use (a)(2) or (a)(3).

Third, the district court suggested that Congress's use of the phrase "to the office of such officer" was not intended to focus on the current inhabitant of the first-assistant position, but instead was merely intended to "refer[] to the agency's formal hierarchical structure" as opposed to "the person on which the outgoing officer relied most heavily." Appx67. That proves the point. The first assistant is the individual who is hierarchically second in command at present, not simply when the vacancy occurs.

Fourth, in a footnote (Appx68 n.175), the district court dismissed the fact that § 3345(a)(3) and (b)(1) have backward-looking language, whereas § 3345(a)(1) does not, because those provisions also address service in the period prior to the vacancy, not just at the time of the vacancy. But that still does not explain why, on the district court's view, § 3345(a)(1) does not have language like those provisions expressly focusing on whether the first assistant held office at the time the vacancy arose. And the district

court completely ignored that § 3345(b)(1)(A)(ii) expressly contemplates that someone who was *not* the first assistant at the time of the vacancy can still be serving as the acting official under (a)(1).

Fifth, the district court invoked (Appx69-72) a Senate report from the legislative history. But in addition to being irrelevant given the clarity of the statutory text, that report concerned an earlier version of the bill with critically different language. Namely, the bill that was the subject of the legislative history defined the first assistant as the "first assistant of such officer," S. Rep. No. 105-250 at 25 (1998), *not* "first assistant to the office of such officer," 5 U.S.C. § 3345(a)(1). The district court speculated, based on other portions of the report, "that the ultimate statutory language was already in legislators' minds." Appx71 n.178. But courts do not properly interpret statutes by engaging in mind-reading based on legislative history of defunct bills with different language. *See, e.g.*, *Azar v. Allina Health Servs.*, 587 U.S. 566, 580 (2019).

Sixth, the district court asserted (Appx72-73) that common practice under the FVRA is immaterial because the FVRA was enacted to curtail Executive Branch evasion of predecessor legislation. But GAO, an arm of Congress, has expressly agreed that § 3345(a)(1) applies to non-incumbent first assistants, and Congress has made no attempt to amend that provision in the past nearly 25 years to curtail this common Executive Branch practice. *See Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) ("long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the action had been taken in pursuance of its consent") (cleaned up).

Finally, the district court suggested (Appx73-74) that limiting § 3345(a)(1) to incumbent first assistants would not wreak havoc during Presidential transitions because the outgoing PAS officials could simply wait to resign until after the new first assistants are appointed after the Inauguration. But it is implausible that all or even most PAS officials from an outgoing Administration will delay their resignations to facilitate the new Administration's appointment of new first assistants who can take over as acting officials. Still less plausible is the district court's supposition that Congress staked a new President's power to name the acting officials of his choosing on obtaining the consent of the outgoing administration, particularly where the administrations are of different parties.

C. **The Defendants' Alternative Argument That Ms. Habba Cannot Serve As Acting U.S. Attorney Because Of Her Withdrawn Nomination To Be U.S. Attorney Misreads The Statute**

The district court declined to reach the defendants' additional argument that, under § 3345(b)(1), Ms. Habba's withdrawn nomination to be U.S. Attorney bars her from serving as Acting U.S. Attorney. Appx75. In reversing the disqualification order, this Court should also reject that alternative basis for affirmance. The Court should definitively and expeditiously resolve the dispute over whether Ms. Habba can continue her service as Acting U.S. Attorney, which is disrupting federal criminal cases in New Jersey.

Section 3345(b)(1)'s bar on acting service by nominees does not apply here. That provision precludes an otherwise-qualified individual from serving as an acting officer if (A) she did not serve as the first assistant for at least 90 days within the year preceding the vacancy, and (B) "the President submits" her "nomination … to the Senate for appointment to such office." 5 U.S.C. § 3345(b)(1)(A)-(B). Section 3345(b)(1)(B)'s use of the present tense—"submits"—shows that for the bar to apply, a nomination must be pending. As discussed, when a statutory provision is "expressed in the present tense," that requires consideration of the status at the time of the covered action, not before. *Dole Food*, 538 U.S. at 478; *accord Nichols*, 578 U.S. at 109-10. Here, the covered action is Ms. Habba's acting service, so the focus of the statute is on her nomination status at the time of her acting service, not when her nomination was pending in the past while she was previously serving as interim U.S. Attorney. Throughout the time of her acting service, the nomination the President had submitted was no longer pending.

Indeed, the Supreme Court itself has used the present-perfect tense to describe what triggers the nomination bar, further indicating that a nomination must be pending for the bar to apply. *See NLRB v. SW General, Inc.*, 580 U.S. 288, 299 (2017) ("Subsection (b)(1) of the FVRA prevents a person *who has been nominated* for a vacant PAS office from performing the duties of that office in an acting capacity.") (emphasis added); *cf. Hewitt v. United States*, 145 S. Ct. 2165, 2172 (2025) (the "present-perfect tense conveys to a listener that the event in question continues to be true or valid").

The Defendants' proposed lifetime ban for withdrawn, returned, or failed nominees is not only atextual, but also wholly disproportionate to the separation-of-powers problem that Congress sought to address in subsection (b)(1). Congress's desire to prevent the nominee for a PAS position from prematurely assuming the duties of the office—to protect its ability to consider and act upon a pending nomination—is not implicated if no nomination is pending. Yet under the defendants' view, anyone who had previously been nominated to fill a PAS position by a President in the past would be barred from serving as an acting official now, regardless of whether the Senate could or did consider that nomination.

In sum, § 3345(b)(1)'s prohibition is limited to pending nominees and has no bearing here. Ms. Habba had been the President's nominee to serve as U.S. Attorney for the District of New Jersey. The President withdrew that nomination, and the Senate never acted on it—all before Ms. Habba became the First Assistant U.S. Attorney. Ms. Habba is not now—and, throughout her service as First Assistant and Acting U.S. Attorney, never has been—the U.S. Attorney nominee.

## II.     Ms. Habba Was Validly Delegated Authority To Supervise The U.S. Attorney's Office

Even if Ms. Habba cannot serve as the Acting U.S. Attorney, she may continue to exercise prosecutorial and supervisory authority in the District of New Jersey pursuant to the Attorney General's express delegation of authority to her in her capacity as Special Attorney and First Assistant U.S. Attorney. The district court erred in

concluding that this delegation of authority is barred by the FVRA and the specific statutes governing the office of U.S. Attorney. Appx75-98.

### A. The Attorney General Possesses Authority To Conduct And Supervise Proceedings In The District of New Jersey, And She Delegated That Authority To Ms. Habba

1. The Attorney General unquestionably has the authority—through multiple reinforcing statutes—to prosecute crimes and supervise litigation in the District of New Jersey. The Attorney General is the "head of the Department of Justice," 28 U.S.C. § 503, and is vested with "[a]ll functions" of DOJ's officers, agencies, and employees, subject to narrow exceptions not relevant here, *id.* § 509. That includes the U.S. Attorneys' functions to conduct litigation in their districts. Indeed, § 515(a) specifies that the Attorney General may "conduct any kind of legal proceeding, civil or criminal, … which United States attorneys are authorized by law to conduct."

The Attorney General also has separate, direct authority to conduct and supervise all litigation on behalf of the United States. The Attorney General may "personally conduct and argue any case in a court of the United States in which the United States is interested." *Id.* § 518(b). The Attorney General also may "supervise all litigation to which the United States, an agency, or officer thereof is a party" and "direct all United States attorneys, assistant United States attorneys, and special attorneys" in exercising their duties. *Id.* § 519; *see also id.* §§ 516-517.

The Attorney General also has unquestioned authority to appoint various attorneys within DOJ and to delegate her functions to those attorneys. The Attorney

General may appoint special attorneys and special assistants to the Attorney General, *id.* § 515(a), AUSAs, *id.* § 542, special attorneys to assist U.S. attorneys, *id.* § 543, and other "officials" to "detect and prosecute crimes against the United States," *id.* § 533(1). The Attorney General may delegate "any function of the Attorney General" to "any other officer, employee, or agency of the Department of Justice," *id.* § 510, and may "specifically direct[]" any DOJ officer or other "attorney specially appointed" by her to "conduct any kind of legal proceeding, civil or criminal, … which United States attorneys are authorized by law to conduct," *id.* § 515(a); *see id.* § 518(b) (the Attorney General "may direct … any officer of the Department of Justice" to "conduct and argue any case in a court of the United States in which the United States is interested"); *id.* §§ 516-517.

The Attorney General exercised those authorities here in appointing Ms. Habba as a "Special Attorney" and designating her as "First Assistant United States Attorney for the District of New Jersey." Appx165. Ms. Habba's appointment as "Special Attorney to the United States Attorney General" expressly authorized her to "conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, … which United States Attorneys are authorized to conduct." Appx161. And her designation as First Assistant U.S. Attorney, in the absence of an appointed U.S. Attorney, authorized her to lead the office. The Attorney General thus validly delegated to Ms. Habba, in her capacity as Special Attorney and First Assistant U.S. Attorney, the authority to conduct and supervise legal proceedings in the District of New Jersey. Ms. Habba may

exercise that authority, including as it relates to the criminal proceedings at issue here, even if she is ineligible to serve as the Acting U.S. Attorney under the FVRA.

2.    The Attorney General's delegation of authority to Ms. Habba is consistent with well-established practice—endorsed by all three branches of government— recognizing that an agency head may delegate authority to an individual to perform certain functions and duties of a vacant PAS office, even where the individual would not be eligible to serve in an "acting" capacity under the FVRA.

The Executive Branch has long understood delegations of authority to allow the duties of an office to be performed during a vacancy when there is no acting official in place.  Shortly after the FVRA was enacted, OLC determined that "the Act permits" certain "responsibilities to be delegated to other appropriate officers and employees in the agency" because "Congress understood that there would be occasions … when there would, for a period, be no one qualified to serve in an acting capacity." *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 72 (1999). Accordingly, executive officials routinely carry out the functions of a vacant PAS office pursuant to a delegation of authority where no acting official is available. *See, e.g.*, Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613, 634 (2020) (noting that "many functions and duties are regularly delegated" to executive officials).

For example, Steven Bradbury led OLC from February 2005 through the end of that Presidential administration without the Senate acting on his nomination to the position of Assistant Attorney General for OLC.  In those portions of his tenure during

which the FVRA's time limits precluded Mr. Bradbury from serving as the "acting" official, he led OLC pursuant to a delegation of authority in his role as the Principal Deputy Assistant Attorney General. *See* Letter from Gary L. Kepplinger, General Counsel, GAO, to U.S. Senators Richard J. Durbin, Russell D. Feingold, and Edward M. Kennedy (Jun. 13, 2008), *available at* https://go.usa.gov/xtEQP ("GAO Bradbury Letter"). Likewise, in the absence of a confirmed Assistant Attorney General for DOJ's Civil Division, Brian Boynton led the Division throughout the entirety of the last Presidential administration, including pursuant to delegated authority after his time for acting service under the FVRA had expired. *Compare, e.g.*, Brief for Respondent, 2021 WL 1154026, *with* Response Brief, 2024 WL 4262497. And of particular relevance here, there have been multiple instances in which a First Assistant U.S. Attorney has continued to lead a U.S. Attorney's Office pursuant to delegated authority when the office of U.S. Attorney was vacant and the time limit for acting service under the FVRA had expired.[6]

Notably, Congress has endorsed the view that executive officials may exercise authority pursuant to delegations that are independent of, and compatible with, the

---

[6] For example, pursuant to a delegation of authority as the First Assistant U.S. Attorney, Elizabeth A. Strange led the U.S. Attorney's Office for the District of Arizona from approximately November 2017 until May 2019, *see, e.g.*, Brief of Appellee, 2018 WL 2418885; Michelle M. Baeppler led the U.S. Attorney's Office for the Northern District of Ohio from approximately May 2022 until June 2023, *see, e.g.*, Brief of Plaintiff-Appellee, 2023 WL 2600208; and Robert J. Troester led the U.S. Attorney's Office for the Western District of Oklahoma from approximately August 2018 until June 2019, *see, e.g.*, Brief of Plaintiff-Appellee, 2018 WL 5309976.

FVRA. In enacting the FVRA, Congress recognized that the "[d]elegable functions of the [vacant] office could still be performed by other officers or employees," even where no acting official was serving under the FVRA. S. Rep. No. 105-250, at 18 (1998). And GAO—again, the arm of Congress charged with monitoring FVRA compliance—agrees that non-acting officials can perform the lawfully delegated duties of a vacant office. *See* GAO Bradbury Letter (concluding that the FVRA did not prohibit Mr. Bradbury from performing the duties of the vacant office of Assistant Attorney General for OLC while serving as Principal Deputy Assistant Attorney General).[7]

Courts too have endorsed this view, concluding that the FVRA does not preclude a non-acting officer from exercising lawfully delegated duties of a vacant PAS office. *See Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1336 (Fed. Cir. 2022); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009). This Court adopted similar logic in holding that the FVRA's remedial provisions do not prohibit ratification of an agency official's performance of lawfully delegated duties of a vacant office. *See Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022); *see also Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1073 (9th Cir. 2024).

---

[7] GAO has reiterated that understanding in subsequent decisions. *See* https://www.gao.gov/assets/880/874603.pdf (Assistant Attorney General for Office of Legal Policy, Department of Justice); https://www.gao.gov/assets/870/865197.pdf (Legal Adviser, Department of State); https://www.gao.gov/assets/870/869737.pdf (Under Secretary of Agriculture for Food, Nutrition, and Consumer Services, Department of Agriculture).

**B.** **The District Court Erred In Holding That The FVRA's Exclusivity Provision Prohibits Delegating Powers Shared By A Vacant Office To A Non-Acting Official**

The district court concluded that 5 U.S.C. § 3347, the provision that generally makes the FVRA the "exclusive means" to designate an "acting official," prohibits Ms. Habba from exercising the authority delegated to her by the Attorney General. Appx82. That was mistaken.

**1.** **The FVRA Does Not Limit the Exercise of Lawfully Delegated Powers**

a. The FVRA's text makes clear that § 3347(a)'s exclusivity provision does not apply to the exercise of lawfully delegated powers by non-acting officials. As detailed above, Congress created in the FVRA a mechanism through which certain classes of government officials may serve as "acting" officers. 5 U.S.C. § 3345(a); *see SW General*, 580 U.S. at 293. An official serving as an "acting" officer pursuant to the FVRA can exercise *all* "the functions and duties" of the vacant office, including any non-delegable powers that are specifically committed by statute exclusively to that office. 5 U.S.C. § 3345(a). Section 3347(a), in turn, provides that unless there is a recess appointment or another statute expressly authorizes the designation of an acting official for a particular office, the FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a PAS office. *Id.* § 3347(a); *see Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) (where there is an office-specific vacancy statute, the FVRA is no longer exclusive but remains

available, and "the President is permitted to elect between these two statutory alternatives"). Section 3347(a) thus makes clear that the FVRA is generally the exclusive means of designating an individual as an "acting official," who is empowered to perform all the functions and duties of the vacant office.

Nothing in § 3347(a)'s exclusivity provision purports to address the delegation of a vacant office's functions and duties to an official exercising those powers in a non-acting capacity. That flows from the plain language of § 3347(a), which provides that the FVRA is the "exclusive means for temporarily authorizing an *acting official* to perform the functions and duties" of a PAS office. 5 U.S.C. § 3347(a) (emphasis added). The critical term "acting official" is not surplusage. Instead, it makes clear that the FVRA concerns the means of designating an "acting official" to perform all the functions and duties of an office, not the means of delegating some or all the office's delegable duties to a non-acting official.

The distinction between an acting official and one exercising a vacant office's powers by delegation is significant. An acting official derives her authority from her designation pursuant to the FVRA and is authorized to perform all "the functions and duties of the office" for which she is acting. 5 U.S.C. § 3345(a). A non-acting official, by contrast, derives authority only to the extent another official has delegated powers to her. *See, e.g.*, 28 U.S.C. § 510. A non-acting official exercising delegated power thus faces two constraints not applicable to an acting official. First, a non-acting official can exercise only delegable powers—that is, the functions and duties that "a statute tasks

34

an officer with … yet permits him to subdelegate." *Kajmowicz*, 42 F.4th at 149. The non-acting official cannot exercise authority that is "'exclusive' to the office" and thus non-delegable. *Id.* Second, non-acting officials are subject to any limits the superior officer sees fit to place on the delegation and can exercise only those delegable powers that have actually been delegated to them. Neither constraint applies to acting officials under the FVRA, who may exercise *all* powers of the office.

b.    The surrounding FVRA provisions confirm that § 3347(a)'s exclusivity provision does not address the delegation of powers to non-acting officials. Start with § 3347(a)(1), which excepts from the FVRA's exclusivity provision a statute that "expressly authorizes" certain officials "to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," or that itself "designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1). That exception applies only to statutes that provide for the designation of an official to serve in an "acting capacity," demonstrating that the FVRA is concerned with which officials may serve as "acting" officials, not officials who merely exercise delegated duties.

That understanding is reinforced by § 3347(b). There, Congress provided that a statute giving "general authority to the head of an Executive agency … to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which" the exception in § 3347(a)(1) applies. *Id.* § 3347(b). That provision precludes using a

35

general delegation statute to make someone an acting official.  That makes sense, given that a general delegation statute cannot authorize the performance of an office's non-delegable functions and duties, which an acting official is authorized to perform and which a non-acting official is not.  The provision thus underscores that Congress drew a distinction in the FVRA between being an acting official authorized to perform all the functions and duties of an office and being a non-acting official delegated the power to perform only the delegable functions and duties of an office.

The FVRA's remedial provisions in § 3348 underscore that Congress distinguished between delegable and non-delegable duties.  That section provides that when a PAS office is vacant, and no one is filling the office on an acting basis under the FVRA, the office remains vacant and "only the head of [the] Executive agency may perform any function or duty of such office."  *Id.* § 3348(b).  An action taken by any other person "shall have no force or effect" and "may not be ratified."  *Id.* § 3348(d). Importantly, though, Congress narrowly defined "function or duty" for "this section" as limited to the functions and duties that are required by statute or regulation "to be performed by the applicable officer (*and only that officer*)."  *Id.* § 3348(a)(2)(A)(ii), (B)(i)(II) (emphasis added); *see also* 23 Op. O.L.C. at 72 ("Congress delimited which functions could be performed only by a qualified acting officer … defining them as only those functions or duties assigned exclusively to the … officer by statute or regulation.").

Section 3348 thus expressly differentiates between delegable and non-delegable powers and provides a remedy only for the unlawful exercise of non-delegable powers.[8]

Furthermore, since enacting the FVRA, Congress has expressly recognized that an official can exercise the functions of a vacant PAS office in a non-acting but temporary capacity. In 2009, Congress passed an appropriations rider that is still in effect and states: "[N]o part of any appropriation contained in this or any other Act may be used for the payment of services to any individual carrying out the responsibilities of any position requiring Senate advice and consent in an *acting or temporary capacity* after the second submission of a nomination for that individual to that position has been withdrawn or returned to the President." Pub. L. No. 111-8, Div. D, Title VII, § 749, 123 Stat. 524, 693 (2009) (emphasis added). This further underscores that Congress has acquiesced in the longstanding and widely accepted practice of subordinate officials exercising the delegable duties of a vacant PAS office in a non-acting capacity.

c. Every court of appeals to consider this and similar issues—including this Court—has agreed with this plain-text interpretation of the FVRA. In *Arthrex*, the Federal Circuit addressed the exact issue presented here and squarely held that § 3347's exclusivity provision does not bar the wholesale delegation of all of an office's delegable

---

[8] For examples of Executive Branch functions that Congress has expressly made non-delegable, *see*, *e.g.*, 10 U.S.C. § 2014(f); 5 U.S.C. § 9807(c)(1); 7 U.S.C. § 7996(e)(2)(C); 31 U.S.C. § 1344(d)(3); 41 U.S.C. § 3304(a)(7).

powers to a non-acting official. 35 F.4th at 1338. That case concerned a challenge to the denial of a rehearing request of an order invalidating a patent. The authority to decide such rehearing requests was vested in the Director of the U.S. Patent and Trademark Office, a PAS office. *See id.* at 1332; 35 U.S.C. § 3(a)(1). But because the offices of Director and Deputy Director were vacant, the rehearing decision was made by the Commissioner of Patents, who had been delegated the non-exclusive duties and functions of the Director under a standing order issued by a previous Director. *See Arthrex*, 35 F.4th at 1332. In holding that the Commissioner had authority to deny the rehearing request, the Federal Circuit explained that the FVRA "does not … restrict" the delegation and performance of a "PAS officer's delegable duties when he is absent.*" Id.* at 1339. The court rejected the argument that this interpretation would render § 3347(b) superfluous, explaining that § 3347(b) "merely provides that a statute granting the head of an agency 'general authority … to delegate [his] duties' does not exempt the agency from the FVRA." *Id.* at 1338. When "Congress grants an agency head general delegation authority but specifies that certain duties are non-delegable," the court explained, "§ 3347(b) makes clear that the FVRA still applies to those non-delegable duties." *Id.*

This Court expressly relied on *Arthrex* in resolving a similar FVRA objection in *Kajmowicz*. *See* 42 F.4th at 148 (citing *Arthrex*, 35 F.4th at 1336). *Kajmowicz* concerned a challenge to a rule that was originally issued by Matthew Whitaker in his role as Acting Attorney General (not pursuant to a delegation of authority), and that was later ratified

by Attorney General William Barr. The plaintiff challenged the validity of the rule on the ground that Mr. Whitaker's designation as Acting Attorney General conflicted with the FVRA. This Court rejected the challenge, reasoning that it did not need to resolve whether Mr. Whitaker's designation violated the FVRA because the issuance of the rule was a delegable function that could be subsequently ratified by the Attorney General under 5 U.S.C. § 3348(d). *Kajmowicz*, 42 F.4th at 148. In so holding, this Court agreed with the Federal Circuit's determination that the FVRA remedial provision's "language is unambiguous" and "applies only to the functions and duties that a [Presidentially appointed and Senate-confirmed] officer alone is permitted by statute … to perform." *Id.* (alterations in original) (quoting *Arthrex*, 35 F.4th at 1336).

Other courts of appeals have likewise concluded that the FVRA does not invalidate the exercise of the delegable functions and duties of a vacant office. *See Schaghticoke*, 587 F.3d at 135 (holding that the FVRA did not prohibit an inferior officer from performing a function of a PAS officer who had resigned because the agency's regulations permitted the PAS officer to delegate that function); *see also Gonzales*, 107 F.4th at 1073 (holding that the FVRA's ratification bar "applies only to those duties of an officer that are nondelegable"); *Stand Up for Cal.! v. U.S. Dep't of Interior*, 994 F.3d 616, 622 (D.C. Cir. 2021) (observing that the "FVRA forecloses the delegation of exclusive duties and authorities to a successor official after expiration of the statutorily authorized 210-day period of acting-capacity service"), *affirming* 298 F. Supp. 3d 136, 150 (D.D.C.

2018) (holding that the exercise of delegable duties of a vacant PAS office by the principal deputy after his acting service had expired did not violate the FVRA).

d.    In all events, the FVRA's exclusivity provision does not prohibit the delegation at issue here because the Attorney General did not solely delegate the powers of the office of the U.S. Attorney.  Rather, the Attorney General also delegated her own separate authority to prosecute crimes and supervise litigation in the District of New Jersey, which is independent of the U.S. Attorney's authority to do so.  As explained (at 28), Congress vested the Attorney General with the powers of all officers within DOJ, 28 U.S.C. § 509, including the U.S. Attorneys, *id.* § 515, and, separately, *directly* vested the Attorney General with authority to conduct and supervise all litigation on behalf of the United States, *id.* §§ 516-519.  At a bare minimum, there is no reason that the FVRA would prohibit the Attorney General from delegating her own powers merely because they overlap with the powers of a vacant office.

### 2.    The District Court's Contrary Conclusion Misreads the FVRA and Conflicts With Multiple Court of Appeals Decisions

The district court adopted a novel construction of the FVRA that departed from the precedent of this Court and other circuits and that was based on a series of mistaken conclusions about both the FVRA's scope and the nature of delegated authority.

First, the district court erred in dismissing this Court's decision in *Kajmowicz* on the ground that this Court addressed only the FVRA's remedial provision (§ 3348) and not its exclusivity provision (§ 3347).  Appx88-89.  As explained, the fact that the

FVRA's remedial provision does not apply to delegable functions and duties underscores why § 3347(a)'s exclusivity provision does not prohibit delegating those powers to an individual in a non-acting capacity. The district court never explained why Congress would enact a remedial scheme that provided no remedy for what the district court understood to be the unlawful exercise of delegable authority in violation of § 3347.[9]

Second, the district court contended that § 3347(a)'s use of the term "acting official" is "not a term of art" and refers to anyone "temporarily performing the duties" of a vacant office. Appx84-85. But as explained, that construction treats the statute as if Congress made the FVRA the "exclusive means for temporarily authorizing *[anyone]* to perform the functions and duties" of a vacant PAS office, as opposed to just an acting official who does so. Nor was the district court correct that the differences between an acting official and one merely performing the functions and duties of the office are merely a matter of "technical title[s]." Appx85. As discussed, only an acting official can perform all the duties of an office, including any non-delegable powers that are specifically committed by statute or regulation exclusively to that office. By contrast,

_____

[9] The district court erroneously stated that *Kajmowicz* and *Gonzales* undermined the government's position because if any delegable duties "may be performed lawfully as a result of delegation, then there is never any need to ratify any of those actions." Appx93 n.263. That is incorrect. Ratification was necessary in *Kajmowicz* and *Gonzales* because the actions at issue had been taken by acting PAS officials, not by subordinates who had been delegated the relevant duties. *See Kajmowicz*, 42 F.4th at 145; *Gonzales*, 107 F.4th at 1067. Moreover, once they were serving as the heads of the relevant agencies, there was no one who could delegate duties to them.

41

non-acting officials may perform only those duties of a vacant office that are delegated to them and only if the duties are delegable in the first instance.

Third, for much the same reason, the district court incorrectly relied on the exception to the FVRA's exclusivity provision for "acting capacity" statutes. 5 U.S.C. § 3347(a)(1); *see* Appx84-85. That exception applies only to statutes that authorize a person to temporarily perform *all* the powers of an office. It makes no difference that such statutes do not always use the term "acting" and are not always drafted "in the same way." Appx85-86. Congress need not use magic words to authorize an official to serve in an acting role. Whatever the precise language, "acting capacity" statutes under § 3347(a)(1) are those that authorize a person to temporarily perform even the non-delegable powers of an office. *Compare* 28 U.S.C. § 508(a) ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office…."), *with id.* § 508(b) ("When … neither the Attorney General nor the Deputy Attorney General is available to exercise the duties of the office of Attorney General, the Associate Attorney General shall act as Attorney General.").

Fourth, the district court similarly erred in suggesting that the government's interpretation would render § 3347(b) "surplusage." Appx86. The Federal Circuit and Ninth Circuit have rejected this argument, explaining that § 3347(b) has meaning because it prohibits the invocation of general delegation statutes to justify designating an individual as an acting officer who can perform the office's non-delegable powers.

*See Arthrex*, 35 F.4th at 1338 (§ 3347(b) "provides that a statute granting the head of an agency 'general authority … to delegate [his] duties' does not exempt the agency from the FVRA"); *Gonzales*, 107 F.4th at 1078 ("§ 3347(b) clarifies that general vesting-and-delegation statutes are not sufficient to authorize the department to choose the acting officer under the FVRA"). Indeed, § 3347(b) was adopted to address a "specific past practice" of "agencies evading the requirements for *designating* acting officers." *Gonzales*, 107 F.4th at 1078 n.7. Accordingly, if "Congress grants an agency head general delegation authority but specifies that certain duties are non-delegable, § 3347(b) makes clear that the FVRA still applies to those non-delegable duties." *Arthrex*, 35 F.4th at 1338.[10]

Fifth, the district court thought it significant that, as the district court saw it, Ms. Habba had been delegated "all of the powers of a United States Attorney" in her role as Special Attorney and First Assistant U.S. Attorney. Appx81. But even if there were *no* powers of the U.S. Attorney that are exclusive to the office and thus non-delegable—and the government is not aware of any—that would not support the districts court's reading of the statute. That fact would just mean that, for this office, the FVRA's exclusivity prohibition (which applies generally to offices throughout the Executive Branch) imposes only a minimal constraint—namely, that the temporary

---

[10] The Senate Report adopted the same interpretation, S. Rep. No. 105-250 at 17, and expressly recognized that "[d]elegable functions of the [vacant PAS] office could still be performed by other officers or employees," *id.* at 18. The district court's reliance (Appx83) on the legislative history was therefore incorrect.

substitute cannot use the title "Acting" and must formally be delegated the powers of the office by the agency head. As the Federal Circuit recognized in *Arthrex*, even if the FVRA's application to a particular office is limited, that "does not … justify departing from the plain language of the statute." 35 F.4th at 1337-38. Congress enacted the FVRA against the background principle that "[w]hen a statute delegates authority to a federal officer or agency, subdelegation … is presumptively permissible absent affirmative evidence of a contrary congressional intent." *Kajmowicz*, 42 F.4th at 149 (alteration in original) (quoting *Louisiana Forestry Ass'n Inc. v. Secretary U.S. Dep't of Labor*, 745 F.3d 653, 671 (3d Cir. 2014)); *see also Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 120-23 (1947). And Congress "chose [the FVRA's] limiting language … knowing full well that 'many [PAS officers] lack any meaningful statutory duties.'" *Arthrex*, 35 F.4th at 1337 (alteration in original) (quoting S. Rep. No. 105-250, at 18).[11]

Sixth, the district court conceded that its holding would end the common practice—blessed by all three branches of government, *see supra* Part II.A.2—of having

---

[11] Even if the office of U.S. Attorney currently has no exclusive functions, there still is a legal difference between the power of an Acting U.S. Attorney and one delegated the functions of a U.S. Attorney. The former official could exercise any exclusive functions of the office added by statute or regulation in the future, whereas the latter official could not. Moreover, an official delegated the functions of a U.S. Attorney may face litigation concerning the delegability of those functions, and some courts have suggested that there are restrictions on the power to delegate certain functions of a U.S. Attorney. *See United States v. Weyhrauch*, 544 F.3d 969, 974-75 (9th Cir. 2009) (certifications under 18 U.S.C. § 3731, ¶ 2); *cf. United States v. Mangan*, 575 F.2d 32, 39 (2d Cir. 1978) (applications under 26 U.S.C. § 6103(i)(1)(B), the current version of which includes U.S. Attorneys).

principal deputies or other individuals perform the delegable powers of a vacant PAS office in a non-acting capacity. As this Court and others have recognized, such a "broad reading" of the FVRA "would effectively cripple the operation of the federal government." *Kajmowicz*, 42 F.4th at 151. That is because "[t]he universe of delegable PAS-officer duties is expansive, potentially encompassing every Executive agency." *Arthrex*, 35 F.4th at 1337. The district court attempted to downplay the consequences that would follow from its holding by suggesting that agency actions could later be ratified by Senate-confirmed officers. Appx93-94. But that ignores the disruptive effect of courts entering prospective relief of the type that the district court granted here. Nor is the court's decision mitigated by its purported limitation to the delegation of "all" non-exclusive powers to "a single person," while reserving whether a "subset" of powers could be delegated or whether powers could be delegated among various individuals. Appx92 & n.257. It is not evident why that distinction would be material under the district court's reasoning. And if the statutory problem the district court identified could in fact be cured by having two officials, rather than one, jointly perform all the functions of a PAS office, that is a *reductio ad absurdum* of its ruling, not a defense of it.

Finally, the district court's opinion is fundamentally flawed because it is based on the mistaken premise that the Attorney General delegated only the U.S. Attorney's authority, rather than the Attorney General's own authority. As the First Circuit recognized when discussing delegations to AUSAs, an AUSA's "ability to act does not

45

hinge on the authority of the local United States Attorney, but derives from the Attorney General's plenary power over litigation to which the United States is a party, *see* [28 U.S.C.] § 516." *United States v. Hilario,* 218 F.3d 19, 22 (1st Cir. 2000). Congress vested the Attorney General with all the U.S. Attorney's authority, 28 U.S.C. §§ 509, 515, and, separately, also vested the Attorney General with authority to conduct and supervise litigation involving the United States, *id.* §§ 516-519. The district court did not even address the Attorney General's authority that is independent of the U.S. Attorney's authority.

C. **The District Court Erred In Holding That The Attorney General's Delegation Of Authority Conflicts With The Specific Statutes Governing The Office Of U.S. Attorney**

Wholly apart from the FVRA's exclusivity provision, the district court separately held that the delegation of authority here was invalid because it "raises direct conflicts" with the statutory provisions governing the appointment and powers of U.S. Attorneys. Appx96; *see* 28 U.S.C. § 541(a). The court reasoned that the purported conflict implicates "related canons of statutory interpretation," including the specific-governs-general canon, the anti-surplusage canon, and the harmonious-interpretation canon. Appx96-97. That reasoning was also mistaken.

As detailed above, Congress set forth by statute the powers and responsibilities of both the Attorney General and the U.S Attorneys. *See* 28 U.S.C ch. 31 (Attorney General); *id.* ch. 35 (U.S. Attorneys). As relevant here, Congress vested the Attorney General with authority to specially appoint various attorneys within DOJ, *id.* §§ 515(a),

46

533, 542, 543, and to delegate "any function of the Attorney General" to those attorneys, *id.* § 510. In addition, Congress authorized the Attorney General to "specifically direct[]" any "attorney specially appointed" to "conduct any kind of legal proceeding, civil or criminal, … which United States attorneys are authorized by law to conduct." *Id.* § 515(a). As for U.S. Attorneys, Congress provided that they shall be appointed by the President for four-year terms upon Senate confirmation, *id.* § 541, and shall, among other things, prosecute criminal offenses within their districts, *id.* § 546, while concurrently vesting those same powers in the Attorney General, *id.* §§ 509, 515.

The Attorney General's designation and delegation authority in no way conflicts with the statutory provisions governing the duties and powers of U.S Attorneys. Courts must construe statutes "in such a way as to give effect to both, if possible." *United States v. Bruno*, 897 F.2d 691, 695 (3d Cir. 1990). The statutes here work in harmony to ensure that DOJ can meet the diverse and complex litigation needs of the United States. Although Congress generally authorized U.S. Attorneys to supervise litigation and prosecute matters within their districts, it also conferred on the Attorney General that same authority, 28 U.S.C. §§ 509, 515, the authority to appoint and direct specially appointed attorneys to conduct litigation matters, *id.* § 515, and independent authority to conduct and supervise litigation, *id.* §§ 516-519. Likewise, although Congress required Senate confirmation before U.S Attorneys could be permanently endowed with all powers of their office, it also allowed the Attorney General to delegate the non-exclusive functions and duties of that office—and the functions and duties she

independently possesses—to other officials when the office is vacant. That understanding of the statutory scheme harmonizes the various statutes and gives full effect to all of them, rather than nullifying the Attorney General's delegation authority as applied to the functions and duties of U.S. Attorneys. Indeed, far from foreclosing the delegation at issue here, the interpretative cannons invoked by the district court cut decisively in favor of the Government's understanding of the statutory scheme.

In reaching a different conclusion, the district court committed the same fundamental error discussed above, reasoning that an official exercising the delegable powers of a U.S. Attorney is the same as, and exercises "all of the powers of," a Senate-confirmed U.S. Attorney. Appx96. But a Senate-confirmed U.S. Attorney exercises *all* powers of the office, including any that are (or will be) non-delegable. Non-acting officials, by contrast, may only exercise delegable powers and only if those powers are actually delegated to them. Moreover, the fact that a U.S. Attorney has been appointed by the President and has gone through the crucible of Senate confirmation gives that official a stamp of approval by a coordinate branch of government and a direct line of accountability to the President, which is a real, practical benefit to the President and DOJ. *Cf. Edmond v. United States*, 520 U.S. 651, 660 (1997) ("By requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one."). Because an officer exercising the delegable functions of the U.S. Attorney is not the same as a Senate-confirmed U.S. Attorney, there is no conflict

between the statutes governing the powers of U.S. Attorneys and the Attorney General

exercising her statutory authority to delegate powers, as she did here.

## CONCLUSION

For the foregoing reasons, the district court's disqualification orders should be

reversed.

Respectfully submitted,

PAMELA J. BONDI
  *Attorney General*

TODD BLANCHE
  *Deputy Attorney General*

HENRY C. WHITAKER
  *Counselor to the Attorney General*

ALINA HABBA
  *Acting U.S. Attorney*
  *Special Attorney*

MATTHEW R. GALEOTTI
  *Acting Assistant Attorney General*

*s/ Katherine Twomey Allen*

KATHERINE TWOMEY ALLEN
  *Criminal Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-1935*

MARK E. COYNE
  *Supervisory Assistant U.S. Attorney*
  *Chief, Appeals Division*
  *District of New Jersey*

September 2025

# COMBINED CERTIFICATIONS

1.    Government counsel are not required to be members of the bar of this Court.

2.    This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,782 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

3.    The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.    This document was scanned for viruses with the most recent version of Microsoft Defender Antivirus, which is continuously updated, and according to that program is free of viruses.


                                        *s/ Katherine Twomey Allen*
                                        Katherine Twomey Allen

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JULIEN GIRAUD, JR., JULIAN GIRAUD III, CESAR HUMBERTO PINA

Defendants-Appellees.

———————————

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:24-cr-768, 2:25-cr-436 (Brann, C.J. (M.D. Pa.))

———————————

## APPENDIX FOR APPELLANT
### Volume I, pp.1-110

———————————

PAMELA J. BONDI
  *Attorney General*

TODD BLANCHE
  *Deputy Attorney General*

HENRY C. WHITAKER
  *Counselor to the Attorney General*

ALINA HABBA
  *Acting U.S. Attorney*
  *Special Attorney*

MARK E. COYNE
  *Supervisory Assistant U.S. Attorney*
  *Chief, Appeals Division*
  *District of New Jersey*

MATTHEW R. GALEOTTI
  *Acting Assistant Attorney General*

KATHERINE TWOMEY ALLEN
  *Criminal Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-1935*

# TABLE OF CONTENTS

Volume I

Giraud Doc. 116    Memorandum Opinion (Aug. 1, 2025) ....................................Appx1

Giraud Doc. 144    Memorandum Opinion (Aug. 21, 2025)...............................Appx28

Giraud Doc. 145    Order (Aug. 21, 2025)........................................................... Appx105

Giraud Doc. 146    Notice of Appeal (Aug. 25, 2025)........................................ Appx107

Pina Doc. 69       Order (Aug. 21, 2025)........................................................... Appx108

Pina Doc. 70       Notice of Appeal (Aug. 25, 2025)........................................ Appx110


Volume II

Giraud Docket ........................................................................................... Appx111

Giraud Doc. 108    Government's Opposition to Motion to Dismiss the
                   Indictment or Bar the United States Attorney's Office
                   from Prosecuting This Case (July 29, 2025)........................ Appx128

Giraud Doc. 108-1  Exhibit A: Attorney General Order No. 6218-2025
                   (March 27, 2025) ..................................................... Appx157

Giraud Doc. 108-2  Exhibit B: Attorney General Order No. 6270-2025
                   (May 19, 2025) ........................................................ Appx158

Giraud Doc. 108-3  Exhibit C: Memorandum For Desiree Leigh Grace from
                   U.S. Department of Justice, Executive Office for United
                   States Attorneys (July 22, 2025) .............................. Appx159

Giraud Doc. 108-4  Exhibit D: Letter from Alina Habba to Attorney
                   General Bondi (July 24, 2025) ................................ Appx160

Giraud Doc. 108-5  Exhibit E: Letter to Alina Habba from U.S. Department
                   of Justice, Executive Office for United States Attorneys
                   (July 24, 2025) ........................................................ Appx161

Giraud Doc. 108-6   Exhibit F: Letter to Alina Habba from U.S. Department
                    of Justice, Executive Office for United States Attorneys
                    (July 24, 2025) ........................................................................ Appx163

Giraud Doc. 108-7   Exhibit G: Attorney General Order No. 6341-2025 (July
                    24, 2025); Memorandum for the Attorney General from
                    U.S. Department of Justice, Executive Office for United
                    States Attorneys (July 24, 2025); Memorandum for
                    Pamela Bondi Attorney General from U.S. Department
                    of Justice, Office of Legal Counsel (July 24, 2025)............ Appx165

Giraud Doc. 108-8   Exhibit H: Letter to Desiree Grace from U.S.
                    Department of Justice, Executive Office for United
                    States Attorneys (July 26, 2025) ............................................. Appx170

Giraud Doc. 108-9   Exhibit I: Email to Desiree Grace from Saurabh
                    Sharma, Special Assistant to the President, Office of
                    Presidential Personnel (July 26, 2025).................................. Appx171

Giraud Doc. 114     Government's Sur-Reply Further Opposing Motion to
                    Dismiss the Indictment or Bar the United States
                    Attorney's Office From Prosecuting This Case (July 30,
                    2025)......................................................................................... Appx172

Giraud Doc. 127     Government's Supplemental Brief Opposing Motion to
                    Bar Alina Habba from Supervising the Prosecution of
                    This Case (Aug. 12, 2025) ...................................................... Appx183

Giraud Doc. 127-1   Declaration of Valarie Mulcahy (Aug. 12, 2025) ............... Appx217

Giraud Doc. 127-2   Declaration of Sergio Gor (Aug. 11, 2025) ......................... Appx220

Giraud Doc. 141     August 15, 2025 Motion Hearing Transcript...................... Appx222

Giraud Doc. 142     Government's Post-Argument Brief Opposing Motion
                    to Bar Alina Habba from Supervising the Prosecution
                    of This Case (Aug. 18, 2025)................................................. Appx382

Pina Docket   ............................................................................................. Appx401

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:24-CR-00768 |
| v. | (Chief Judge Brann)[*] |
| JULIEN GIRAUD JR., and JULIEN GIRAUD III, | |
| Defendants. | |

## MEMORANDUM OPINION

### AUGUST 1, 2025

Julien Giraud Jr. and Julien Giraud III ("the Girauds"), defendants in this criminal case, moved to dismiss the indictment or in the alternative to bar Acting United States Attorney for the District of New Jersey Alina Habba—and any Assistant United States Attorney acting at her direction—from prosecuting their case. They contend that Ms. Habba was illegally appointed to the position of Acting United States Attorney in violation of the Federal Vacancy Reform Act,[1] 28 U.S.C. § 546(d), the Appointments Clause of the Constitution, and the Due Process Clause of the Constitution. The Girauds are not entitled to dismissal of their case, but, if they are correct on the merits, the injunctive relief they seek appears appropriate. Accordingly, the motion to dismiss is denied in part and deferred in part. The Court

---

[*] The Honorable Matthew W. Brann, Chief United States District Judge for the Middle District of Pennsylvania, sitting by designation.

[1] 5 U.S.C. § 3345.

will consider additional argument regarding the legality of Ms. Habba's appointment.

## I.    BACKGROUND

On November 21, 2024, a federal Grand Jury in the District of New Jersey returned a three-count indictment charging the Girauds with drug and firearm offenses.[2] That indictment was signed by then-United States Attorney for the District of New Jersey Philip R. Sellinger.[3] Mr. Sellinger was nominated for the United States Attorney role by former-President Joseph R. Biden, Jr. and confirmed to that position by the United States Senate by voice vote.[4]

The Girauds' case proceeded apace through the transition period between the administrations of former-President Biden and President Donald J. Trump and was scheduled for a jury trial to begin on Monday, August 4, 2025.[5] However, a parallel chain of events has raised questions about whether that prosecution can continue.

As is standard practice, Mr. Sellinger resigned from the United States Attorney position at the end of Mr. Biden's term to make way for the Trump Administration's nominee.[6] Upon Mr. Sellinger's resignation, First Assistant United

---

[2]    Doc. 54 (Indictment) (charging violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1)(A)(i).

[3]    *Id.* at 6.

[4]    Nomination of Philip R. Sellinger for Department of Justice, 117th Congress (2021-2022), PN1301, 117th Cong. (2021), https://www.congress.gov/nomination/117th-congress/1301.

[5]    Doc. 77 (Am. Scheduling Order).

[6]    Press Release, *U.S. Attorney Philip R. Sellinger Announces His Resignation*, U.S. Attorney's Office for the District of New Jersey (Dec. 23, 2024), https://www.justice.gov/usao-nj/pr/us-attorney-philip-r-sellinger-announces-his-resignation (announcing resignation to take effect "at 11:59 p.m., Jan. 8, 2025"); *see* Doc. 115 (Correction Letter).

Appx2

States Attorney Vikas Khanna became Acting United States Attorney pursuant to the Federal Vacancies Reform Act ("FVRA").[7] Mr. Khanna continued in the Acting role until March 3, 2025, when the Trump Administration appointed John Giordano to be Interim United States Attorney pursuant to 28 U.S.C. § 546(a)'s vacancy provisions.[8] Mr. Giordano held that role for approximately three weeks. On March 24, 2025, President Trump posted to his social media website, Truth Social, that "Alina Habba . . . will be our interim U.S. Attorney for the District of New Jersey . . . effective immediately," while Mr. Giordano "will now be nominated as the new Ambassador to Namibia."[9] The Government now represents that Ms. Habba's appointment was not "effective immediately." Instead, she was formally sworn in to the Interim position by Attorney General Pamela Bondi pursuant to section 546(a) on March 28, 2025.[10]

Interim appointments under section 546 are time limited. The statute provides that "[a] person appointed as United States attorney under this section may serve until the earlier of" the Senate's confirmation of the President's nominee to the full position, or "the expiration of 120 days after appointment by the Attorney General

---

[7]   *Id.*; *see* 5 U.S.C. § 3345(a)(1).
[8]   Press Release, *John Giordano Sworn In As 64th U.S. Attorney For District Of New Jersey*, U.S. Attorney's Office for the District of New Jersey (March 5, 2025), https://www.justice.gov/usao-nj/pr/john-giordano-sworn-64th-us-attorney-district-new-jersey (announcing that Mr. Giordano was sworn in on March 3, 2025).
[9]   Donald J. Trump (@realDonaldTrump), Truth Social (March 24, 2025, 10:37 AM), https://truthsocial.com/@realDonaldTrump/posts/114217913229258108.
[10]  Doc. 108-1 (Order of Appointment).

Appx3

under this section."[11] For Ms. Habba, that meant that her term ended, at the latest, on Saturday, July 26, 2025.[12]

On June 30, 2025, with about one month remaining in her interim appointment, President Trump formally nominated Ms. Habba to be the United States Attorney.[13] But the Senate did not act, and the 120-day deadline grew nearer.

On July 22, 2025—120 days from March 24, 2025, when President Trump posted that Ms. Habba had been appointed "effective immediately"—the Judges of the United States District Court for the District of New Jersey invoked their statutory power to appoint a United States Attorney upon the expiration of an Interim United States Attorney's 120-day term pursuant to section 546(d).[14] The court issued a Standing Order appointing Desiree Grace (Ms. Habba's First Assistant) as the United States Attorney and, acknowledging the uncertainty regarding the commencement date of Ms. Habba's term as Interim United States Attorney (Ms. Bondi's Order appointing Ms. Habba does not appear to have been a matter of public record before this litigation), made that appointment effective "July 22, 2025 or 'upon the expiration of 120 days after appointment by the Attorney General' of the

---

[11] 28 U.S.C. § 546(c).
[12] *See* Doc. 108-2 (Order Extending Appointment) (listing final date of 7/25/25).
[13] Nomination of Alina Habba for Department of Justice, 119th Congress (2025-2026), PN379-12, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/379/12.
[14] 28 U.S.C. § 546(d).

Appx4

Interim U.S. Attorney Alina Habba, whichever is later."[15] Trump Administration officials were not pleased with that appointment.

Before the court issued its Standing Order, Deputy Attorney General Todd Blanche accused "[t]he district court judges in NJ [of] trying to force out [Ms. Habba] before her term expires at 11:59 p.m. Friday."[16] And after the Order was docketed, Ms. Bondi posted that "politically minded judges refused to allow [Habba] to continue in her position, replacing Alina with the First Assistant."[17] To counter those judges, Ms. Bondi stated that "the First Assistant United States Attorney in New Jersey"—Ms. Grace—"has just been removed."[18] Mr. Blanche affirmed Ms. Bondi's announcement and added that Ms. Grace's removal was "[p]ursuant to the President's authority."[19] It does appear that Ms. Grace was terminated from her position with the Department of Justice on July 22, 2025.[20] But that termination does not purport to come from President Trump, as Mr. Blanche suggested.[21]

Notwithstanding her termination from the Department of Justice, the next day, July 23, 2025, Ms. Grace posted that she intended to "follow that Order [of the

---

[15] *In re Appointment of United States Attorney for the District of New Jersey*, Standing Order 2025-03 (D.N.J. July 22, 2025).

[16] Todd Blanche (@DAGToddBlanche), X (July 22, 2025, 2:02 PM), https://x.com/DAGToddBlanche/status/1947718932908982301.

[17] Pam Bondi (@AGPamBondi), X (July 22, 2025, 5:18 PM), https://x.com/AGPamBondi/status/1947768353025556950.

[18] *Id.*

[19] Todd Blanche (@DAGToddBlanche), X (July 22, 2025, 5:19 PM), https://x.com/DAGToddBlanche/status/1947768601454514308.

[20] Doc. 108-3 (Termination Letter).

[21] *Id.*

District of New Jersey] and begin to serve in accordance with the law."[22] But Ms. Grace did not take a position on when her appointment was effective.

Trump Administration officials, knowing that Ms. Habba's term did not end until midnight on Friday, July 25, 2025, conceived a multi-step maneuver to keep her in the United States Attorney role. On July 24, 2025, the Administration made five moves. First, Ms. Habba's nomination to be the United States Attorney was withdrawn.[23] Second, Ms. Habba resigned from her position as Interim United States Attorney.[24] Third, Ms. Bondi appointed Ms. Habba as a "Special Attorney to the Attorney General" pursuant to 28 U.S.C. § 515 and "authorized [her] to conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct."[25] Fourth, Ms. Bondi appointed Ms. Habba to the (vacant due to Ms. Grace's termination) position of First Assistant United States Attorney.[26] And fifth, Ms. Habba was automatically elevated to the position of Acting United States Attorney pursuant to the FVRA by virtue of her new role as First Assistant United States Attorney and the vacancy in the United

---

[22] Desiree Grace, LinkedIn (July 23, 2025), https://www.linkedin.com/posts/desiree-grace-78288115_it-has-been-the-honor-of-a-lifetime-to-represent-activity-7353908927010328576-ksOH?utm_source=li_share&utm_content=feedcontent&utm_medium=g_dt_web&utm_campaign=copy.

[23] Nomination of Alina Habba for Department of Justice, 119th Congress (2025-2026), PN379-12, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/379/12 (the exact order of these events is not entirely clear).

[24] Doc. 108-4 (Resignation Letter).

[25] Docs. 108-5 & 108-6 (Appointment Letter).

[26] Doc. 108-7 (Appointment Letter).

Appx6

States Attorney position that followed from her resignation—presumably moments earlier—from the Interim United States Attorney position.[27] Ms. Habba confirmed her view of the events that evening, posting "I am now the Acting United States Attorney for the District of New Jersey."[28]

Ms. Grace remained a loose end, given her express intent to accept her appointment by the District Court, so the Administration's last act was to nip that in the bud. On Saturday, July 26, 2025—the date when Ms. Grace's appointment would have become effective under sections 546(c) and (d)—Administration officials sent a letter and email to Ms. Grace informing her that her appointment had never become effective because Habba's term as Interim U.S. Attorney did not "expire" (she instead resigned and then became the Acting U.S. Attorney) and, just in case, stating that "the President of the United States has removed you from that office today, pursuant to his authority under 28 U.S.C. § 541(c) and Article II of the U.S. Constitution."[29]

Mr. Giraud Jr. filed his motion to dismiss the next day, Sunday, July 27, 2025, arguing that Ms. Habba's appointment to the Acting United States Attorney

---

[27] *See* Doc. 108 (Opp'n) at 6, 8 (citing 5 U.S.C. § 3345(a)(1)).

[28] Alina    Habba    (@USAttyHabba),    X    (July    24,    2025,    5:04    PM), https://x.com/USAttyHabba/status/1948489536507707793.

[29] Doc. 108-8 (Letter to Desiree Grace); *see* Doc. 108-9 (Email to Desiree Grace) (stating at 12:02 a.m. on Saturday, July 26, 2025, that "the President of the United States hereby removes you from office pursuant to his authority under 28 U.S.C. 541(c) and Article II of the Constitution.").

Appx7

position was illegal,[30] and Mr. Giraud III moved to join in that motion on Monday, July 28, 2025.[31]

On Monday morning, July 28, 2025, the Honorable Edward S. Kiel, who was then presiding in this case, converted a previously scheduled motions hearing into a status conference and advised the parties that the trial and other pretrial proceedings would be stayed pending resolution of the motion to dismiss.[32] Shortly thereafter, the Honorable Michael A. Chagares, Chief Judge of the United States Court of Appeals for the Third Circuit, designated me for service in the District of New Jersey pursuant to 28 U.S.C. § 292(b) and reassigned this matter "and all related cases" to me.[33]

I ordered the Government to respond to the Girauds' motion by noon on Tuesday, July 29, 2025, and, after its brief was submitted, I held a joint status conference that afternoon to discuss the process for resolving the pending motion.[34] Following the conference, I ordered both sides to submit briefs on the "threshold" question of whether the Girauds were entitled to any relief assuming Ms. Habba's appointment was illegal.[35] Those briefs have since been submitted.[36]

---

[30]  Doc. 99.
[31]  Doc. 101 (Mot. for Joinder).
[32]  Doc. 102 (Minute Entry).
[33]  Doc. 103 (Designation Order).
[34]  Doc. 110 (Minute Entry).
[35]  Doc. 111 (Briefing Order).
[36]  Doc. 113 (Giraud Threshold Brief); Doc. 114 (Gov't Threshold Brief).

Appx8

The threshold question is now ripe for resolution; for the reasons that follow, the motion is DENIED IN PART and DEFERRED IN PART.

## II.    DISCUSSION

"[P]rinciples of constitutional avoidance and judicial restraint guide [the Court] not to consider" thorny constitutional or statutory questions when their resolution would not affect the relief available to the movant.[37] These values control "no matter how novel, significant, or interesting" the underlying question may be.[38] Applying them, courts considering FVRA and Appointments Clause challenges to the conduct of Government actors have avoided passing on the legality of the appointment when the result of that inquiry would not offer the movant any relief.[39]

Considering this precedent, I bifurcated briefing to determine whether the Girauds presented a valid case to reach the merits question of whether Ms. Habba's appointment was legal. I find this approach useful for two reasons. First, if no remedy is available, the Court can make that determination quickly and provide clarifying guidance for the District of New Jersey about how to manage cases in a similar posture to this one. Second, if a remedy is possible, the Court can refocus on the merits of Ms. Habba's appointment in a subsequent opinion after the benefit of

---

[37]    *Kajmowicz v. Whitaker*, 42 F.4th 138, 153 (3d Cir. 2022).

[38]    *Id.* at 154.

[39]    *Id.* at 147-50, 153; *United States v. Tafoya*, 541 F. Supp. 2d 1181, 1184 (D.N.M. 2008) ("It follows that the appointment of a United States Attorney for the District of New Mexico under 28 U.S.C. § 546(d) has no bearing on the relief that Defendant seeks in this case, and there is no need for the Court to address the merits of Defendant's constitutional claims under the circumstances presented here.").

Appx9

more extensive briefing and without the distraction of extraneous justiciability matters.

The Girauds argue that they should have remedies by contending that the remedies available are coextensive with the constitutional violations affecting them. The Government briefly addresses the premise, arguing that Assistant United States Attorneys ("AUSAs") may conduct a prosecution under the authority of the Attorney General even without a validly appointed United States Attorney. However, much of the Government's argument focuses on a merits contention: no remedy is available *because*, under their theories, Ms. Habba is acting and may continue to act lawfully. To the extent the parties' arguments rely on the resolution of the merits issues, I do not decide them as beyond the scope of the question presented for this briefing.

I resolve the threshold question by considering the viability of the types of relief the Girauds have requested. I begin with dismissal of the indictment, which I conclude is not available, and then turn to injunctions against Ms. Habba and anyone acting under her authority, which I conclude would be appropriate if the Girauds prevail on the merits.

### A.    Dismissal of the Indictment

The Girauds maintain that the proper remedy for Ms. Habba's appointment, if illegal, is dismissal of the indictment.[40] But that argument is unmoored from any

---

[40]    Doc. 113 at 2, 3, 9-10.

clear legal hook. The Girauds fail to identify any defect with the issuance of the indictment or any reason why Ms. Habba's appointment at this stage in the prosecution should require its dismissal. So dismissal is not an available remedy.

To start, the Court agrees with the Government that the indictment remains facially valid. In this case, a grand jury—"an investigative body 'acting independently of either prosecuting attorney or judge'"[41]—investigated the Girauds and determined that there was probable cause to believe that they had committed the crimes with which they are charged.[42] The indictment the grand jury returned was signed by "an attorney for the government"[43] whose authority no one disputes: Mr. Sellinger. That is generally enough to preclude dismissal: "[i]t is well-established that an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits."[44] The Girauds do not describe any defect in the "structural protections of the grand jury . . . [so severe] as to render the proceedings fundamentally unfair, allowing the presumption of prejudice,"[45] nor any issue that would raise a "grave doubt" that "the violation substantially influenced the grand jury's decision to indict."[46]

---

[41] *United States v. Williams*, 504 U.S. 36, 49 (1992) (quoting *United States v. Dionisio*, 410 U.S. 1, 16 (1973)) (emphasis omitted).

[42] *Williams*, 504 U.S. at 48; *Ex parte United States*, 287 U.S. 241, 249-50 (1932); *see Kaley v. United States*, 571 U.S. 320, 328 (2014).

[43] Fed. R. Crim. P. 7(c)(1).

[44] *United States v. Huet*, 665 F.3d 588, 594-95 (3d Cir. 2012) (quoting *United States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007)) (cleaned up).

[45] *United States v. Gussie*, 51 F.4th 535, 539 (3d Cir. 2022) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988)).

[46] *Id.* (quoting *Nova Scotia*, 487 U.S. at 256).

Appx11

That the Girauds cannot marshal an argument to dismiss the indictment under these familiar principles is unsurprising. The only relevant dispute they have with their prosecution is Ms. Habba's appointment as Acting United States Attorney on July 24, 2025, months after they were indicted. It escapes logic to contend that that appointment somehow retroactively taints the indictment, or any aspect of the prosecution that preceded it; indeed, courts generally should not rely on "postindictment [constitutional] violations" as a basis for questioning the indictment.[47] Without a viable argument that Ms. Habba's appointment infects the grand jury issued indictment, there is no clear basis to dismiss it.

This conclusion accords with those of other courts to consider appointment-based challenges to indictments that were issued by an independent and properly constituted grand jury. Several courts have addressed the instant situation in which a defendant's indictment was signed by a Government attorney acting under a Senate-confirmed Attorney General and a Senate-confirmed United States Attorney, and all have concluded that a subsequent illegitimate appointment of a United States Attorney would not require dismissal of the indictment.[48] Courts have also

---

[47] *Nova Scotia*, 487 U.S. at 258-59.

[48] *Tafoya*, 541 F. Supp. 2d at 1183-84 (noting that operative superseding indictment was returned before challenged appointment and was not signed by appointee, and holding that "[u]nder these circumstances, questions about the constitutionality of the appointment of a United States Attorney 'would not affect the validity of indictments'"); *United States v. Baldwin*, 541 F. Supp. 2d 1184, 1214 (D.N.M. 2008) ("Baldwin offers no explanation why the Court should dismiss a validly obtained indictment, filed during the tenure of a duly-appointed United States Attorney and signed by an Assistant United States Attorney, if the Court defectively appoints a subsequent United States Attorney.").

Appx12

concluded that an indictment signed by an unquestioned United States Attorney and AUSA need not be dismissed due to an appointment issue with the Attorney General,[49] and have ruled similarly even when the United States Attorney's appointment was in question at the time of the indictment.[50]

Moreover, the bases for a Court to dismiss a prosecution for postindictment events are limited. A court may exercise its inherent supervisory authority to dismiss an indictment "if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy [is] available to address the prejudice."[51] But that test is a poor fit for the Girauds' complaint. The *Wright* test is inherently backwards looking and is designed to remedy prejudice that has already occurred. But here, thanks to the diligence of the Girauds' counsel, there has been no opportunity for the Government to engage in the misconduct that they fear, nor have

---

[49] *United States v. Brooks*, 841 F. App'x 346, 349 (3d Cir. 2020); *United States v. Valencia*, No. 5:17-CR-0882, 2018 WL 6182755, at *7 (W.D. Tex. Nov. 27, 2018) (finding legitimacy of Acting Attorney General's appointment irrelevant to the validity of an indictment); *United States v. Peters*, No. 6:17-CR-0055, 2018 WL 6313534, at *6-7 (E.D. Ky. Dec. 3, 2018) (reasoning that a defendant must show that the illegitimately appointed individual had an "influence or role" in the grand jury proceeding for dismissal under *Nova Scotia*); *United States v. Santos-Caporal*, No. 1:18-CR-0171, 2019 WL 468795, at *7 (E.D. Mo. Jan. 9, 2019) (following *Valencia* based on similar facts except indictment was returned under Acting Attorney General's term).

[50] *United States v. Ruiz Rijo*, 87 F. Supp. 2d 69, 71 (D.P.R. 2000) ("The Court does not believe the constitutionality of [United States. Attorney] Gil's appointment controls the validity of an indictment."); *United States v. Cardarella*, No. 07-CR-0007, 2007 WL 1545849, at *4 (W.D. Mo. May 29, 2007); *see United States v. Gantt*, 194 F.3d 987, 998 (9th Cir. 1999) *overruled in part on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc) ("The constitutionality of § 546(d) would not affect the validity of indictments, by contrast, as indictments need only be signed by an 'attorney for the government.'").

[51] *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019) (citing *Nova Scotia*, 487 U.S. at 254-56).

Appx13

they suffered any prejudice yet. Moreover, to the extent that any remedy should be afforded under the *Wright* test at this time, it is not dismissal. As stated, the validity of the Girauds' prosecution up to this point is unquestioned. By raising their complaint of misconduct at the moment it began, the Court is well-positioned to provide a far narrower remedy to address any imminent prejudice: preventing it from happening.

Similarly, postindictment constitutional violations can result in dismissal, but only when the constitutional violation results in some prejudice to the defendant and "no lesser remedial action is available."[52] So even in the constitutional context, dismissal of the indictment is a "drastic remedy," and the "general rule [is that] remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[53] This is true even for some of the most egregious violations of constitutional rights, for which prejudice must be assumed.[54] For example, a *Batson* violation can be remedied in the moment by "discharg[ing] the venire and select[ing] a new jury from a panel not previously associated with the case . . . or . . . disallow[ing] the discriminatory challenge[s] and resum[ing] selection with the improperly challenged jurors

---

[52] *United States v. Struckman*, 611 F.3d 560, 575 (9th Cir. 2010) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991)).

[53] *United States v. Morrison*, 449 U.S. 361, 364, 365 n.2 (1981).

[54] *United States v. Hasting*, 461 U.S. 499, 508 n.6 (1983) (citing authority that admission of a coerced confession and violations of the right to counsel or to an impartial judge can never be harmless).

Appx14

reinstated on the venire."[55] And even after a trial and conviction that were tainted by such a violation, the remedy is a new trial, not outright dismissal.[56] Similarly, a violation of a defendant's Sixth Amendment right to counsel does not require dismissal, and instead courts should "suppress the evidence [obtained in violation of the right] or . . . order a new trial if the evidence has been wrongfully admitted and the defendant convicted."[57] And "retrial is normally the most severe sanction available for a *Brady* violation."[58] In sum, "in all jurisdictions, dismissal with prejudice is in practice a rare sanction for any constitutional violation."[59]

To be sure, dismissal of the indictment for a postindictment constitutional violation is *possible*, but the standard is incredibly high. That "harsh sanction" should only be granted when both the level of prejudice to the movant and the need for deterring the Government's misconduct weigh heavily in that direction.[60] Here, dismissal is not necessary for any constitutional violation that may flow from Ms. Habba's appointment because the prejudice to the Girauds has not occurred. Instead, the properly tailored remedy is to purge the harm of that violation by excising

---

[55] *Batson v. Kentucky*, 476 U.S. 79, 99 n.24 (1986).

[56] *See Riley v. Taylor*, 277 F.3d 261, 293-94 (3d Cir. 2001) (remanding case for new trial upon finding that there may have been a *Batson* violation); *Simmons v. Beyer*, 44 F.3d 1160, 1171 (3d Cir. 1995) ("The usual remedy for a *Batson* violation is to grant a petition for habeas corpus, but allow the state an opportunity to retry the petitioner before a properly selected jury."); *cf. Johnson v. Rankins*, 104 F.4th 194, 198-99 (10th Cir. 2024) (holding that *Batson* reconstruction hearing should be held when possible before granting new trial).

[57] *Morrison*, 449 U.S. at 364-65.

[58] *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 255 (3d Cir. 2005).

[59] *Id.* at 254.

[60] *Id.* at 253-54; *see id.* at 254 ("[A] court fashioning a remedy for a *Brady* violation should take into account the particular character and consequences of the government's actions.").

proceedings infected by it or preventing them from happening. As noted, the indictment itself is not affected, and dismissal is therefore not the proper remedy.

Finally, the Girauds' reliance on *United States v. Trump* as a basis for dismissal is misplaced.[61] The Honorable Aileen Cannon, writing for the United States District Court for the Southern District of Florida, determined that the defendant's success on his argument that Special Counsel Jack Smith was unconstitutionally appointed in violation of the Appointments Clause required dismissal of the indictment.[62] But that conclusion did not follow as a matter of course from the fact of the constitutional violation. Instead, Judge Cannon explained that the "proper remedy [for an Appointments Clause violation] is invalidation of the *ultra vires* action."[63] In other words, she tailored the remedy "to the injury suffered from the constitutional violation."[64] Judge Cannon then went on to review the "actions of Special Counsel Smith in connection with this proceeding" to "set [them aside]."[65] Mr. Smith's involvement in the case had been essentially ubiquitous, and critically "includ[ed] his seeking of the Superseding Indictment on which [the] proceeding" hinged.[66] In contrast, Ms. Habba had nothing to do with the Girauds' indictment. Nor has she engaged in their prosecution during the period in

---

[61]    Doc. 113 at 2-3 (citing *United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024)).
[62]    *Trump*, 740 F. Supp. 3d at 1302.
[63]    *Id.* (citing *Collins v. Yellen*, 594 U.S. 220, 258 (2021)).
[64]    *Morrison*, 449 U.S. at 364.
[65]    *Trump*, 740 F. Supp. 3d at 1303.
[66]    *Id.*

**Appx16**

which her authority is questioned[67] except for the submission of a reply brief, a short motion in limine, and the instant briefing.[68] So, at this stage, there has been essentially no "*ultra vires* action" to "invalidate."[69]

In sum, where an indictment was returned by a validly composed grand jury and signed by a properly appointed United States Attorney, the illegal or unconstitutional appointment of a subsequent United States Attorney does not necessarily require dismissal of the charges. And when the defendant objects to that appointment before the questioned United States Attorney has substantially participated in his prosecution, dismissal is not the proper remedy. Accordingly, the Giraulds' request to dismiss the indictment is denied.

## B.    Enjoining Ms. Habba from Participation

The Giraulds argue in the alternative that Ms. Habba should be enjoined from prosecuting their case, and that any AUSAs acting under her supervision be similarly barred.[70] As discussed in the previous section, the Court generally agrees that this remedy would be the appropriate response to the constitutional and statutory violations the Giraulds claim. This relief raises two questions: (1) can the Court bar Ms. Habba from participating in the Giraulds' prosecution, and (2) does a bar on Ms. Habba's participation extend to AUSAs?

---

[67] The Giraulds do not argue that Ms. Habba's term as Interim United States Attorney was illegitimate.
[68] Docs. 97 & 98.
[69] *Trump*, 740 F. Supp. 3d at 1302.
[70] Doc. 99 at 2; Doc. 113 at 2.

**Appx17**

### 1.    Barring Ms. Habba

As to the first question, I conclude that the answer is yes. The Girauds argue that Ms. Habba was illegally appointed to serve as Acting United States Attorney in violation of the Appointments Clause of the Constitution and several statutes. They also raise a general separation of powers challenge to her authority.[71] The Supreme Court has advised that these types of claims go to "the Constitution's structural integrity" and affect the interests of "not . . . any one branch of Government but of the entire Republic."[72] Accordingly, the Court has stated that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred."[73] There is no reason to limit the permissive approach to Appointments Clause claims and remedies where a defendant challenges the appointment of the party bringing criminal charges against him, as opposed to the party adjudicating the case.[74] The same "structural" interests are at stake, because the allegation is that one branch has attempted to "aggrandiz[e] its power at the expense of another branch" and thereby "diffus[e] the appointment power."[75]

---

[71] Doc. 99 at 4.

[72] *Freytag v. C.I.R.*, 501 U.S. 868, 878, 880 (1991).

[73] *Ryder v. United States*, 515 U.S. 177, 182-83 (1995).

[74] *See Trump*, 740 F. Supp. 3d at 1302 (quoting *Ryder* and omitting "who adjudicates his case"); *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 297, 299 (2017) (permitting FVRA challenge to appointment of NLRB's acting general counsel, who had "'final authority' to issue complaints alleging unfair labor practices").

[75] *Freytag*, 501 U.S. at 878 (citing *Mistretta v. United States*, 488 U.S. 361, 382 (1989)).

Appx18

Accepting that Giraud may bring his challenge to Ms. Habba's appointment, his requested remedy is also appropriate. When an appointment violates the Appointments Clause from the jump, the actor has "exercise[d] power that [she] did not lawfully possess."[76] Such ultra vires conduct is generally remediated by declaring it "void."[77] This remedy should also obtain in a prospective case, so long as the threat of illegally exercised power employed against the movant is "actual or imminent, not conjectural or hypothetical."[78] In such a case, if the appointment is illegal or unconstitutional, the Court can prospectively invalidate any illegal exercise of power by enjoining the appointee from acting in that office.

Here, the threat that Ms. Habba will exercise the powers of the office of the United States Attorney in Mr. Giraud's case "is certainly impending or there is [at least] a substantial risk that the harm will occur."[79] It is apparent from the Government's briefing that Ms. Habba intends to supervise the Girauds' prosecution

---

[76] *Collins*, 594 U.S. at 258.

[77] *See Collins*, 594 U.S. at 257-58 (collecting such cases but distinguishing them from the case at hand which involved a valid appointment but an unconstitutional removal provision); *see Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 251-52 (2018) (holding that remedy for hearing conducted by improperly appointed officer was entirely new hearing "'before a properly appointed' official" (quoting *Ryder*, 515 U.S. at 183)). Similar remedies are available for FVRA violations. *SW Gen., Inc.*, 580 U.S. at 298, 309 (affirming Court of Appeals's decision to invalidate enforcement order resulting from unfair labor practices complaint issued by individual appointed in violation of FVRA); *see Seago v. O'Malley*, 91 F.4th 386, 389-90 (5th Cir. 2024) (citing *Lucia* when discussing potential remedy for FVRA violation).

[78] *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[79] *Clemens*, 48 F.4th at 152 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (internal quotations omitted).

Appx19

and otherwise act as the United States Attorney.[80] Indeed, Ms. Habba's name has appeared on the signature block of each of the Government's briefs in this case bearing the title "Acting United States Attorney."[81] Assuming that Ms. Habba is legally barred from holding that office, as I am for the purposes of this opinion, such involvement would be illegal and subject to invalidation under the Appointments Clause or statute.[82]

The Government's argument to the contrary puts the cart before the horse. It argues that no remedy is available to the Girauds by simply rejecting the premise— which I ordered them to assume—that Ms. Habba has been illegally appointed,[83] instead contending that she is legally exercising the powers of the United States Attorney through a delegation of the Attorney General's power to conduct and supervise "all litigation to which the United States . . . is a party"[84] as a "Special Attorney" or in her role as the First Assistant United States Attorney.[85] But that is explicitly a merits argument: the Girauds are only entitled to no remedy if the Court finds that Ms. Habba's appointment as a Special Attorney is valid or that Ms. Bondi can delegate a First Assistant a level of authority commensurate with the United

---

[80]   Doc. 108 at 14, 24-25; Doc. 114 at 1-2, 4, 7.
[81]   Doc. 108 at 28; Doc. 114 at 10.
[82]   *See Collins*, 594 U.S. at 257-60.
[83]   Doc. 111 at 3 (ordering briefing on "the threshold issue of whether any relief is available to the Girauds *even assuming that Ms. Habba's appointment is illegal*.").
[84]   28 U.S.C. § 519.
[85]   Doc. 114 at 4 (citing 28 U.S.C. §§ 510, 515, 518, 542).

**Appx20**

States Attorney's. Because it violates my Order, I do not consider the argument at this stage.

The Court declines to take the issue up at this time for the additional reason that it lacks adversarial development. The Girauds have not yet given serious response to the "Special Attorney" issue because it was not clear that Ms. Habba had been so appointed at the time of their initial motion (filed just days after the appointment occurred), and in their supplemental brief they correctly limited their lead arguments to what remedies might be possible assuming that the appointment was not permitted at all. The Government's position has extreme implications that it openly embraces: by using the Special Attorney designation and delegation, Ms. Habba may exercise all of the powers of the United States Attorney without being subject to *any of the statutory limitations on that office*.[86] Whether the Attorney General may statutorily or constitutionally delegate all of the powers of a specific office created by separate statute and constrained by its own statutory limitations in order to evade those limitations is a completely novel question, and one that inherently implicates the Appointments Clause and thus the merits of the Girauds' motion. I defer resolving it until it has been fully briefed.

---

[86] *See* Doc. 114 at 1 ("[N]one of those grants of authority depends on whether Ms. Habba may serve as the Acting United States Attorney, because they all flow directly from the Attorney General's own authority to conduct and supervise the work of the U.S. Attorney's Office, wholly apart from whether there is any United States Attorney *at all*.") (emphasis in original).

**Appx21**

The Government offers no other argument that Ms. Habba may personally participate in the Girauds' prosecution assuming that she was illegally appointed. Accordingly, the legality of Ms. Habba's appointment is squarely presented.[87] The Court will order additional briefing to develop the arguments on that issue.

### 2.    Barring AUSAs

Finally, the Girauds request that AUSAs "acting under [Ms. Habba's] purported authority" also be enjoined from prosecuting them.[88] They base that contention on the argument that "[t]he AUSAs are acting *in her name*, and the legitimacy of their authority is tethered to hers."[89] The Government responds that the AUSAs "derive their power to prosecute directly from the Attorney General" and can therefore continue to prosecute cases.[90]

The Court generally agrees with the Government that AUSAs' power fundamentally stems from the Attorney General. In several cases in which the validity of a United States Attorney's appointment was challenged, courts have upheld AUSAs' continued prosecution of the case pursuant to the Attorney General's delegation of authority.[91] But the Attorney General is not the sole fount of

---

[87]  *See Baldwin*, 541 F. Supp. 2d at 1188 (reaching the merits of the constitutional issues because "Baldwin's requested remedy . . . is that the Court require the Department of Justice to have the Attorney General personally direct his case, or to have an Assistant Attorney General for the Criminal Division sign all pleadings and have assistants directly accountable to him prosecute this case" as opposed to the challenged United States Attorney).

[88]  Doc. 99 at 2; Doc. 113 at 2.

[89]  Doc. 113 at 5.

[90]  Doc. 108 at 25-26.

[91]  *Tafoya*, 541 F. Supp. 2d at 1184; *Baldwin*, 541 F. Supp. 2d at 1196; *see United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000); *Gantt*, 194 F.3d at 998 ("An infirmity in the United States

22

**Appx22**

AUSAs' power. An AUSA's authority can stem exclusively from the local United States Attorney, even when the Attorney General's appointment is questionable.[92] Based on these lines of case law and the Attorney General's and United States Attorney's complementary statutory authority to oversee litigation in their respective jurisdictions,[93] the Court concludes that whether an AUSA is acting under the authority of the Attorney General or the United States Attorney is a fact-based question.[94] If the facts should show that an AUSA is operating at the express

---

Attorney's appointment would not generally affect the jurisdiction of this court so long as a proper representative of the government participated in the action."); *cf. United States v. Suescun*, 237 F.3d 1284, 1287 (11th Cir. 2001) (in dicta stating "[a]n appointment of a United States Attorney that is not made as provided by the Appointments Clause does not affect the Government's power to prosecute.").

[92] *Brooks*, 841 F. App'x at 349 ("Brooks was prosecuted by the United States Attorney for the District of the Virgin Islands who was independently empowered by statute to prosecute cases and duly appointed by a district court."); *United States v. Castillo*, 772 F. App'x 11, 15 (3d Cir. 2019) ("[T]he legality of Whitaker's service as Acting Attorney General has no bearing on the validity of criminal prosecutions or sentences."); *United States v. Patara*, 365 F. Supp. 3d 1085, 1092 (S.D. Cal. 2019) ("[T]he United States Attorney has statutory authorization, independent of any authorization by the office of the Attorney General, to conduct prosecutions."); *United States v. Peters*, No. 6:17-CR-0055, 2018 WL 6313534, at *6-7 (E.D. Ky. Dec. 3, 2018); *Valencia*, 2018 WL 6182755, at *7 (reasoning that prosecution of defendants "by the United States Attorney for the Western District of Texas 'within his district' under 28 U.S.C. § 547" may continue notwithstanding questions about Attorney General's appointment); *cf.* U.S. Attorney's Manual, Dep't of Justice § 3-2.210 ("Assistant United States Attorneys are responsible to the United States Attorney for the performance of duties assigned by that official.") (replaced by Justice Manual, Dep't of Justice in 2018).

[93] 28 U.S.C. §§ 519, 547; *see* Justice Manual, Dep't of Justice § 9-2.001 ("The United States Attorney, within his/her district, has plenary authority with regard to federal criminal matters. This authority is exercised under the supervision and direction of the Attorney General and his/her delegates. *The statutory duty to prosecute for all offenses against the United States (28 U.S.C. § 547) carries with it the authority necessary to perform this duty*. The USA is invested by statute and delegation from the Attorney General with the broadest discretion in the exercise of such authority.") (emphasis added); *Thomas v. I.N.S.*, 35 F.3d 1332, 1339 (9th Cir. 1994) ("Congress expressly assigned overlapping authority to both the Attorney General and to United States Attorneys . . . . A United States Attorney in Denver does indeed exercise authority without the need for delegation from the Attorney General.").

[94] *See Valencia*, 2018 WL 6182755, at *7 (considering "Acting Attorney General Whitaker's 'indirect involvement with this case'"); *Peters*, 2018 WL 6313534, at *7 (considering fact of

**Appx23**

direction of an official who is improperly appointed, the Court can validly bar them from doing so: "if the United States Attorney's appointment is invalid, then her delegation is similarly invalid."[95]

Here, as stated, there is ample reason to believe that Ms. Habba will continue directing litigation in the District of New Jersey. And given that possibility, the Court cannot foreclose the potential need to bar AUSAs from prosecuting cases under her authority, if it is illegal.

To be clear, the Court is not suggesting that it might impose the "officewide disqualification" the Government fears. Instead, the Court agrees that a valid remedy for the violations the Girauds' assert, if I find that they occurred, may be to bar AUSAs from engaging in prosecutions when they do so under Ms. Habba's authority.[96] That kind of targeted disqualification based on the scope of a conflict or violation and requiring individualized fact finding about the chain of command in

---

"utterly no influence by or role of Whitaker in the prosecution"); *Castillo*, 772 F. App'x at 14; *see also United States v. Easton*, 937 F.2d 160, 161 (5th Cir. 1991) (discussing District Court's decision not to disqualify entire United States Attorney's Office by virtue of United States Attorney's conflict "[b]ased on affidavits submitted by the government which indicated that [United States Attorney] had not meaningfully participated in the criminal prosecution against [Defendant].").

[95]   *Gantt*, 194 F.3d at 998.

[96]   *See United States v. Williams*, 68 F.4th 564, 571 (9th Cir. 2023) (acknowledging that courts may disqualify prosecutors when their participation would be "a violation of . . . the Constitution, a federal statute, or a procedural rule." (quoting *United States v. Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992)). The Court also notes that if Ms. Habba is enjoined from prosecuting the Girauds, so long as she follows that Order, no AUSAs would need to be disqualified.

Appx24

each instance stops well short of officewide disqualification.[97] The Court sees no reason why AUSAs acting directly under the delegated authority of Ms. Bondi, or possibly another Department of Justice official with sufficient authority to extend Ms. Bondi's powers to AUSAs in New Jersey, would need to be disqualified.[98] Moreover, so long as it is clear that they are acting under Ms. Bondi's—and not Ms. Habba's—authority (essentially a temporary recusal until this matter is resolved), there would appear to be no issue with all of District of New Jersey's AUSAs moving prosecutions forward now.

Again, the Court does not decide at this time whether Ms. Bondi's delegation of the entirety of the United States Attorney's authority to Ms. Habba as a Special Attorney or as First Assistant is valid. That answer to that question is far less clear than whether Ms. Bondi may delegate authority to AUSAs to prosecute specific offenses. AUSAs are directly appointed by the Attorney General without any input from the Senate,[99] and "their ability to act . . . derives from the Attorney General's

---

[97] *See United States v. Bolden*, 353 F.3d 870, 880 (10th Cir. 2003) ("[T]he district court must make attorney-specific factual findings and legal conclusions before disqualifying attorneys from the USA's office."); *cf. United States v. Vlahos*, 33 F.3d 758, 762-63 (7th Cir. 1994) (reversing officewide disqualification because some attorneys in office did not have conflict of interest that justified disqualification of others); *United States v. Lorenzo*, 995 F.2d 1448, 1452-53 (9th Cir. 1993) (rejecting officewide disqualification because AUSA who prosecuted case was not involved in conflict).

[98] *See Hilario*, 218 F.3d at 22. The Court offers no opinion as to which Department of Justice officials may be validly able to wield Ms. Bondi's delegated authority to direct prosecutions in New Jersey, but "Senate-confirmed officials in main justice" seems like a good start. Doc. 108 at 26; *see* 28 U.S.C. § 506.

[99] 28 U.S.C. § 542.

plenary power over litigation to which the United States is a party."[100] United States Attorneys, on the other hand, are appointed by the President,[101] confirmed by the Senate,[102] are removable only by the President,[103] and have an independent source of statutory authority.[104] Temporary appointees to the office are subject to statutory time limits.[105] Whether it is statutorily or constitutionally permissible for the Attorney General to delegate all of the statutory powers of a United States Attorney to a Special Attorney or the First Assistant, without any of the statutory limitations on United States Attorneys, is not immediately apparent to the Court, and should be addressed in the briefing on the merits issues.

To summarize, I conclude that the Girauds are entitled to injunctive relief precluding Ms. Habba from participating in their prosecution if they are correct that she was appointed in violation of statute or the Constitution. And that injunctive relief should extend to AUSAs purporting to operate pursuant to Ms. Habba's authority. Because relief will be available to them if they are correct, the Court should reach the merits of the Girauds' claims. I defer that decision pending further briefing and oral argument.

---

[100] *Hilario*, 218 F.3d at 22 (citing 28 U.S.C. § 516).
[101] 28 U.S.C. § 541(a).
[102] *Id.*
[103] *Id.* § 541(c).
[104] *Id.* § 547.
[105] 28 U.S.C. § 546(c)(2) (120 days for interim appointees); 5 U.S.C. § 3346(a)(1) (210 days for acting appointees, subject to specific extensions).

Appx26

## III.    CONCLUSION

For the above-stated reasons, the Girauds' motion to dismiss the indictment or in the alternative to enjoin Ms. Habba and AUSAs operating under her authority from participating in their prosecution is denied in part and deferred in part.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge for
the Middle District of Pennsylvania
Specially Presiding

**Appx27**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:24-CR-00768 |
| v. | (Chief Judge Brann)[*] |
| JULIEN GIRAUD JR., and<br>JULIEN GIRAUD III, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | No. 2:25-CR-00436 |
| v. | (Chief Judge Brann)[*] |
| CESAR HUMBERTO PINA, | |
| Defendant. | |

## MEMORANDUM OPINION

### AUGUST 21, 2025

The Executive branch has perpetuated Alina Habba's appointment to act as the United States Attorney for the District of New Jersey through a novel series of legal and personnel moves. Along the way, it has disagreed with the Judges of the United States District Court for the District of New Jersey and criminal defendants in that District about who should or may lead the office. Faced with the question of whether Ms. Habba is lawfully performing the functions and duties of the office of the United States Attorney for the District of New Jersey, I conclude that she is not.

---

[*] The Honorable Matthew W. Brann, Chief United States District Judge for the Middle District of Pennsylvania, sitting by designation.

The pending motions challenge the legality of Alina Habba's appointment to serve as Acting United States Attorney for the District of New Jersey. They also raise questions about the viability of actions that she took while purporting to be serving as the Interim United States Attorney. After reviewing several issues of first impression, the Court concludes that Ms. Habba has exercised the functions and duties of the office of the United States Attorney for the District of New Jersey without lawful authority since July 1, 2025. Her actions since that point may be declared void, including her approval of the indictment of Defendant Cesar Humberto Pina, although that fact does not require its dismissal. And because she is not currently qualified to exercise the functions and duties of the office in an acting capacity, she must be disqualified from participating in any ongoing cases, including Mr. Pina's and those of Defendants Julien Giraud Jr. and Julien Giraud III ("the Girauds"). Accordingly, for the following reasons, the Girauds' remaining relief is granted, and Mr. Pina's motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The following factual background is largely duplicated from the Court's prior Memorandum Opinion in this matter, given that few of the facts are disputed and all parties have adopted that recitation.[1] I have added additional citation where

---

[1]    *United States v. Giraud*, No. 1:24-CR-0768, 2025 WL 2196794, at *1-3 (D.N.J. Aug. 1, 2025).

Appx29

development of the record has resolved factual disputes, and I include discussion of events that have become relevant or occurred since the prior Opinion.

On November 21, 2024, a federal Grand Jury in the District of New Jersey returned a three-count indictment charging the Girauds with drug and firearm offenses.[2] That indictment was signed by then-United States Attorney for the District of New Jersey Philip R. Sellinger.[3] Mr. Sellinger was nominated for the United States Attorney role by former-President Joseph R. Biden, Jr. and confirmed to that position by the United States Senate by voice vote.[4]

As is standard practice, Mr. Sellinger resigned from the United States Attorney position at the end of Mr. Biden's term to make way for the Trump Administration's nominee.[5] Upon Mr. Sellinger's resignation, First Assistant United States Attorney Vikas Khanna became Acting United States Attorney pursuant to the Federal Vacancies Reform Act ("FVRA").[6] Mr. Khanna continued in the Acting role until March 3, 2025, when the Trump Administration appointed John Giordano as Interim United States Attorney pursuant to 28 U.S.C. § 546(a)'s vacancy

---

[2]  Doc. 54 (Indictment) (charging violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1)(A)(i)). Unless otherwise indicated, citations to the Docket refer to that of the *Giraud* matter.

[3]  *Id.* at 6.

[4]  Nomination of Philip R. Sellinger for Department of Justice, 117th Congress (2021-2022), PN1301, 117th Cong. (2021), https://www.congress.gov/nomination/117th-congress/1301.

[5]  Press Release, *U.S. Attorney Philip R. Sellinger Announces His Resignation*, U.S. Attorney's Office for the District of New Jersey (Dec. 23, 2024), https://www.justice.gov/usao-nj/pr/us-attorney-philip-r-sellinger-announces-his-resignation (announcing resignation to take effect "at 11:59 p.m., Jan. 8, 2025"); *see* Doc. 115 (Correction Letter).

[6]  *Id.*; *see* 5 U.S.C. § 3345(a)(1).

provisions.[7] Mr. Giordano held that role for approximately three weeks. On March 24, 2025, President Trump posted to his social media website, Truth Social, that "Alina Habba . . . will be our interim U.S. Attorney for the District of New Jersey . . . effective immediately," while Mr. Giordano "will now be nominated as the new Ambassador to Namibia."[8] Ms. Habba was formally sworn in to the Interim United States Attorney position by Attorney General Pamela Bondi pursuant to section 546(a) on March 28, 2025.[9] Although the defendants contend that Ms. Habba's appointment should be considered effective on the date of President Trump's post, it is now clear that she did not assume the role of Interim United States Attorney until she was sworn in on March 28.[10]

Interim appointments under section 546 are time limited. The statute provides that "[a] person appointed as United States attorney under this section may serve until the earlier of" the Senate's confirmation of the President's nominee to the full

---

[7]   Press Release, *John Giordano Sworn In As 64th U.S. Attorney For District Of New Jersey*, U.S. Attorney's Office for the District of New Jersey (March 5, 2025), https://www.justice.gov/usao-nj/pr/john-giordano-sworn-64th-us-attorney-district-new-jersey (announcing that Mr. Giordano was sworn in on March 3, 2025).

[8]   Donald J. Trump (@realDonaldTrump), Truth Social (March 24, 2025, 10:37 AM), https://truthsocial.com/@realDonaldTrump/posts/114217913229258108.

[9]   Doc. 108-1 (Order of Appointment).

[10]  Doc. 141 (Hrg. Tr.) at 9:19-10:6 (affirming that Mr. Giordano continued signing filings as Interim United States Attorney until March 28); *id.* at 21:7-18 (stating that Ms. Habba's salary became effective on March 29); *see, e.g.*, Information, *United States v. Shoultz*, No. 25-cr-0165 (D.N.J. Mar. 24, 2025), Doc. 56 (signed by Mr. Giordano); Information, *United States v. Ramirez-Sanchez*, No. 25-cr-0179 (D.N.J. Mar. 25, 2025), Doc. 23 (signed by Mr. Giordano); Information, *United States v. Morales-Martinez*, No. 25-cr-0170 (D.N.J. Mar. 26, 2025), Doc. 9 (signed by Mr. Giordano); Indictment, *United States v. Pena Peralta*, No. 25-cr-0181 (D.N.J. Mar. 27, 2025), Doc. 39 (signed by Mr. Giordano).

position, or "the expiration of 120 days after appointment by the Attorney General under this section."[11] For Ms. Habba, that meant that her term ended, at the latest, on Saturday, July 26, 2025.[12]

On June 30, 2025, with about one month remaining in her interim appointment as the Government saw it, President Trump formally nominated Ms. Habba to be the United States Attorney.[13] But the Senate did not act, and July 26 grew nearer.

A week after Ms. Habba was nominated to be the United States Attorney, on July 7, 2025, she signed Mr. Pina's indictment, charging him with six counts including charges for wire fraud, money laundering, and bribery.[14]

On July 22, 2025—120 days from March 24, 2025, when President Trump posted that Ms. Habba had been appointed "effective immediately"—the Judges of the United States District Court for the District of New Jersey invoked their statutory power to appoint a United States Attorney upon the expiration of an Interim United States Attorney's 120-day term pursuant to section 546(d).[15] The Court issued a Standing Order appointing Desiree Grace (Ms. Habba's First Assistant) as the United States Attorney and, acknowledging the uncertainty regarding the commencement date of Ms. Habba's term as Interim United States Attorney (Ms.

---

[11]    28 U.S.C. § 546(c).

[12]    *See* Doc. 108-2 (Order Extending Appointment) (listing final date of 7/25/25).

[13]    Nomination of Alina Habba for Department of Justice, 119th Congress (2025-2026), PN379-12, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/379/12.

[14]    *Pina* Doc. 44 (Indictment) at 20.

[15]    28 U.S.C. § 546(d).

Bondi's Order appointing Ms. Habba does not appear to have been a matter of public record before this litigation), made that appointment effective "July 22, 2025 or 'upon the expiration of 120 days after appointment by the Attorney General' of the Interim U.S. Attorney Alina Habba, whichever is later."[16] Trump Administration officials were not pleased with that appointment.

Before the court issued its Standing Order, Deputy Attorney General Todd Blanche accused "[t]he district court judges in NJ [of] trying to force out [Ms. Habba] before her term expires at 11:59 p.m. Friday."[17] And after the Order was docketed, Ms. Bondi posted that "politically minded judges refused to allow [Ms. Habba] to continue in her position, replacing Alina with the First Assistant."[18] To counter those judges, Ms. Bondi stated that "the First Assistant United States Attorney in New Jersey"—Ms. Grace—"has just been removed."[19] Mr. Blanche affirmed Ms. Bondi's announcement and added that Ms. Grace's removal was "[p]ursuant to the President's authority."[20] It does appear that Ms. Grace was terminated from her position with the Department of Justice on July 22, 2025.[21] But

---

[16] *In re Appointment of United States Attorney for the District of New Jersey*, Standing Order 2025-03 (D.N.J. July 22, 2025).

[17] Todd Blanche (@DAGToddBlanche), X (July 22, 2025, 2:02 PM), https://x.com/DAGToddBlanche/status/1947718932908982301.

[18] Pam Bondi (@AGPamBondi), X (July 22, 2025, 5:18 PM), https://x.com/AGPamBondi/status/1947768353025556950.

[19] *Id.*

[20] Todd Blanche (@DAGToddBlanche), X (July 22, 2025, 5:19 PM), https://x.com/DAGToddBlanche/status/1947768601454514308.

[21] Doc. 108-3 (Termination Letter).

6

that termination does not purport to come from President Trump, as Mr. Blanche suggested.[22]

Notwithstanding her termination from the Department of Justice, the next day, July 23, 2025, Ms. Grace posted that she intended to "follow that Order [of the District of New Jersey] and begin to serve in accordance with the law."[23] But Ms. Grace did not take a position on when her appointment was effective.

Trump Administration officials, believing that Ms. Habba's term did not end until midnight on Friday, July 25, 2025, conceived a multi-step maneuver to keep her in the United States Attorney role. On July 24, 2025, the Administration made five moves. First, Ms. Habba's nomination to be the United States Attorney was withdrawn.[24] Second, Ms. Habba resigned from her position as Interim United States

---

[22]   *Id.*

[23]   Desiree Grace, LinkedIn (July 23, 2025), https://www.linkedin.com/posts/desiree-grace-78288115_it-has-been-the-honor-of-a-lifetime-to-represent-activity-7353908927010328576-ksOH?utm_source=li_share&utm_content=feedcontent&utm_medium=g_dt_web&utm_campaign=copy.

[24]   Nomination of Alina Habba for Department of Justice, 119th Congress (2025-2026), PN379-12, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/379/12. The Government asserts that the withdrawal of Ms. Habba's nomination preceded her resignation as Interim United States Attorney because it is noted on the Senate record for July 24, and the Senate adjourned for the day at 3:02 p.m. Indeed, it does appear that the message of withdrawal was transmitted before the Senate adjourned. 171 Cong. Rec. S4697 (daily ed. July 24, 2025) (noting during morning business that the Senate received "a message from the President of the United States submitting a withdrawal which was referred to the appropriate committee. (The message received today is printed at the end of the Senate proceedings.)"); *id.* at S4756 (lone withdrawal stating "Executive Message transmitted by the President to the Senate on July 24, 2025 withdrawing from further Senate consideration the following nomination: Alina Habba, of New Jersey, to be United States Attorney for the District of New Jersey. . . ." and noting adjournment at 3:02 p.m.).

Appx34

Attorney.[25] Third, Ms. Bondi appointed Ms. Habba as a "Special Attorney to the Attorney General" pursuant to 28 U.S.C. §§ 509, 510, and 515 and "authorized [her] to conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct."[26] Fourth, Ms. Bondi appointed Ms. Habba to the (vacant due to Ms. Grace's termination) position of First Assistant United States Attorney.[27] And fifth, according to the Government, Ms. Habba was automatically elevated to the position of Acting United States Attorney pursuant to the FVRA by virtue of her new role as First Assistant United States Attorney and the vacancy in the United States Attorney position that followed from her resignation—presumably moments earlier—from the Interim United States Attorney position.[28] Ms. Habba confirmed her view of the events that evening, posting "I am now the Acting United States Attorney for the District of New Jersey."[29]

Ms. Grace remained a loose end, given her express intent to accept her appointment by the District Court, so the Administration's last act was to nip that in the bud. On Saturday, July 26, 2025—the date when Ms. Grace's appointment would

---

[25]  Doc. 108-4 (Resignation Letter).
[26]  Docs. 108-5 & 108-6 (Appointment Letter), 108-7 (Appointment Order).
[27]  Doc. 108-7.
[28]  *See* Doc. 108 (Opp'n) at 6, 8 (citing 5 U.S.C. § 3345(a)(1)). Whether this actually triggers a "vacancy" under the FVRA is a disputed question of law.
[29]  Alina    Habba    (@USAttyHabba),    X    (July    24,    2025,    5:04    PM), https://x.com/USAttyHabba/status/1948489536507707793.

Appx35

have become effective under sections 546(c) and (d)—Administration officials sent a letter and email to Ms. Grace informing her that her appointment had never become effective because Habba's term as Interim United States Attorney did not "expire" (she instead resigned and then became the Acting United States Attorney) and, just in case, stating that "the President of the United States has removed you from that office today, pursuant to his authority under 28 U.S.C. § 541(c) and Article II of the U.S. Constitution."[30] The Government includes an affidavit from Sergio Gor, Assistant to the President and Director of the Office of Presidential Personnel, which attests that the termination email invoking the President's authority was sent "at [Mr. Gor's] direction to implement the President's decision to remove Ms. Grace in connection with the President's determination that Alina Habba should serve as Acting United States Attorney and continue leading the U.S. Attorney's office for the District of New Jersey."[31] At oral argument on August 15, 2025, the Government stated "that Mr. Gor did personally interact with the President on that and received that direction from the President."[32] In the absence of any countervailing evidence, the Court accepts this representation.

Mr. Giraud Jr. filed his motion to dismiss the next day, Sunday, July 27, 2025, arguing that Ms. Habba's appointment to the Acting United States Attorney position

---

[30] Doc. 108-8 (Letter to Desiree Grace); *see* Doc. 108-9 (Email to Desiree Grace).
[31] Doc. 127-2 (Decl. of Sergio Gor) ¶ 5.
[32] Doc. 141 at 22:11-19.

Appx36

was illegal,[33] and Mr. Giraud III moved to join in that motion on Monday, July 28, 2025.[34]

On Monday morning, July 28, 2025, the Honorable Edward S. Kiel, who was then presiding in the Giraud case, converted a previously scheduled motions hearing into a status conference and advised the parties that the trial and other pretrial proceedings would be stayed pending resolution of the motion to dismiss.[35] Shortly thereafter, the Honorable Michael A. Chagares, Chief Judge of the United States Court of Appeals for the Third Circuit, designated me for service in the District of New Jersey pursuant to 28 U.S.C. § 292(b) and reassigned this matter "and all related cases" to me.[36]

The following day, I held a status conference with counsel at which I explained that I would consider the issues in this matter in two stages.[37] First, I ordered briefing on the "threshold" issue of "whether the Girauds were entitled to any relief assuming Ms. Habba's appointment was illegal."[38] The parties briefed that issue, and I determined that the Girauds were not entitled to dismissal of their indictment, but that their request to disqualify Ms. Habba from participating in their prosecution raised a viable basis for relief.[39] Accordingly, I ordered further briefing

---

[33] Doc. 99 (Giraud Mot.).
[34] Doc. 101 (Mot. for Joinder).
[35] Doc. 102 (Minute Entry).
[36] Doc. 103 (Designation Order).
[37] Doc. 110 (Minute Entry – July 29, 2025).
[38] *Giraud*, 2025 WL 2196794, at *3.
[39] *See generally id.*

on the "merits" issue of whether Ms. Habba was unlawfully appointed, and set a date for oral argument on the matter.[40] I also permitted the submission of *amicus* briefs, four of which were submitted.[41] Finally, I granted *amicus curiae* the Association of Criminal Defense Lawyers of New Jersey's ("ACDL-NJ") motion to participate in oral argument.[42]

On Monday, August 11, 2025, Mr. Pina filed his motion to dismiss the indictment raising arguments that substantially overlapped with the Girauds'.[43] The Pina matter was reassigned to me the next day pursuant to an Order of the Honorable Madeline Cox Arleo.[44] I held a joint status conference on August 13, 2025, in both the Giraud and Pina matters, at which all participants agreed to combine the motions for a single oral argument.[45]

On August 15, 2025, following briefing, the Court held oral argument on the motions in both cases. At the close of oral argument, the parties agreed that optional supplemental briefing was appropriate, and I set a briefing deadline for Monday,

---

[40] Doc. 117 (Order).
[41] *Id.*; Docs. 129 (Lawyers for the Rule of Law Amicus Mot.), 135 (Bipartisan Current and Former Members of Congress Amicus Mot.), 136 (Association of Criminal Defense Lawyers of New Jersey Amicus Brief), 138 (Former Republican Members of Congress Mot.). No party has opposed any of the motions to file an *amicus* brief, and all are therefore granted.
[42] Doc. 126 (Order).
[43] *Pina* Doc. 52 (Mot. to Dismiss).
[44] *Pina* Doc. 57 (Order).
[45] *See* Doc. 133 (Order); *Pina* Doc. 60 (Order).

August 18.[46] Those briefs have been submitted, and the motions are now ripe for review.

For the reasons that follow, the Giraud's' motion to disqualify Ms. Habba from participating in their prosecution is granted, and Mr. Pina's motion to dismiss the indictment and disqualify Ms. Habba is denied in part and granted in part.

## II.    LEGAL BACKROUND

Familiarity with the applicable constitutional and statutory provisions and relevant standard of review is necessary to understand the intricate analyses that follow. I therefore detail (1) the constitutional provisions in issue, (2) the applicable statutes, and (3) the principles of statutory interpretation.

### A.    The Appointments Clause

"The 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power, because 'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism.'"[47] Responding to that problem, the Framers devised the Appointments Clause.[48] The Clause provides that:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United states, whose appointments are not herein

---

[46]   Doc. 139 (Order).
[47]   *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (citing G. Wood, *The Creation of The American Republic 1776–1787*, 79, 143 (1969)).
[48]   U.S. Const. art. II, § 2, cl. 2.

otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.[49]

Through the Appointments Clause, the Constitution divides the power of appointments between the legislative and executive branches through the "default" rule of Presidential nomination and Senatorial consent (offices subject to this rule are often called "PAS" offices).[50] That rule combines the benefits of vesting the selection of officers in a single person[51] with the "check upon a spirit of favoritism in the President" that "cooperation of the Senate" offers.[52] Thus, "[t]he Senate's advice and consent power is a critical 'structural safeguard of the constitutional scheme,'"[53] protecting against unilateral appointment by the President of "candidates who ha[ve] no other merit than that . . . of being in some way or other personally allied to him, or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."[54]

Of course, in a complex government there will be many officials to appoint and "[t]he constitutional process of Presidential appointment and Senate confirmation . . . can take time."[55] Anticipating this issue, the Framers added the

---

[49] *Id.*

[50] *Edmond v. United States*, 520 U.S. 651, 659-60 (1997).

[51] *See* The Federalist No. 76, at 405 (Alexander Hamilton) (Sweet Water Press ed., 2017) (discussing problems with selection of officials by an assembly).

[52] *Id.* at 406-07.

[53] *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (quoting *Edmond*, 520 U.S. at 659).

[54] The Federalist No. 76, at 407.

[55] *SW Gen.*, 580 U.S. at 293.

Appx40

"Excepting Clause" for "administrative convenience," permitting Congress to either retain its advice and consent role for inferior officers or allow their direct appointment by either the President, a Department Head, or the courts.[56] Additionally, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval."[57] This framework is designed to carefully balance the separation of powers and prevent "one branch's aggrandizing its power at the expense of another branch"[58] while at the same time ensuring that the work of Government gets done.

The Constitution's structural provisions, including the Appointments Clause, are "designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty."[59] And "when questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch 'to say what the law is.'"[60] In such cases, courts "do[] not defer to the other branches' resolution of such controversies . . . [r]ather, policing the 'enduring structure' of constitutional government when the political branches fail to do so is 'one of the most vital

---

[56] *Edmond*, 520 U.S. at 660; *United States v. Arthrex*, 594 U.S. 1, 12 (2021).
[57] *SW Gen.*, 580 U.S. at 294.
[58] *Freytag*, 501 U.S. at 878, 882.
[59] *SW Gen.*, 580 U.S. at 317 (Thomas, J., concurring) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 571 (2014) (Scalia, J., concurring in judgment)).
[60] *Noel Canning*, 573 U.S. at 571 (Scalia, J., concurring in judgment) (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)).

14

functions of th[e] [Judiciary].'"[61] The same principles must apply when interpreting statutory provisions allocating authority between the branches pursuant to these constitutional provisions.[62] Congress is expected to speak clearly when it rebalances the separation of powers,[63] and courts should be chary of Executive branch interpretations of structural enactments that result in greater arrogation of power to the President.[64] That watchfulness is heightened where, as here, there is a long history of "interbranch conflict" over the allocation of authority in question, throughout which the Executive has repeatedly taken an expansive view of

---

[61] *Id.* at 571-72 (Scalia, J., concurring in judgment) (citing *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring) and quoting *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J. concurring in judgment)).

[62] *Cf. SW Gen.*, 580 U.S. at 317 (Thomas, J., concurring) ("That the Senate voluntarily relinquished its advice-and-consent power in the FVRA does not make this end-run around the Appointments Clause constitutional.").

[63] *West Virginia v. EPA*, 597 U.S. 697, 740-42 (2022) (Gorsuch, J., concurring) (describing importance of clear-statement rule in case about "self-government, equality, fair notice, federalism, and the separation of powers"); *see Myers v. United States*, 272 U.S. 52, 116 (1926) ("[T]he reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires.").

[64] *See FCC v. Consumers' Rsch.*, 606 U.S. __, 145 S. Ct. 2482, 2538-39 (2025) (Gorsuch, J., dissenting); *Gundy v. United States*, 588 U.S. 128, 168-69 (2019) (Gorsuch, J., dissenting) (warning that "abdication" of judicial enforcement of the separation of powers risks "accelerat[ing] the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties."); *United States v. Midwest Oil Co.*, 236 U.S. 459, 511 (1915) ("The grant of authority to the Executive, as to other departments of the government, ought not to be amplified by judicial decisions."); *cf. United States v. Texas*, 599 U.S. 670, 735 (2023) (Alito, J., dissenting) ("This sweeping Executive Power endorsed by today's decision may at first be warmly received by champions of a strong Presidential power, but if Presidents can expand their powers as far as they can manage in a test of strength with Congress, presumably Congress can cut executive power as much as it can manage by wielding the formidable weapons at its disposal. That is not what the Constitution envisions.").

Congressional cessions of power, and Congress has consistently acted to refute these "threat[s] to the Senate's advice and consent power."[65]

## B.    Statutory Provisions

For United States Attorneys, Congress has preserved the constitutional default rule of Presidential appointment and Senate confirmation.[66] United States Attorneys are appointed for four-year terms, and always remain "subject to removal by the President."[67]

But when a United States Attorney's office is vacant, Congress has provided several alternative options to ensure that the functions of that office are carried out. Most directly, 28 U.S.C. § 546 provides the Attorney General with the power to temporarily "appoint a United States attorney for the district in which the office of United States attorney is vacant."[68] The Attorney General may not appoint "a person whose appointment by the President to that office the Senate has refused to give advice and consent,"[69] and "[a] person appointed as United States attorney under this section may serve until the earlier of" the Senate's confirmation of a Presidential appointee for the office, or "the expiration of 120 days after appointment by the Attorney General under this section."[70] If the 120-day limit expires, "the district

---

[65]   *SW Gen.*, 580 U.S. at 294-95.
[66]   28 U.S.C. § 541(a).
[67]   *Id.* §§ 541(b), (c).
[68]   28 U.S.C. § 546(a).
[69]   *Id.* § 546(b).
[70]   *Id.* §§ 546(c)(1), (2).

court for such district may appoint a United States attorney to serve until the vacancy is filled."[71]

Congress has also enacted a general statute to provide for the temporary execution of the functions and duties of a vacant PAS office: 5 U.S.C. § 3345 (the Federal Vacancies Reform Act or "FVRA"). The FVRA provides that "[i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office," "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity,"[72] or "notwithstanding" the first assistant's assumption of acting status, "the President (and only the President) may direct" either another PAS officer or "an officer or employee of such Executive agency" who "during the 365-day period preceding the [vacancy] . . . served in a position in such agency for not less than 90 days" and held a position with a rate of pay at GS-15 or higher to "perform the functions and duties of the officer temporarily in an acting capacity."[73]

The FVRA also bars from acting service officers who meet one of the above requirements if, "during the 365-day period preceding the [vacancy], such person

---

[71] *Id.* § 546(d).
[72] 5 U.S.C. § 3345(a)(1).
[73] *Id.* §§ 3345(a)(2), (3); *see SW Gen.*, 580 U.S. at 295-96.

Appx44

. . . did not serve in the position of first assistant to the office of such officer; or . . . served in the position of first assistant to the office of such officer for less than 90 days; and . . . the President submits a nomination of such person to the Senate for appointment to such office."[74] The next subsection "creates an exception to this prohibition, providing that [it] 'shall not apply to any person' serving in a first assistant position that itself requires the Senate's advice and consent."[75]

The FVRA sets a 210-day limit for acting service "beginning on the date the vacancy occurs."[76] If the vacancy exists during "the 60-day period beginning on a transitional inauguration day," the 210-day clock begins 90 days after the vacancy or inauguration day, whichever is later.[77] When the President submits a nomination for the office to the Senate, acting service can continue throughout the pendency of the nomination,[78] and, if the nomination is "rejected . . ., withdrawn, or returned to the President," a new 210-day period of acting service is triggered on the day of the "rejection, withdrawal, or return."[79] A second nomination again tolls the FVRA's clock during its pendency,[80] and the acting officer may serve for a final 210-day period if the second nomination also fails.[81]

---

[74] 5 U.S.C. § 3345(b)(1)
[75] *SW Gen.*, 580 U.S. at 296 (quoting 5 U.S.C. § 3345(b)(2)).
[76] 5 U.S.C. § 3346(a)(1).
[77] *Id.* § 3349a(b).
[78] *Id.* § 3346(a)(2).
[79] *Id.* § 3346(b)(1).
[80] *Id.* § 3346(b)(2)(A).
[81] *Id.* § 3346(b)(2)(B).

Appx45

The FVRA further provides that "[s]ections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office of an Executive agency . . . unless . . . a statutory provision expressly authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specific office temporarily in an acting capacity; or . . . designates an officer or employee" to do the same.[82] The exclusivity provision also makes an exception for recess appointments.[83] Finally, the exclusivity provision explicitly notes that the exception in section 3347(a)(1) for office-specific statutes does not apply to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency."[84]

Last, the FVRA imposes consequences for its violation. It provides that "[u]nless an officer or employee is performing the functions and duties [of a vacant office] in accordance with sections 3345, 3346, and 3347," "the office shall remain vacant" and "only the head of such Executive agency may perform any function or duty of such office."[85] Furthermore, "[a]n action taken by a person who is not acting

---

[82] *Id.* §§ 3347(a)(1)(A), (B).
[83] *Id.* § 3347(a)(2).
[84] *Id.* § 3347(b).
[85] *Id.* §§ 3348(b)(1), (2). "Function or duty" is narrowly defined for purposes of this section, under provisions that I will return to later.

under section 3345, 3346, or 3347," or the head of the Department, "in the performance of a function or duty of a vacant office . . . shall have no force or effect," and "may not be ratified."[86]

## C.    Statutory Interpretation

When interpreting a statute, courts "must begin with the statutory text."[87] Often the plain text will answer the question at hand, and if it does, the analysis ends.[88] "We do not examine the language in isolation, however."[89] "Rather, in examining the statutory language, 'we take account of the specific context in which that language is used, and the broader context of the statute as a whole.'"[90] The Court's duty is to "give effect, if possible, to every clause and word of the statute."[91] If this view of the text provides "plain and unambiguous meaning with regard to the particular dispute in the case[, the] inquiry must cease."[92] Though the text, particularly when viewed in context, will almost always be sufficiently clear to

---

[86]   *Id.* §§ 3348(d)(1), (2).

[87]   *Khan v. Att'y Gen.*, 979 F.3d 193, 197 (3d Cir. 2020) (quoting *A.A. v. Att'y Gen.*, 973 F.3d 171, 180 (3d Cir. 2020)).

[88]   *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).

[89]   *Hayes v. Harvey*, 903 F.3d 32, 41 (3d Cir. 2018).

[90]   *Id.* (quoting *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008)); *Bondi v. VanDerStok*, 145 S. Ct. 857, 875 (2025) (Gorsuch, J.); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)); *see Gundy*, 588 U.S. at 141 (plurality) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

[91]   *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

[92]   *Robinson*, 519 U.S. at 340.

answer the question at hand, resort to "the statutory history [can] reinforce[] that textual analysis."[93]

## III.    DISCUSSION

My analysis generally proceeds in chronological order. First, I consider whether Ms. Habba's tenure as Interim United States Attorney pursuant to 28 U.S.C. § 546, which began on March 28, 2025, lawfully continued until July 24, 2025, when she purported to resign, and conclude that it did not. As I interpret the law, her interim appointment ended on July 1, 2025—120 days after Attorney General Bondi invoked her power under section 546(a) by appointing Mr. Giordano Interim United States Attorney on March 3, 2025. Thus, Ms. Habba was not lawfully acting as the United States Attorney in any capacity from July 1, 2025 until at least July 24, 2025. Second, I analyze whether Ms. Habba lawfully assumed the role of Acting United States Attorney on July 24, 2025, pursuant to 5 U.S.C. § 3345. I conclude that she is not statutorily eligible to perform the functions and duties of the office of the United States Attorney and has therefore unlawfully held the role since July 24, 2025. Third, I review the Government's backstopping argument that Ms. Habba's conduct has nevertheless been permissible because she has been exercising the functions and duties of the office of United States Attorney pursuant to her appointment by the Attorney General as a Special Attorney and the Attorney General's attendant

---

[93]    *Snyder v. United States*, 603 U.S. 1, 12 (2024) (Kavanaugh, J.).

21

delegation of the powers of a United States Attorney to her in that capacity. I reject that argument. Fourth, I briefly note that, given my statutory rulings, there is no need to reach the Girauds' constitutional claims. Fifth, given the legal and factual complexity of the issues, I set forth a fresh timeline of the relevant events incorporating my legal conclusions. Last, I consider whether my conclusions require dismissal of Mr. Pina's indictment and determine that such relief is not required.

### A.    28 U.S.C. § 546

The defendants have asserted two legal issues with Ms. Habba's tenure pursuant to 28 U.S.C. § 546. First, they contend that the Attorney General is limited to one section 546(a) appointment of an Interim United States Attorney, and that the section 546(a) power does not recur at the end of an appointment.[94] As a result, Ms. Habba's term as Interim United States Attorney ended sometime before her resignation on July 24, 2025. Second, they argue that, once invoked, section 546 becomes the exclusive means for appointing a person to exercise the functions and duties of a United States Attorney in a temporary capacity, displacing the FVRA's acting officer scheme.[95] The defendants are correct on the first issue but not the second.

---

[94]  Doc. 121 (Giraud Supp. Brief) at 9-11; *Pina* Doc. 52-1 (Pina Mot.) at 9-11.
[95]  Doc. 99 at 4; Doc. 121 at 13-15; *Pina* Doc. 52-1 at 11-17.

### 1.    Repeat Appointments

Section 546(a) provides that "the Attorney General may appoint a United States attorney for the district in which the office of the United States attorney is vacant."[96] "A person appointed" under the statute "may serve until the earlier of" the confirmation of a United States Attorney by the Senate, or "the expiration of 120 days after appointment by the Attorney General under this section."[97] The defendants' argument that these provisions preclude Ms. Habba's service takes two flavors: (1) section 546 allows the Attorney General a single appointment of a single person, and when that appointment ends for any reason, the appointing power shifts to the district court under section 546(d); and (2) section 546 allows the Attorney General to make appointments of different individuals, but for an aggregate term of 120 days. The Government interprets the statute to mean that the Attorney General can make unlimited appointments under section 546(a) unless and until one of those appointments reaches the 120-day limit, at which point the appointing power shifts to the district court.[98] I agree with the defendants' second reading.[99]

---

[96]  28 U.S.C. § 546(a).

[97]  *Id.* § 546(c).

[98]  Doc. 127 at 14-15.

[99]  This is an issue of first impression. Only one case appears to note the possibility of repeat appointments, and it suggests that such conduct may be permitted. In *In re Grand Jury Proceedings*, 673 F. Supp. 1138, 1142 n.11 (D. Mass. 1987), the court explained in dicta in a footnote that "[a]lthough the drafters appeared to envision that the district court would act at the expiration of an interim appointment, it is not clear from this Court's reading of the statute, that the Attorney General himself would be foreclosed from making a second interim appointment under subsection (a), though limited in his choice, of course, by subsection (b)."

Appx50

The defendants' first reading has no basis in the text. The Attorney General has the power to appoint a United States Attorney when the office is vacant.[100] That may occur even if a section 546(a) appointment has already been made, if the original appointee steps down or is removed.[101] The only limitations on appointments and service are those in sections 546(b) and (c), and none even arguably applies to an appointee to a vacant office who has not been rejected as a nominee by the Senate and who is serving less than 120 days after the original appointment.[102] So there is no prohibition on making a personnel change. That reading is confirmed by section 546(c)'s use of the indefinite article "*A*" to describe an appointee to whom the barring provisions apply.[103] Indefinite articles indicate that the thing referred to is nonspecific,[104] and Congress's choice to use an indefinite article here indicates that more than one individual may be the subject of the Attorney General's appointment power, and that whomever is serving at the occurrence of one of the barring provisions is subject thereto.

---

This reasoning is extremely brief and does not purport to be a holding. It is therefore not persuasive.

[100]  *Id.* § 546(a).

[101]  *Id.* § 541(c).

[102]  There is no dispute that Ms. Habba's section 546(a) appointment was made less than 120 days after the Attorney General's first effective section 546(a) appointment of Mr. Giordano.

[103]  28 U.S.C. § 546(c); *see also id.* § 546(d) ("If *an* appointment expires . . .") (emphasis added)..

[104]  *Indefinite*, Oxford English Dictionary (3d ed. 2025) ("Applied to various adjectives, pronominal words, and adverbs, which do not define or determine the actual person or thing, the place, time, or manner, to which they refer."); *id.* (2d ed. 1989) (identical definition).

Appx51

The defendants' second reading is textually sound. Section 546(c)(2), the 120-day limit, is benchmarked only to "appointment by the Attorney General under this section."[105] It does not refer to *the person's* appointment." In grammatical terms, there is no article, definite or indefinite, to describe the appointment to which section 546(c)(2) refers. But the text has not left us without guidance. The statute tells us that the 120 days are counted from "appointment by the Attorney General under this section."[106] The Attorney General makes such appointment when she invokes section 546(a). So the 120-day clock begins running when the Attorney General first invokes section 546(a) and makes an appointment.

The Government protests that the appointment referred to in section 546(c)'s "chapeau"—"a person appointed"—should carry through to the "appointment" referred to section 546(c)(2).[107] But that reading strains the text for three reasons. First, it transforms the indefinite article in the chapeau into a definite article or pronoun that is unstated in section 546(c)(2), rewriting the unmodified term "appointment" as "her appointment" or "that appointment."[108] Second, both the chapeau and subsection (c)(2) describe an appointment "under this section."[109] If

---

[105] 28 U.S.C. § 546(c)(2).

[106] *Id.*

[107] Doc. 127 at 14; Doc. 141 at 26:18-25.

[108] *See Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) (Gorsuch, J.) ("Nor does this Court usually read into statutes words that aren't there. It's a temptation we are doubly careful to avoid when Congress has (as here) included the term in question elsewhere in the very same statutory provision.").

[109] 28 U.S.C. §§ 546(c), (c)(2).

subsection (c)(2)'s bar is limited to the appointment described in (c), then restating "under this section" is redundant because that is the only type of appointment to which it could apply. But courts should give "'every clause and word of a statute' . . . meaning."[110] Giving meaning to the second use of "under this section" indicates that that subsection (c)(2) refers more broadly to *any* appointment "under this section." And third, the chapeau clearly does not modify the other barring provision in section 546(c)(1), which is indisputably benchmarked to an event unrelated to any specific person's interim appointment: Senate confirmation of the President's nominee.[111] Had Congress wanted the 120 day clock to run on a per-appointee basis, it could easily have written the statute to place the bar of subsection (c)(2) first and written it as "the expiration of 120 days after *her* appointment." Congress's choice not to so define the appointment in subsection (c)(2) is meaningful, and the Court will not redraft the text.[112]

Statutory context confirms that the defendants' reading is correct. First, Congress provided next steps for keeping the United States Attorney's office filled when the 120-day clock runs out: section 546(d) permits the district court to step in and make an appointment.[113] Accepting the Government's reading would give the

---

[110] *United States, ex rel. Ploansky v. Exec. Health Resources, Inc.*, 599 U.S. 419, 432 (2023) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

[111] 28 U.S.C. § 546(c)(1).

[112] *Romag Fasteners*, 590 U.S. at 215.

[113] 28 U.S.C. § 546(d).

Executive a permanent means of thwarting that provision by terminating every section 546(a) appointment on its 119th day. Taken to the extreme, the President could use this method to staff the United States Attorney's office with individuals of his personal choice for an entire term without seeking the Senate's advice and consent.[114] But it is a core maxim of statutory interpretation that "[w]e generally avoid construing one provision in a statute so as to suspend or supersede another provision. To avoid 'denying effect to a part of a statute,' we accord 'significance and effect to every word.'"[115] Read together with the alternatives in sections 546(d) and 541(a), there must be some limit to section 546(a) appointments, and the text tells us that the limit is 120 days.

The statute is unambiguous, and my analysis need go no further. But the statutory history also supports the defendants' reading and thus reinforces the textual conclusion.[116] The statute's modern text was enacted in a 1986 amendment.[117] But in 2006, Congress revised section 546 as part of the USA PATRIOT Improvement

---

[114] *See* 28 U.S.C. § 541(a); *see Aviel v. Gor*, No. 25-CV-0778, 2025 WL 2374618, at *10-11 (D.D.C. Aug. 14, 2025) (raising constitutional concerns about acting appointments without a time limit). Even assuming reappointments of the same person would be impermissible, and the Government does not concede as much, the roster of candidates would not need to be extensive. A full term would only require 13 appointments.

[115] *Rake v. Wade*, 508 U.S. 464, 471-72 (1993) (Thomas, J.) (quoting *Ex parte Pub. Nat'l Bank of New York*, 278 U.S. 101, 104 (1928)) (internal alterations omitted).

[116] *Snyder*, 603 U.S. at 12.

[117] Criminal Law and Procedure Technical Amendments Act of 1986, Pub. L. No. 99-646, § 69, 100 Stat. 3592, 3616-17 (1986).

27

and Reauthorization Act of 2005.[118] The 2006 revision entirely removed the 120-day limit and the district court's backstopping role, and simply provided that "[a] person appointed as United States attorney under this section may serve until the qualification of a United States Attorney for such district appointed by the President under section 541 of this title."[119] The switch to an unlimited appointment was short lived. Barely more than a year later, Congress reverted to the pre-PATRIOT Act language.[120] Readdition of the 120-day limit is strong evidence that Congress did not intend to permit that limit to be circumvented by repeat appointments.[121] And, to the extent it is of any use at all, the House Report on the draft 2007 bill identified as a primary concern "Bypassing the Requirement of Senatorial Advice and Consent," which included "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals. For example, one individual received a total of four successive interim appointments."[122]

---

[118] USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006).

[119] *Id.*

[120] Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224 (2007).

[121] *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (defining statutory history as "the record of *enacted* changes Congress made to the relevant statutory text over time, the sort of textual evidence everyone agrees can sometimes shed light on meaning" (emphasis in original)).

[122] H.R. Rep. No. 110-58 at 6 (2007); *see Al-Hasani v. Sec'y U.S. Dep't of Homeland Sec.*, 81 F.4th 291, 298 n.4 (3d Cir. 2023) ("[Statutory history] is distinct from legislative history—committee reports and the like—the mining of which is 'disfavored' as a statutory interpretation strategy." (quoting *Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (Willett, J., concurring))).

As a final thrust, the Government points to historical practice and contends that Attorneys General have made successive section 546 appointments in the past, and that Congress's 2007 reenactment of the 1986 statutory language, with knowledge of the Executive's practice, indicates its acquiescence in that practice.[123] It is true that "'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned,' can 'raise a presumption that the action had been taken in pursuance of its consent,'"[124] but "past practice does not, by itself, create power."[125] In this case, "'historical practice' is too grand a title for the [Government's] evidence."[126]

The Government does not identify how common successive appointments were before the 2007 reenactment, and Congress did not suggest that the practice was widespread.[127] Moreover, the very same Committee that proposed re-adopting the 1986 language identified successive appointments as a primary concern, so the practice is far from being "never before questioned."[128] Inferring Congress's

---

[123] Doc. 141 at 31:7-24.

[124] *Medellín v. Texas*, 552 U.S. 491, 531 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)) (internal alterations omitted); *Noel Canning*, 573 U.S. at 525 ("[T]he longstanding 'practice of the government,' can inform our determination of 'what the law is.'" (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819) and *Marbury v. Madison*, 1 Cranch 137, 177 (1803))) (rule of constitutional interpretation).

[125] *Medellín*, 552 U.S. at 531-32 (quoting *Dames & Moore*, 453 U.S. at 686) (internal alterations omitted).

[126] *SW Gen.*, 580 U.S. at 308.

[127] *See* H.R. Rep. No. 110-58 at 6 (2007) (describing "several instances [of] successive interim appointments").

[128] *Id.* at 13 (draft language); *Medellín*, 552 U.S. at 531 (quoting *Dames & Moore*, 453 U.S. at 686).

acquiescence from a historical record this thin and contradictory is simply untenable. At bottom, any post-enactment practice is not consistent with the unambiguous text of section 546, and the text must control.[129]

Based on the text, context, and statutory history of section 546, the Attorney General is vested with 120 total days to appoint an Interim United States Attorney from the date that she first invokes section 546(a). Termination of an appointment before the 120-day deadline does not allow another 120-day term. Accordingly, the section 546(c)(2) bar triggered to end Ms. Habba's appointment as Interim United States Attorney for the District of New Jersey on July 1, 2025, 120 days after Ms. Bondi appointed Mr. Giordano Interim United States Attorney on March 3, 2025. As a result, Mr. Habba was acting without authority when she signed Mr. Pina's indictment on July 7, 2025, so the indictment is presumptively defective.[130]

### 2.    Exclusivity

The defendants argue that once the section 546(c)(2) bar is triggered, "the exclusive authority to appoint an interim U.S. Attorney shifts unequivocally to the District Court" under section 546(d).[131] The Government responds that the FVRA

---

[129] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (rule of constitutional interpretation).

[130] Fed. R. Crim. P. 7(c)(1) (requiring that indictment be "signed by an attorney for the government").

[131] Doc. 99 at 4; Doc. 121 at 13-15; *Pina* Doc. 52-1 at 11-17.

remains a viable option for temporarily filling the United States Attorney role in such cases.[132] I agree with the Government.

There is no textual basis for concluding that, once triggered, section 546(d) is the exclusive means for appointing a United States Attorney until a PAS official is confirmed. Section 546 contains no exclusivity provision. And the FVRA's exclusivity provision, 5 U.S.C. § 3347(a), contains an exception for "a statutory provision [that] expressly . . . authorizes the President, a court or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity.[133] The FVRA's provision does not say that in such cases, the office-specific provision shall be exclusive of the FVRA.

Lacking a textual hook, the defendants contend that section 546 becomes exclusive once invoked because, as the office-specific statute, it controls over the FVRA's general provisions.[134] It is true that the general/specific canon "has full application . . . to statutes . . . in which a general authorization and a more limited specific authorization exist side-by-side."[135] But the purpose of the rule in such cases is to avoid "the superfluity of a specific provision that is swallowed by a general

---

[132] Doc. 108 at 15-20; Doc. 127 at 10-12.

[133] 5 U.S.C. § 3347(a)(1).

[134] *See Pina* Doc. 52-1 at 12 (citing authority for the general/specific canon).

[135] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Appx58

one."[136] If "the specific provision embraced within a general one is not superfluous," there is no need to apply the canon.[137] Retaining the FVRA does not render section 546 superfluous for several reasons.

First, the statutes provide different incentives and consequences. Any person can be appointed an Interim United States Attorney under section 546(a), but only for 120 days.[138] Under the FVRA, only a limited set of individuals can perform the functions and duties of a vacant office in an acting capacity,[139] but can do so for a longer period that is subject to significant extensions.[140] So the President and Attorney General may wish to use one or the other depending on the situation.

Second, reverting to the FVRA scheme after a section 546(a) appointment makes logical sense. The FVRA's timelines are triggered by the occurrence of the vacancy, and do not depend on whether someone is performing the functions and duties of the office.[141] So the section 3346 clock continues to run even if the vacant office is held in an interim capacity under a position-specific statute like section 546. If a section 546(a) appointment expires before the section 3346 clock has run, there is no basis for excluding the remaining time under the FVRA. Moreover, there are several situations in which no one will hold the office under section 546, and in those

---

[136] *Id.* (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).
[137] *Id.* at 646-47.
[138] 28 U.S.C. § 546(c)(2).
[139] 5 U.S.C. § 3345(a).
[140] *Id.* § 3346.
[141] *Id.* § 3346(a)(1) (starting 210-day clock on "the date the vacancy occurs").

Appx59

cases, assuming that there is still time left under section 3346, it makes sense to permit a person to take acting status. Those situations include: (1) the expiration of section 546(a) appointments under section 546(c)(2) and District Court declination to use its permissive section 546(d) power;[142] or Presidential termination of a section 546(d) appointee pursuant to section 541(c).[143] In those cases, the Executive may wait for the District Court to act (or do so again) or it may invoke section 3345(a)(2) or (a)(3) to temporarily fill the role.

Finally, applying the FVRA after a section 546(a) appointment does not render section 546(d) superfluous. There is no time limit on when the District Court may use its section 546(d) power.[144] If the time limits on the FVRA run out, "the office shall remain vacant,"[145] but position-specific statutes remain viable alternatives to fill the role on a temporary basis.[146] At that point, the District Court—and only the District Court—may act to temporarily appoint a United States Attorney.[147] This conclusion accords with those of other courts to have considered the interaction between the FVRA and position-specific statutes.[148]

---

[142] 28 U.S.C. §§ 546(c)(2), (d); *see United States v. Gantt*, 194 F.3d 987, 1000 (9th Cir. 1999) ("The judicial branch is not required to appoint a United States Attorney; it is simply empowered to do so.").

[143] 28 U.S.C. § 541(c) ("Each United States attorney is subject to removal by the President.").

[144] *Id.* § 546(d).

[145] 5 U.S.C. § 3348(b)(1).

[146] *Id.* § 3348(b) (providing that the "remain vacant" rule applies only if there is not a section 3347 option for performing the functions and duties of the vacant office).

[147] 28 U.S.C. § 546(d).

[148] *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) ("[N]either the FVRA nor the NLRA is the exclusive means of appointing an Acting General Counsel of the

Legislative history reinforces this interpretation of the text. In enacting the current version of section 546, Congress considered adding a provision making section 546 "the exclusive means for appointing a person to temporarily perform the functions of a United States attorney for a district in which the office of United States attorney is vacant," but that provision was removed from the final version of the bill.[149] That deletion "strongly militates against a judgment that Congress intended a result that it expressly declined to enact."[150]

Based on the text of section 546 and the FVRA, I conclude that section 546 appointments do not displace the FVRA as an alternative means of temporary appointment.

## B.    5 U.S.C. § 3345 *et seq.*

Because the FVRA was a viable option for filling the vacant office of United States Attorney for the District of New Jersey at the time that the Executive invoked it, I turn to that provision next. The defendants contend Ms. Habba is not lawfully serving as the Acting United States Attorney because her appointment violates two

---

NLRB. Thus, the President is permitted to elect between these two statutory alternatives to designate an Acting General Counsel."); *United States v. Patara*, 365 F. Supp. 3d 1085, 1088-91 (S.D. Cal. 2019); *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 356 F. Supp. 3d 109, 138-44 (D.D.C. 2019) *aff'd*, 920 F.3d 1 (D.C. Cir. 2019); *English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018) ("[T]he FVRA's exclusivity provision makes clear that it was generally intended to apply alongside agency-specific statutes, rather than be displaced by them.").

[149] H.R. Rep. No. 110-58 at 13 (2007).

[150] *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 200 (1974); *see Lora v. United States*, 599 U.S. 453, 463 n.6 (2023); *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 787 (1984).

provisions of the FVRA. First, they argue that a first assistant may assume a vacant office in an acting capacity under section 3345(a)(1) only at the moment that the vacancy occurs, and that a person who takes the first assistant office during the vacancy's pendency does not take the acting role in the vacant office.[151] Second, they assert that section 3345(b)(1) prohibits Ms. Habba from taking the acting role because she previously was nominated by the President to fill the vacant office.[152] The Court agrees with the defendants on the first issue and, having found that Ms. Habba's appointment violates the FVRA, does not reach the second.

### 1.    First Assistant Eligibility

The FVRA provides that "[i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office," . . . "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity."[153] "Notwithstanding" the performance of those functions and duties by the first assistant, "the President (and only the President) may direct" either another

---

[151] Doc. 121 at 15-17; *Pina* Doc. 52-1 at 17-27.

[152] Doc. 99 at 3; Doc. 121 at 17-19; *Pina* Doc. 52-1 at 28-32. Mr. Pina also asserts a third argument which I do not reach. *Pina* Doc. 52-1 at 27-28.

[153] 5 U.S.C. §§ 3345(a), 3345(a)(1). I note that the FVRA's definition of a vacancy precludes any argument that Ms. Habba's resignation as the Interim United States Attorney created a new vacancy that retriggered section 3345(a), because, as Interim United States Attorney, Ms. Habba was not "an officer . . . whose appointment to office [was] required to be made by the President, by and with the advice and consent of the Senate." *Id.* § 3345(a).

Appx62

PAS officer or another employee of the same agency who worked in that agency for at least 90 days in the year before the vacancy and is paid at a GS-15 level "to perform the functions and duties of the vacant office temporarily in an acting capacity."[154] This statutory framework convincingly indicates that a "first assistant" who may take office in an "acting capacity" must be the first assistant at the time the vacancy occurs.[155]

First, the vacancy provision and the first assistant provision function in a simple if-then form, indicating that the promotion of the first assistant occurs

---

[154] *Id.* §§ 3345(a)(2)-(3)

[155] This is an issue of first impression. Several courts have noted the possibility of this interpretation, but none has resolved the question either way. *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015) *aff'd*, 580 U.S. 288 (2017) ("Although we do not decide its meaning today, subsection (a)(1) may refer to the person who is serving as first assistant when the vacancy occurs. *Accord* 23 Op. O.L.C. at 64 ('[W]e believe ... you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant.'). Under this reading, subsection (a)(1) provides a default rule that automatically promotes someone (the current first assistant) to be the acting officer without a break in service and without action by the President."); *Hooks*, 816 F.3d at 560 ("If (b)(1) applies only to (a)(1), which refers only to first assistants, then (b)(1)'s reference to persons who 'did not serve in the position of first assistant to the office of such officer,' 5 U.S.C. § 3345(b)(1)(A)(i), would be, as the D.C. Circuit recognized, 'inoperative because the current first assistant necessarily served as the first assistant in the previous year.'" (quoting *SW Gen.*, 796 F.3d at 76)); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 24 (D.D.C. 2020) ("[T]he parties focus their arguments on the question whether, as Plaintiffs contend, . . . the first-assistant default rule applies only to individuals serving as first assistants at the time the vacancy arises or, as Defendants contend, . . . the default rule also applies to individuals first appointed to the position of first assistant after the vacancy in the PAS office arises. That dispute poses a difficult question that the Office of Legal Counsel has answered differently at different times, . . . and that the courts have not had the occasion to resolve, . . . . Now is not the time to resolve that question . . . ." (citing *SW Gen.*, 796 F.3d at 76)); *cf. Williams v. Phillips*, 360 F. Supp. 1363, 1370 n.11 (D.D.C. 1973) (reasoning in dicta that one could not become an acting officer if they were named the first assistant after the vacancy under precursor statute to FVRA); *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 63-64 (1999) ("[W]e believe that the better understanding is that you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant.").

36

automatically at the moment of the vacancy.[156] Subsection (a) provides the triggering condition—when the last PAS officer "dies, resigns, or is otherwise unable to perform the duties of the office"[157]—and subsection (a)(1) sets the mandatory condition that follows—"the first assistant to the office of such officer shall perform the functions and duties."[158] This immediate action is confirmed by the vacancy provision's use of present tense verbs ("dies, resigns, or is otherwise unable to perform").[159] There is no textual indication that the President has any choice in invoking the first assistant provision, nor that it is meant to trigger at any time other than the moment that the vacancy occurs.

That reading is confirmed by the text of the next two provisions of the statute. Subsections (a)(2) and (a)(3) both provide that "notwithstanding" the first assistant's automatic promotion, the President may choose someone else to fill the role.[160] The use of "notwithstanding," indicates that subsection (a)(1) triggers whether the

---

[156] *SW Gen.*, 580 U.S. 288, 295 (2017) ("Subsection (a)(1) prescribes a general rule: If a person serving in a PAS office dies, resigns, or is otherwise unable to perform his duties, the first assistant to that office "shall perform" the office's "functions and duties ... temporarily in an acting capacity."); *id.* at 305 (describing (a)(1) as "automatic[]"); *Hooks*, 816 F.3d at 557 ("As described in (a)(1), 'the first assistant to the office' automatically fills the vacancy as an acting officer unless someone else is appointed."); *SW Gen.*, 796 F.3d at 71 ("The FVRA provides that, in the event of a vacancy in a PAS position, the 'first assistant' automatically takes over in an acting capacity.").

[157] 5 U.S.C. § 3345(a).

[158] *Id.* § 3345(a)(1).

[159] *Id.* § 3345(a). The present verb tense stands in contrast to the present perfect tense, which "conveys to a listener that the event in question continues to be true or valid." *Hewitt v. United States*, 605 U.S. __, 145 S. Ct. 2165, 2173 (2025).

[160] 5 U.S.C. §§ 3345(a)(2), (3).

President wishes it to or not, and he may merely override it.[161] Furthermore, the fact that subsections (a)(2) and (a)(3) provide that the President "may direct" someone else to fill the role stands in clear contradistinction to subsection (a)(1)'s rule that the first assistant "shall perform" the functions and duties of the office.[162] Comparing the provisions' subjects also confirms this reading. Subsection (a)(1) refers only to the "first assistant" and does not mention any other person, while (a)(2) and (a)(3) both feature "the President (and only the President)" as the subject. The sum of these considerations is that the first assistant provision textually provides that the first assistant automatically begins performing the functions and duties of the vacant office in an acting capacity at the moment the vacancy occurs. Neither the President nor anyone else has a role in this process.

Statutory context also supports the reading that the Executive may not appoint a first assistant after the vacancy and have that person begin performing the functions and duties of the vacant office under subsection (a)(1). Applying the Government's

---

[161] *Hooks*, 816 F.3d at 557 ("Signaled by the phrase 'notwithstanding paragraph (1),' the statute goes on to provide two ways the President may override the automatic operation of (a)(1)."); *SW Gen.*, 580 U.S. at 301 (explaining that "[t]he ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'").

[162] *SW Gen.*, 580 U.S. at 303-04 ("Compare the mandatory language of subsection (a)(1) to (a)(2) and (a)(3). People appointed under those provisions are just as much acting officers as first assistants who assume the role. But there is no freestanding directive that they perform acting duties; subsections (a)(2) and (a)(3) just say that the President 'may direct' them to do so. . . . Subsections (a)(2) and (a)(3) are each preceded by the phrase 'notwithstanding paragraph (1).' The phrase recognizes that subsection (a)(1) is unique, and resolves the potential conflict between the mandatory 'shall perform' in that provision and the permissive 'may direct' in (a)(2) and (a)(3).").

Appx65

reading would render the limits in subsections (a)(2) and (a)(3) surplusage in the vast majority of cases.[163] Those provisions set a very high bar for the President's options for a non-first-assistant acting official: either a person who has already been confirmed by the Senate to another position, or a person who worked in the relevant agency for at least 90 days before the vacancy and was paid at the GS-15 level.[164] But if the President may simply name anyone as the first assistant at any time and thereby vest them with acting powers, these limitations on acting service are rendered entirely irrelevant.[165] On that reading, the President is free to select someone from outside the Government, with no experience in the relevant agency, and immediately imbue them with the functions and duties of a PAS office. That is what happened here. Moreover, the First Assistant United States Attorney role is not named by the President,[166] so reading (a)(1) to permit subsequent appointees to take the Acting role would also render the "President (and only the President)" language

---

[163] *Feliciano v. Dep't of Transp.*, 605 U.S. __, 145 S. Ct. 1284, 1302 (2025) (Thomas, J., dissenting) ("Because we interpret statutes, where possible, to avoid superfluity, we strive to avoid interpretations that 'would in practical effect render statutory language entirely superfluous in all but the most unusual circumstances.'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001))); *Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011) (quoting *TRW Inc.*, 534 U.S. at 31).

[164] 5 U.S.C. §§ 3345(a)(2), (3); *see Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 11 (D.C. Cir. 2019).

[165] *See L.M.-M.*, 442 F. Supp. 3d at 28-29 (describing the three methods of appointing Acting officers and reasoning that allowing the agency head to create new post-vacancy offices and designate them first assistants to assume acting status "would decimate this carefully crafted framework").

[166] 28 C.F.R. § 0.137(b) ("Where there is no position of Principal Deputy to the PAS office, the First Assistant shall be the person whom the Attorney General designates in writing.").

of sections (a)(2) and (a)(3) surplusage in this case and every other instance where the first assistant is not named by the President.[167]

The Government responds with two arguments. First, it contends textually that the first assistant provision refers to the first assistant "to the office of such officer,"[168] and thus contemplates that a first assistant can fill the acting role in an already vacant office, as opposed to immediately following the last PAS "officer."[169] That argument fails textually. The phrase "office of such officer" can just as easily be read as a definition for "first assistant"—one that demonstrates that it is a term of art which refers to the agency's formal hierarchical structure as opposed to an ordinary meaning interpretation which would suggest that the phrase merely refers to the person on which the outgoing officer relied most heavily.[170] Moreover, even reading the phrase "office of such officer" to refer to the vacant office does not alter my interpretation of the function of subsection (a)(1), because the office must become vacant for at least a moment before the first assistant begins performing its

---

[167] *See L.M.-M.*, 442 F. Supp. 3d at 28.

[168] 5 U.S.C. § 3345(a)(1).

[169] Doc. 127 at 4; *see Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 179-80 (2001) (asserting the same argument). Notably, the only other argument that this OLC opinion asserts for its reading of section 3345(a)(1) is contradicted by the holding of *SW Gen.*, 580 U.S. 288.

[170] *See* 144 Cong. Rec. 22525 (statement of Sen. Lieberman) ("As the bill is currently drafted, only one of two individuals can serve as acting officials in the case of a vacancy: Either the first assistant to the vacant position, a term of art that generally refers to the top deputy. . . ."); *but see L.M.-M.*, 442 F. Supp. 3d at 24-26 (reading the first assistant provision to refer to someone who "serve[d] in a subordinate role—that is, as an 'assistant'—to any other [agency] official.").

functions and duties.[171] The Government's reading does not change the timing of subsection (a)(1)—which is determined by subsection (a)—nor indicate that it should retrigger at some later point. In light of the textual arguments cutting the other direction, this argument is unpersuasive.

The Government's second contention is that their reading does not render subsections (a)(2) and (a)(3) surplusage or ineffective in cases where the first assistant position is also a PAS office and is also vacant at the moment the primary office becomes vacant.[172] The coincidence of those two circumstances will undoubtedly be "unusual," and therefore the Government's argument does little to assuage my concerns about surplusage.[173] Moreover, had Congress wished to cabin subsections (a)(2) and (a)(3) to PAS first assistants, it could have said so using much clearer terms than the several layers of implication required to make sense of the Government's reading.[174] Instead, it made these two provisions exceptions to a subsection that applies to each and every first assistant who performs the functions and duties of a vacant PAS office.[175]

---

[171] 5 U.S.C. §§ 3345(a), (a)(1).

[172] Doc. 127 at 6; Doc. 142 at 3.

[173] *TRW Inc.*, 534 U.S. at 29; *see L.M.-M.*, 442 F. Supp. 3d at 29.

[174] *See* 5 U.S.C. § 3345(b)(2) (clearly stating that an exception applies to PAS first assistants).

[175] The Government also contends that subsection (a)(1)'s lack of a backwards-looking eligibility requirement, like those in subsections (a)(3)(A) and (b)(1)(A)(ii), cuts against this reading. But eschewing a pre-vacancy service requirement makes sense for a first assistant automatically taking office because of the risk that an unexpected event, like a death, could trigger a vacancy. In such a case, the first assistant will perform the functions and duties of the office even if he was only appointed a few days earlier. But to pick a different career officer, or to offer the first assistant as the nominee, additional service requirements are logical.

Appx68

Even accepting the Government's arguments, I would go no further than to find the statutory text ambiguous as to this issue. In that case, a court should "prefer 'the most natural reading' of a statute, one that "harmonizes the various provisions in [it] and avoids the oddities that [a contrary] interpretation would create."[176] The defendants' reading creates far more harmony between the FVRA's provisions than the Government's reading, which would find a major loophole in subsection (a)(1) permitting an end-run around every one of the limitations included in subsections (a)(2) and (a)(3) in most instances.[177]

Furthermore, the FVRA's legislative history supports this reading.[178] First, the "automatic" understanding of first assistant promotion is repeated *ad nauseum*

---

[176] *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 58 (1st Cir. 2021) (quoting *Rep. of Sudan v. Harrison*, 587 U.S. 1, 15 (2019) (Alito, J.)); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 147 (2017) (unanimous, Roberts, C.J., recused) ("Whenever possible, however, we should favor an interpretation that gives meaning to each statutory provision." (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[177] *See County of Maui, Haw. v. Haw. Wildlife Fund*, 590 U.S. 165, 179 (2020) ("That Maui's proffered interpretation would also create a serious loophole in the permitting regime also indicates it is an unreasonable one."); *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 168 (1964) (reasoning that proffered interpretation "would be illogical and disrespectful of the plain congressional purpose in amending [a statute] for it would create a large loophole in a statute designed to close a loophole." (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 343 (1963))).

[178] The Government argues that the Senate Report should be discarded because the bill's draft language at the time did not include the final statute's "office of such officer" language on which it relies. *See* Doc. 142 at 4 (citing S. Rep. No. 105-250 at 25 (1998)). But other legislative history suggests that the ultimate statutory language was already in legislators' minds and comported with the Senate Report's draft language. *See* S. Rep. No. 105-250 at 12 ("[First assistant] has a long history of use in the Vacancies Act. As under current law, the term 'first assistant' is used to refer to the first assistant to the 'officer.' However, the practice under current law, which would be continued by this bill, is that the first assistant is actually the first assistant to the vacant office."). This language is concededly unclear, but it implies a definition similar to my reading of the "office of such officer" phrase. To the extent the Senate Report is unreliable, my textual analysis controls and is definitively against the Government.

throughout the Senate Report.[179] The report also clearly contemplates that the first assistant provision only functions in its automatic form at the moment the vacancy occurs, and does not repeat,[180] and suggests that the President has no role in that process.[181] The report emphasizes the value of the first assistant's experience and independence, severely undercutting the idea that the President can hand pick a first assistant with the express purpose of installing them in the acting role.[182]

Moreover, the first assistant's automatic assumption of the functions and duties of the vacant office is contrasted against what happens "[i]f there is no first assistant, or if the President following the assumption of acting status by the first assistant, but within the time limits prescribed by section 3346 so chooses, the President (and only the President) may direct a person who has already received Senate confirmation for another position to perform the functions and duties of the office temporarily in an acting capacity, subject to the time limits of section 3346 . . . . *If there is no first assistant, no one is permitted by law to become an acting*

---

[179] S. Rep. No. 105-250 at 12, 13 ("Notwithstanding *a first assistant on the day of the vacancy's automatic[ally] functioning as the acting officer . . . .*" (emphasis added)).

[180] *Id.* at 12 ("When a vacancy arises, the bill provides an exclusive set of procedures that may be followed. *If the vacant officer has a first assistant*, the first assistant performs the functions and duties of the office temporarily in an acting capacity." (emphasis added)).

[181] *Id.*; *see id.* at 14-15 ("Even if there is no first assistant, and the President declines to designate a Senate-confirmed person to be the acting person, the 150-day period begins to run.").

[182] *Id.* at 12 ("The Vacancies Act provides for the automatic performance of the functions and duties of the vacant office by the first assistant because such person is often a career official with knowledge of the office or a Senate-confirmed individual, and the Committee believes that the routine functions of the office should be allowed to continue for a limited period of time *by that one person*." (emphasis added)); *see also id.* at 31 (additional view).

43

*officer until the President designates a Senate-confirmed individual to be the acting officer.*"[183]

As a final piece of evidence in support of the defendant's reading, the FVRA's purpose is clearly stated and affirmed by both the majority and minority of the Senate Committee and the Supreme Court.[184] As the majority explained, "[i]n recent decades, the Department of Justice has argued that its advise and consent positions are not covered by the Vacancies Act," and has instead argued that its general delegation

> authority supersedes the Vacancies Act's restrictions on temporarily filling vacant advice and consent positions, allowing for designation of acting officials for an indefinite period, even without submitting a nomination to the Senate to fill the position on a permanent basis. This interpretation of the law is wholly lacking in logic, history, or language, as evidenced by repeated opinions of the Comptroller General.[185]

Given the Executive's refusal to comply with the Appointments Clause, the committee determined that corrective legislation was necessary:

> If the Constitution's separation of powers is to be maintained, and officers of the government subjected to the scrutiny of the Senate for the benefit of the liberty of the people, legislation to address the deficiencies in the operation of the current Vacancies Act is necessary.

---

[183] *Id.* at 13 (emphasis added); *see id.* at 12-13; *id.* at 35 (minority view) ("In addition, the lack of a first assistant to a particular office that becomes vacant would leave the position vacant until such time as the President designates a previously Senate-confirmed official to temporarily fill that vacancy as an acting official.").

[184] *SW Gen.*, 580 U.S. at 293-95 (describing history of vacancies acts and portraying the FVRA as a Congressional response to "a threat to the Senate's advice and consent power").

[185] S. Rep. No. 105-250 at 3; *id.* at 30 (additional view) ("For too long, the Executive Branch's interpretation and implementation of [the Vacancies Act] have stripped it of its original intent and, on occasion, effectively deprived the Senate of its constitutional right to partake in the appointment of a number of Federal officers."); *id.* at 34 (minority view).

Appx71

The 1988 legislation unfortunately has not succeeded in encouraging presidents to submit nominees in a timely fashion, and it has not resulted in the Justice Department's agreement that is covered by the Act.[186]

As far as it is useful, this legislative history confirms what the text makes clear. In enacting the FVRA, Congress severely limited the options for who may perform the functions and duties of a vacant PAS office.[187] A statutory interpretation that opens a gaping loophole in this tightly crafted scheme meant to provide only limited flexibility and prevent "manipulation" flies in the face of the goal that Congress was trying to accomplish. Although clearer text could require such a result, the Government's arguments reaching such a conclusion through vague implication must fail.

The Government does not give up there, however. As before, it asserts that historical practice cuts in favor of its interpretation because post-vacancy-appointed first assistants have taken the acting role before, and warns that grave consequences will follow from adopting the defendants' reading of the statute.[188] I find the Government's practice-based argument particularly unconvincing in the context of the FVRA. Congress enacted the FVRA *exactly because* the Executive's practice had been to avoid application of the prior Vacancies Act by interpreting its

---

[186] *Id.* at 5; *see id.* at 8 ("In short, in light of various administrations' noncompliance with the Vacancies Act and a recent court decision undermining its operation, it is imperative that Congress enact legislation to restore constitutionally mandated procedures that must be satisfied before acting officials may serve in positions that require Senate confirmation.").

[187] 5 U.S.C. § 3345(a).

[188] Doc. 127 at 6.

45

Appx72

provisions narrowly and other statutes broadly.[189] And when Congress had tried to fix similar problems before, the Executive had been just as noncompliant.[190] So resorting to Executive practice following the FVRA is unlikely to show anything other than the Executive's preferred interpretation of the language, and that is shaky evidence of what *Congress* intended. At bottom, the Supreme Court has advised that "historical practice" under the FVRA is not particularly useful, given that "the FVRA was not enacted until 1998."[191] That is all the truer here, where the Executive has only produced anecdotal evidence of post-vacancy-appointed first assistants, unlike in *National Labor Relations Board v. SW General, Inc.* where the NLRB came up with at least 112 examples of its practice.[192]

I am also unmoved by the Government's consequentialist argument. It explains that the Presidential practice has been to appoint first assistants at noon on a transitional Inauguration Day to perform the functions and duties of offices that are vacant due to resignations that predated the Inauguration.[193] Adopting the defendants' reading, it warns, would hamstring incoming administrations, forcing them to temporarily staff PAS offices with holdover officials from their

---

[189] *SW Gen.*, 580 U.S. at 295 ("But tensions did not ease. By 1998, approximately 20 percent of PAS offices in executive agencies were occupied by 'temporary designees, most of whom had served beyond the 120–day limitation period . . . without presidential submissions of nominations.' These acting officers filled high-level positions, sometimes in obvious contravention of the Senate's wishes." (internal citation omitted)).

[190] *Id.* at 294-95.

[191] *Id.* at 308 (alterations omitted).

[192] *Id.*; *see Guedes*, 356 F. Supp. 3d at 143 n.9.

[193] Doc. 127 at 6.

predecessors. But the vacancy-creating resignations are also a matter of practice—not law—and are offered as a courtesy to the incoming administration. So long as the courtesy continues, it should make little difference to an outgoing administration to delay its officers' resignations until very shortly after Inauguration Day, thereby permitting the incoming President to install his desired first assistants *before* the vacancies.

Finally, it is worth noting that practice is a fickle thing. A government operating by handshake and mutual understanding may go along swimmingly, but only for so long as everyone is willing to play by the rules. Those rules are the result of good-faith compromise—a concession by one branch is premised on the understanding that another branch will not abuse the benefit. So even if a practice of making exceptions to the letter of the law exists, it is likely cabined by other practice-based rules that limit the scope of those exceptions. When one side decides that the practice-based limits no longer apply, what then? May that party take all the benefits of past practice with none of the concessions? In such a situation, recourse to the law—with no atextual exceptions—provides the only answer.

Accordingly, I conclude that Ms. Habba was ineligible to assume the functions and duties of the office of the United States Attorney for the District of New Jersey on July 24, 2025, because she was not the first assistant when the vacancy occurred upon Mr. Sellinger's resignation on January 8, 2025. Therefore,

Appx74

Ms. Habba may not participate in the defendants' prosecutions going forward as the "Acting United States Attorney."

### 2.    Nomination Bar

The defendants also argue that Ms. Habba is barred from serving as Acting United States Attorney under 28 U.S.C. § 3345(b)(1) because she did not serve as the first assistant for at least 90 days before the vacancy and the President nominated her for appointment to the office. I do not reach this argument and offer no opinion on it because I have already concluded that Ms. Habba is barred from service under a different provision of the FVRA.

### C.    Special Attorney

I have determined that Ms. Habba's appointment to be Acting United States Attorney is unlawful. Undeterred, the Government responds that she may still perform the functions and duties of the office of the United States Attorney through her appointment as a Special Attorney vested with the powers of a United States Attorney pursuant to statutes generally vesting all of the duties of the Department of Justice in the Attorney General and granting the Attorney General power to delegate all of her duties. I proceed by (1) describing the contours of this theory, and then explain why I conclude that it is not viable because: (2) the scope of the delegation is commensurate with the powers of a PAS United States Attorney; (3) the Government's maneuver is prohibited by the FVRA's exclusivity provision, 5 U.S.C. § 3347(b); and (4) the general vesting and delegation statutes cannot bear the

48

specific type of delegation claimed here. Because the Government argues vehemently that section 3347(b) does not apply, subsection (3) below is further suborganized.

### 1.    Overview

The duties of a United States Attorney are set forth by statute.[194] And a separate statute vests in the Attorney General "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice."[195] Additionally, the Attorney General is independently authorized to "supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."[196] The Attorney General is also empowered to "appoint attorneys to assist United States attorneys when the public interest so requires."[197] Last, a final pair of statutes empowers the Attorney General to "make such provisions as [s]he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General,"[198] and authorize "any attorney specially appointed by the

---

[194] 28 U.S.C. § 547.
[195] 28 U.S.C. § 509 (noting exceptions not relevant here).
[196] 28 U.S.C. § 519.
[197] 28 U.S.C. § 543.
[198] 28 U.S.C. § 510.

Attorney General under law . . . [to] conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct."[199]

Taking all of these statutes together, the Government argues that, regardless of sections 546 and 3345, Ms. Habba was appointed a Special Attorney pursuant to section 515 (or section 543, or both), named First Assistant United States Attorney for the District of New Jersey, and in those capacities delegated the Attorney General's power to "conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal . . . which United States Attorneys are authorized to conduct."[200] Through this appointment and delegation, the Government contends that Ms. Habba may "at a minimum . . . supervise th[ese] case[s]."[201]

### 2.    Scope of Delegation

At the outset, it is important to understand what powers the Government has delegated to Ms. Habba in her capacity as a Special Attorney. Although the Government has downplayed the delegation in some of its briefing, a full view of the record demonstrates that the Government intends for its delegation to confer upon Ms. Habba the full panoply of powers of a PAS United States Attorney.

---

[199] 28 U.S.C. § 515.
[200] Doc. 108 at 24-26 (citing Docs. 108-5, 108-7).
[201] *Id.* at 24; *see generally* Doc. 114.

In its briefing, the Government has at times characterized the delegation as a simple delegation of modest powers intended to achieve administrative continuity. In its merits brief, for example, the Government contends that "an official delegated the functions of a U.S. Attorney is [not] equivalent to an official actually serving as a U.S. Attorney."[202] Moreover, the Government repeatedly focuses on Ms. Habba's power to "conduct and supervise litigation in the District of New Jersey" and how that delegation applies in these cases.[203] The Government contends that there is a meaningful distinction between serving as a "Acting officer" pursuant to the FVRA, which allows an official to perform "all functions associated with an office on par with an official who actually occupies that office, including any nondelegable functions of the office," and "being delegated functions that are *not* exclusive to the office of U.S. Attorney."[204] The narrow delegation that the Government describes is not consistent with their arguments about Ms. Habba's powers or the way that Ms. Habba was delegated her duties.

According to Ms. Habba's appointment letter, she has been vested with the authority "to conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct."[205] The

---

[202] Doc. 127 at 22.
[203] *Id.* at 17.
[204] *Id.* at 17-18.
[205] Doc. 108-6.

letter does not purport to limit Ms. Habba's authority to particular cases or issues, nor has the Government ever indicated that Ms. Habba would lack authority to supervise any matter at all. Instead, they have repeatedly taken the opposite position. The Government has indicated that, as Special Attorney, Ms. Habba was "directed to supervise the USAO-NJ."[206] That delegation includes "the authority to supervise all pending prosecutions and other matters in the USAO-NJ."[207] This level of delegation is consistent with the full suite of a United States Attorney's statutory duties.[208] Furthermore, although the Government identifies duties that may hypothetically be exclusive to the office of the United States Attorney,[209] when faced with the prospect of one of these duties being declared exclusive, the Government refused to make any concession.[210] The Government said it best: under the

---

[206] Doc. 108 at 2.

[207] *Id.* at 10, 24; Doc. 127 at 2, 15, 17 ("[S]he would be able to exercise prosecutorial and supervisory authority in the District of New Jersey pursuant to her position as Special Attorney and FAUSA and the Attorney General's express delegation of authority to her in those capacities.").

[208] 28 U.S.C. § 547.

[209] Doc. 127 at 22-23 (citing authority suggesting that 18 U.S.C. § 3731 and 26 U.S.C. § 6103(i)(1)(B) involve duties exclusive to the United States Attorney); *see* Doc. 141 at 119:10-16 (noting that "there are relatively few exclusive functions that are identified under the United States Code").

[210] Doc. 141 at 110:15-22; *see id.* at 103:14-15 ("[W]e've delegated her—*not necessarily all* the functions . . ." (emphasis added)). The Government's vesting and delegation argument does not appear to embrace the idea that a United States Attorney has *any* exclusive powers. *See* 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice . . . are vested in the Attorney General."); *id.* § 510 ("The Attorney General may . . . authoriz[e] the performance by any other officer, employee, or agency of the Department of Justice any function of the Attorney General."). *See* Doc. 114 at 4-5.

delegation theory, "Ms. Habba can do ***anything*** the United States Attorney can do."[211]

Additionally, the Government has reiterated the position that "Ms. Habba is the person the President wishes to head the Office of the United States Attorney for the District" of New Jersey.[212] And it is no mere coincidence that Ms. Habba was named a Special Attorney and delegated this authority as part of a single series of moves made with the express goal of installing her as the Acting United States Attorney.[213] It is clear from the record that the Attorney General is using her power of delegation to make Ms. Habba the United States Attorney.[214]

Finally, I reject the Government's contention that I should take a narrow view of how the delegation applies in these cases alone.[215] Such a myopic perspective obscures the validity of the delegation in the first place by ignoring its full scope.

---

[211] Doc. 114 at 4 (emphasis and bolding in original).

[212] Doc. 141 at 145:1-4, 147:16-21 ("[T]he Executive Branch has made very clear whom they wish to be in charge of my office. That is Alina Habba . . . That is a choice, and the Executive Branch has made that very clear.").

[213] Doc. 108-7 (naming Ms. Habba a "Special Attorney" and "designat[ing] her as First Assistant United States Attorney for the District of New Jersey . . . [in which position she] will have authority to serve as Acting United States Attorney.").

[214] Additionally, I am not blind to the fact that other officials in this administration are purporting to exercise the powers of a United States Attorney pursuant to this theory of delegation, which undermines the idea that Ms. Habba's delegation is a simple administrative necessity. *See* Letter from John A. Sarcone III to Chief Judge Brenda K. Sannes (July 14, 2025), available at https://www.nynd.uscourts.gov/news/inquiries-regarding-designation-john-sarcone-be-acting-us-attorney-ndny (including special attorney appointment letter identical to Ms. Habba's). *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 89 n.10 (3d Cir. 2016) (noting that courts may take judicial notice of public records on government websites).

[215] Doc. 108 at 24; Doc. 141 at 110:1-22.

Appx80

But if the delegation is unlawful, then so are all of its applications. More directly, the Supreme Court has advised that

> one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred. Any other rule would create a disincentive to raise Appointment Clause challenges with respect to questionable judicial appointments."[216]

That sentiment has equal applicability to nonconstitutional appointments challenges, and the same concerns about creating a disincentive to challenge invalid appointments arise if I do not view the scope of the appointment as a whole.

Accordingly, I conclude that, as Special Attorney, Ms. Habba has been delegated all of the powers of a United States Attorney and is acting on a level equal to one holding the office in a PAS capacity.

### 3.    FVRA Bar

The FVRA's exclusivity provision provides that "[s]ections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate."[217] As discussed earlier, the statute makes an exception for "a statutory provision [which] expressly . . . authorizes the President, a court, or the head of an Executive

---

[216] *Ryder v. United States*, 515 U.S. 177, 182-83 (1995).
[217] 5 U.S.C. § 3347(a).

department, to designate an officer or employee to perform the functions and duties of a specific office temporarily in an acting capacity," and 28 U.S.C. § 546 does here.[218] But the statute goes on to clarify the scope of that exception, explaining that it does not apply to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head, or to reassign duties among, officers or employees of such Executive agency."[219] In other words, general vesting and delegation statutes may not be used to "temporarily authoriz[e] an acting official to perform the functions and duties of any [PAS] office."[220]

The Government's "Special Attorney" theory crashes headlong into this unambiguous barring provision. As I have concluded, Ms. Habba is performing all of the functions and duties of the United States Attorney, including "conduct[ing] . . . legal proceeding[s]" and "supervis[ing] . . . litigation" pursuant to the Attorney General's "delegat[ion]" of authority under the Department of Justice's general delegation statute, section 510.[221] That is exactly what section 3347(b) prohibits. The Government agrees.[222]

---

[218] *Id.* § 3347(a)(1)(A).

[219] *Id.* § 3347(b).

[220] *Id.* § 3347(a).

[221] *See* Doc. 114 at 3-5; Doc. 127 at 15-16 (describing vesting and delegation of authority).

[222] Doc. 142 at 9 ("As explained, the government agrees that the FVRA applies and that § 3347(b) forecloses the use of general delegation statutes to designate *acting officials*." (emphasis in original)); Doc. 141 at 106:21-107:18; *id.* at 129:3-10 ("[I]f the Attorney General had said . . . regardless of whether 3345 authorizes her to be the acting, I'm nonetheless designating her to

Appx82

Reading section 3347(b) to apply to Ms. Habba's performance of the functions and duties of the United States Attorney as a Special Attorney is confirmed by the FVRA's legislative history. The FVRA's exclusivity provision was enacted for the *express purpose* of precluding the *exact argument* that the Government presses here. For years, the Department of Justice had argued that the Vacancies Act did not apply to it and that vacancies within DOJ were to be temporarily filled through delegation of the Attorney General's authority pursuant to sections 509 and 510.[223] Congress expressly rejected that interpretation, and manifested that rejection in section 3347(b).

The Government offers a number of arguments to the contrary. First, it makes two textual arguments: (1) Ms. Habba's Special Attorney appointment does not fall under section 3347 at all because she does not hold the title of "Acting" United States Attorney,[224] and (2) section 3347(b)'s reference to the "functions and duties" that

---

be the acting under my authority under 515. That is not what she did here. And that would not be lawful. I agree. That would definitely not be lawful.").

[223] S. Rep. 105-250 at 17 (1998) ("[Section 3347(b) forecloses the argument raised by the Justice Department that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that department"); 144 Cong. Rec. 22508 (Sen. Thompson) ("The Justice Department relies on its organic statute's 'vesting and delegation' provision, which states that the Attorney General can designate certain other powers to whomever she chooses in the Department."); *id.* at 22511 (Sen. Byrd) ("Those two very broad, very general provisions . . . are being used to justify what amounts to an end run around the Vacancies Act" . . . "[T]o accept the position of the Department of Justice is to accept the position that the United States Senate . . . [W]ith the concurrence of the House of Representatives, has systematically divested itself of its constitutional responsibility to advise and consent to Presidential nominations."); *id.* at 22515 (Sen. Durbin) ("I wholeheartedly concur that this law needs clarification so that moves to end-run its application are halted."); *see SW Gen.*, 580 U.S. at 294-95.

[224] Doc. 127 at 17-18; Doc. 142 at 8-9.

may not be delegated includes only the vacant PAS office's exclusive and nondelegable functions and duties.[225] Second, it raises two practical arguments: (1) the functions and duties of a vacant PAS officer are frequently delegated to officials who are not in an "acting" role under the FVRA,[226] and (2) the consequences of holding that this type of delegation is prohibited would be severe. None of these arguments overcomes the plain meaning of section 3347(b).

### a.    Text

The Government's textual arguments are unconvincing. First, it argues that Ms. Habba is not an "acting official" subject to section 3347's provisions at all because she first held the office under section 546, which does not use the term "acting" and instead treats temporary appointees as full United States Attorneys, serving on an interim basis, and she now performs these duties as a "Special Attorney" and First Assistant United States Attorney. Essentially, it suggests that what it admittedly cannot achieve in name, it can do in practice. Second, it contends that "functions and duties" is a narrow term of art defined by statute to refer only to a PAS-officer's exclusive and nondelegable duties. Neither position is correct with regard to section 3347.

First, the FVRA's use of the term "acting" is general, not a term of art. The statute itself does not define the term. But Black's Law Dictionary explains that it

---

[225]  Doc. 127 at 18-20.
[226]  *Id.* at 20-21; Doc. 142 at 10.

Appx84

means "[h]olding an interim position; serving temporarily."[227] And "acting officer" is defined simply as "[o]ne performing the duties of an office—usually temporarily—but who has no claim of title to the office."[228] That common understanding is just how the statute uses the term throughout its provisions: one who is "performing the functions and duties of the office temporarily" is doing so "in an acting capacity."[229] And those definitions all describe exactly what Ms. Habba is doing, regardless of her technical title:[230] she is temporarily performing the duties of the office of the United States Attorney while it is vacant.

This understanding is confirmed by the FVRA's description of position-specific statutes subject to the barring provision's exception. That exception only applies to statutory provisions which permit a proper person "to designate an officer or employee to perform the functions and duties of a specified office temporarily in an *acting capacity*."[231] If "acting" is a term of art, statutes subject to this exception should be expected to describe the temporary service that they authorize in the same

---

[227] *Acting*, Black's Law Dictionary (7th ed. 1999).

[228] *Acting Officer*, Black's Law Dictionary (7th ed. 1999); *see also Acting-order*, Oxford English Dictionary (2d ed. 1989) ("a temporary appointment to a vacant position made by one entitled to do so, but which may or may not be confirmed by the superior authority").

[229] 5 U.S.C. §§ 3345(a)(1)–(3).

[230] *See Bullock v. United States Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1127 (D. Mont. 2020) ("The Interior Secretary carefully crafted the Secretarial Order to avoid designation of Pendley as 'Acting BLM Director,' but the Executive Branch cannot use wordplay to avoid constitutional and statutory requirements."); *cf. L.M.-M.*, 442 F. Supp. 3d at 26 ("[L]ables— without *any* substance—cannot satisfy the FVRA's default rule under any plausible reading of the statute." (emphasis in original)); Doc. 141 at 85:1-4 (contending that "formal distinction [in titles] [does not] really make[] a difference."); Doc. 114 at 7 (contending that title makes no difference).

[231] 5 U.S.C. § 3347(a)(1) (emphasis added).

way.[232] Some do, but others do not. Section 546, to pick a random one, describes its temporary officers as full "United States attorney[s]," just ones subject to strict time limitations.[233] Another, 28 U.S.C. § 508(a), provides that "[i]n case of a vacancy in the office of Attorney General . . . the Deputy Attorney General may exercise all the duties of that office."[234] And a third, 29 U.S.C. § 552, states that "[t]he Deputy Secretary [of Labor] shall . . . in case of [a vacancy,] perform the duties of the Secretary."[235]

At bottom, the Government's strict reading of "acting" would render section 3347(b) surplusage. If a formal "acting" title is necessary to be subject to any part of section 3347 and, as the Government contends, performing the full functions and duties of a vacant PAS office pursuant to a delegation by the agency head does not result in an "acting" title, then section 3347(b) will never take effect. The occurrence of its conditions will always go hand-in-hand with the lack of an "acting" designation, and section 3347(b) will therefore be self-defeating.[236] That result is not

---

[232] *See United States v. Davis*, 588 U.S. 445, 458 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning." (citing *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990))).

[233] 28 U.S.C. § 546(a); *see* S. Rep. 105-250 at 15, 17 (describing existing statutes subject to exclusivity provision's exception and listing 28 U.S.C. § 546).

[234] 28 U.S.C. § 508(a); *see* S. Rep. 105-250 at 16 (listing 28 U.S.C. § 508). Subsection (b) of the same statute does use the term "act," but this just goes to show that "acting" can describe the general performance of duties.

[235] 29 U.S.C. § 552; *see* S. Rep. 105-250 at 16 (listing 29 U.S.C. § 552)

[236] *See United States v. Davis*, 588 U.S. 445, 489 (2019) (Kavanaugh, J., dissenting) ("The Court usually tries to avoid an interpretation of a statutory provision that would make the provision redundant and accomplish virtually nothing." (collecting authority)).

textually sound, so the Government's argument that section 3347 does not apply because Ms. Habba is not performing her duties as an "acting official" fails.[237]

Second, the Government's contention that section 3347's application to "functions and duties" refers only to the exclusive and nondelegable duties of an office is not textually supported. The source of the Government's narrow definition of "functions and duties" comes from section 3348, which defines "function or duty" as "any function or duty of the applicable office that . . . is established by statute; and . . . is required by statute to be performed by the applicable officer (and only that officer)."[238] But, as the Government acknowledges,[239] the definitions in section 3348 are expressly limited to application "in this section."[240] In addition to that explicit and unambiguous limitation, two textual considerations convince the Court that "functions and duties" is used in a more general sense throughout the rest of the statute.

---

[237] The Government contends that *Gonzales & Gonzales Bonds & Insurance Agency Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1078 & n.7 (9th Cir. 2024), supports its reading, but *Gonzales* says nothing like the Government's assertion. Because I rely on *Gonzales* in the next section, I do not belabor the distinction now. Similarly, the Government's reliance on *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1338 (Fed. Cir. 2022), is not convincing because, as I note later, I find that decision unpersuasive.

[238] 5 U.S.C. § 3348(a)(2); *see Gonzales*, 107 F.4th at 1073-74 (describing such duties as "exclusive, or nondelegable")

[239] Doc. 142 at 8.

[240] 5 U.S.C. § 3348(a); *Gonzales*, 107 F.4th at 1078 & n.6 ("3347(b) clarifies that general vesting-and-delegation statutes are not sufficient to authorize the department to choose the acting officer under the FVRA, but this does not impact the meaning of 'function or duty' in § 3348. That a department head cannot rely on a general vesting-and-delegation statute to designate the acting officer in the event of a vacancy, § 3347(b), answers a question wholly distinct from the consequences of violations of the FVRA under § 3348.").

Appx87

First, the definition itself makes clear that "function or duty" also has a general meaning, because it is self-referential, defining "'function or duty'" as "*any* function or duty of the applicable office that" is subject to certain conditions.[241] Second, reading "functions and duties" narrowly throughout the statute renders the entire scheme incredibly insignificant. Every individual who may serve under the statute is only authorized to "perform the functions and duties of the office."[242] On the Government's understanding, this would vest acting officers with essentially no responsibility or authority in many cases. Any powers of the vacant office that are nonexclusive or delegable would not be automatically conferred, and could only be exercised by the acting official through a delegation of those functions in addition to the FVRA.[243] That is clearly not the scheme Congress contemplated, and reading "functions and duties" in the broader sense of *all* functions and duties of the vacant office in provisions of the FVRA other than section 3348 is the better textual understanding of the statute.[244]

*Kajmowicz v. Whitaker* is in no way to the contrary. True, in *Kajmowicz* the United States Court of Appeals for the Third Circuit quoted broad language from the

---

[241] 5 U.S.C. § 3348(a)(2) (emphasis added).

[242] *Id.* §§ 3345(a)(1)–(3).

[243] In post-argument briefing the Government acknowledges this point and argues against such an outcome. *See* Doc. 142 at 8 ("Indeed, when § 3345(a) authorizes certain officials to 'perform the functions and duties of the vacant office temporarily in an acting capacity,' that authority includes *all* of the functions of the vacant office—both delegable and nondelegable." (emphasis in original)).

[244] *See Function*, Black's Law Dictionary (7th ed. 1999) ("Office; duty; the occupation of an office.").

Appx88

United States Court of Appeals for the Federal Circuit's opinion in *Arthrex, Inc. v. Smith & Nephew, Inc.*, and stated that "[t]he statutory language is unambiguous: the Vacancies Reform Act applies only to functions and duties that a Presidentially appointed and Senate-confirmed officer alone is permitted by statute . . . to perform. It does not apply to delegable functions and duties."[245] But, as the Government acknowledges,[246] the sole question in *Kajmowicz* turned on the interpretation of section 3348, and the Third Circuit never mentioned section 3347—or any other FVRA provision other than section 3348—in the analysis.[247] Thus, the Third Circuit never confronted the question of whether section 3348's definition applies to other sections.

*Arthrex* applied the section 3348 definition of "functions and duties" to the entire statute. But that opinion is not binding authority, and I find the reasoning that led it to apply the section 3348 definition statute-wide unconvincing.[248] The Federal Circuit never so much as mentioned the limiting provision in section 3348(a)'s chapeau and was clearly extremely concerned with the "significant consequences" of holding otherwise, apparently without considering that section 3348's definition

---

[245] *Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022) (quoting *Arthrex*, 35 F.4th at 1336) (original alterations omitted)

[246] Doc. 142 at 10 ("*Kajmowicz* involved ratification and did not present the precise circumstance here.").

[247] *Kajmowicz*, 42 F.4th at 145 (sole reference to section 3347).

[248] *Cf. Gonzales*, 107 F.4th at 1073 (narrowing the holding of *Arthrex* to only the FVRA's "ratification bar"); *Kajmowicz*, 42 F.4th at 151 (altering passages from *Arthrex* to change "FVRA" to "section 3348").

might be limited to only that section.[249] Moreover, *Arthrex* appears to misunderstand section 3347(b), explaining that it "merely provides that a statute granting the head of an agency 'general authority . . . to delegate [his] duties' does not exempt the agency from the FVRA," which is a good deal less than what section 3347(b) does, as explained earlier.[250] Thus, *Arthrex* is not persuasive.[251]

### b.    Practice

As is starting to seem familiar, the Government turns to practice and consequences to find an exception to the plain statutory text. It explains that the functions and duties of many vacant offices in the Executive are commonly performed by officials who have been delegated those authorities outside of the FVRA's framework. And it warns that reading the FVRA to bar such delegation would require important offices to sit vacant. Both of those contentions fall short.

First, as I have already described, Executive practice under the FVRA is not useful evidence of the meaning of the statutory text. The FVRA is a relatively young provision, and it is common knowledge that the Executive has a history of

---

[249] *Arthrex*, 35 F.4th at 1337.

[250] *Id.* at 1338.

[251] To the extent they have precedential value, I also find *Schagticoke Tribal Nation v. Kempthorne* 587 F.3d 132, 134-35 (2d Cir. 2009), and *Stand Up for California! v. United States Dep't of the Interior*, 994 F.3d 616, 622 (D.C. Cir. 2021), distinguishable for similar reasons. *Schagticoke*, a *per curiam* opinion, did not limit section 3348's definitions to that section and did not discuss section 3347. 587 F.3d at 134-35. And in *Stand Up* the FVRA claims were "not raised . . . on appeal," so the panel only used the statute as a "guidepost." 994 F.3d at 622 n.2. Moreover, the panel did not appear to limit the section 3348 definitions to that section, nor did it discuss section 3347. *Id.* at 622.

"disregard[ing] [related acts'] restrictions on the service of acting officials."[252] Practice cannot overcome the text.

Second, the Government is correct that consequences will follow from my interpretation of section 3347(b). But those consequences are the ones that Congress explicitly chose and, in any case, they are not particularly severe. Congress anticipated that there would be times when the FVRA and position-specific statutes could no longer provide an officer to temporarily perform the functions and duties of a PAS office.[253] In those cases "the office shall remain vacant," and "only the head of such Executive agency may perform any function or duty of such office."[254] If someone other than the head of the agency performs the (narrowly defined) functions and duties of the vacant office, that action "shall have no force or effect," and "may not be ratified."[255] The upshot of this scheme is that, once FVRA and position-specific temporary appointments statutes have been exhausted, no one may hold the vacant office in *any* capacity, and only the department head may perform the exclusive and nondelegable duties of that office. If anyone else performs such duties, those actions are forever void. As to the vacant office's nonexclusive and delegable duties—those not covered by the narrow definition of "function or

---

[252] *Kajmowicz*, 42 F.4th at 145.
[253] 5 U.S.C. § 3348(b) (describing what happens when the duties of the vacant office are not being performed in compliance with the FVRA).
[254] *Id.* §§ 3348(b)(1)–(2). Note that here, the narrower definition of "function or duty" as exclusive and nondelegable duties *does* apply. *Id.* § 3348(a)(2).
[255] *Id.* §§ 3348(d)(1)–(2).

Appx91

duty"[256]—they may not all be vested in a single person through delegation.[257] But even if such an invalid delegation occurs, actions involving those nonexclusive and delegable duties are not automatically void, and may be ratified.

Through one more translation from statutory complexity to common English, it becomes clear that Congress has created a logical scheme of rules and consequences. When there is no longer any way to perform the functions or duties of a PAS office under the FVRA, the office is vacant.[258] The statute then creates a two-tiered system for handling the functions and duties (broader definition) of the office during the vacancy. For the most important functions and duties—those that are exclusive and nondelegable (i.e., narrower definition)—the agency head can validly continue performing them,[259] but if anyone else does so, those actions are void and nonratifiable.[260] This ensures that these important functions can continue to be performed while the vacancy is pending, but only by a person of high authority. For the less important functions and duties, those that are nonexclusive and delegable, they may not be performed through a full-scale delegation of all of the functions and duties of the vacant office to a single official.[261] But since less care is

---

[256] *Id.* § 3348(a)(2).
[257] *Id.* § 3347(b). I do not express any opinion on the possibility of parceling out these duties to separate individuals or delegating only a clearly limited subset of nonexclusive and delegable duties.
[258] *Id.* § 3348(b)(1).
[259] *Id.* § 3348(b)(2).
[260] *Id.* §§ 3348(d)(1)–(2).
[261] *Id.* §§ 3347(b), 3348(b)(1).

Appx92

necessary for these shared duties, if they are improperly performed they are not automatically void and may be ratified.[262] So even if the Executive does improperly delegate such authority, in many cases the consequences will not be particularly severe, at least after the fact.

Finally, the Government's focus on section 3348 and the possibility of ratification of the nonexclusive and delegable functions and duties performed by someone who is appointed in violation of the FVRA is misplaced given the posture of this case. I agree with the Third Circuit and the United States Court of Appeals for the Ninth Circuit that many if not all actions of most PAS officers taken in violation of the FVRA will not ultimately be declared void because they will be ratifiable.[263] But both of those cases involved a *post-action* challenge to an action that *had already been ratified*.[264]

Here, the defendants seek relief while Ms. Habba is currently wielding all of the functions and duties of the PAS office and ask that she *be barred from taking*

---

[262] *Id.* §§ 3348(d)(1)–(2).

[263] *See Kajmowicz*, 42 F.4th at 151 ("[W]e acknowledge that most statutes that confer authority will permit subdelegation, which means that many statutory functions and duties will be ratifiable under the Vacancies Reform Act."); *Gonzales*, 107 F.4th at 1076-77. The ratification cases undermine the Government's position that delegable duties can be undertaken by anyone, regardless of appointment. If the Government is correct that any delegable and nonexclusive duties may be performed lawfully as a result of delegation, then there is never any need to ratify any of those actions. Thus, *Kajmowicz* and *Gonzales* implicitly conflict with *Schagticoke* and *Stand Up*.

[264] *Kajmowicz*, 42 F.4th at 146 (noting that "Attorney General Barr . . . ratified" the action before the district court ruled); *Gonzales*, 107 F.4th at 1071 (noting that "Secretary Alejandro Mayorkas . . . ratified the Rule" before the district court ruled).

Appx93

*future action*. For them, the prospect of ratification is little solace.[265] As the Ninth Circuit explained, "subsequent ratification of an action taken by an improperly appointed Acting Secretary is not inevitable. The subsequent Secretary would have to exercise his lawful authority to ratify the action, an action he could take independently in his capacity as Secretary, and only if Congress had not made that earlier action nondelegable."[266] Indeed, the Ninth Circuit expressly envisioned the situation at hand: "agencies hypothetically could rely on their vesting-and-delegation authority, even if knowingly violating the FVRA, *but that would neither make their actions immediately lawful nor ensure their ratification*."[267] As I noted in my prior opinion, the defendants face an imminent threat of Ms. Habba taking action against them[268] and I have concluded that she is not lawfully holding the office of United States Attorney. So if and when she takes those actions, they will be "immediately [un]lawful" unless and until they are ratified following independent review by a properly appointed official.[269]

---

[265] *See Guedes*, 920 F.3d at 13-14 (describing the need for judicial review in a situation where the decision of a challenged appointee would always be subject to ratification before judicial review would become available (citing *Landry v. FDIC*, 204 F.3d 1125, 1131-32 (D.C. Cir. 2000))); *L.M.-M.*, 442 F. Supp. 3d at 22 (noting that challenges may be brought "even when a properly appointed official might have reimposed the challenged action").

[266] *Gonzales*, 107 F.4th at 1077.

[267] *Id.* at 1077 (emphasis added).

[268] Doc. 116 at 19-20.

[269] *Gonzales*, 107 F.4th at 1077.

Appx94

In this posture, the only sure solution for the defendants' timely challenge, as I have noted before, is to bar Ms. Habba from taking such actions in the first place.[270] Finally, for the one past action that has been challenged that falls during a term when Ms. Habba was unlawfully appointed, signing Mr. Pina's indictment, the Government does not identify any ratification that has occurred. So although that act may not be automatically "void," it was and remains "voidable."[271] And with no ratification before or since Mr. Pina's challenge, I now declare that action void in violation of section 3347(b).

*     *     *

All of this is a long way of saying that section 3347(b) is effective, and that it means what it says. To temporarily perform the full panoply of the functions and duties of a vacant PAS office, a person must be eligible to do so under the FVRA or a position-specific statute. The general vesting and delegation provisions that exist for every department head in the Executive do not create alternative paths for authorizing someone to temporarily perform those functions and duties. Section 3347(b) thus precludes the Special Attorney argument in its entirety.

---

[270] Doc. 116 at 19; *see Bullock*, 489 F. Supp. 3d at 1130-31 (enjoining officer appointed in violation of the FVRA from exercising the authority of the office).

[271] *Gonzales*, 107 F.4th at 1077 (quoting *Hooks*, 816 F.3d at 564).

### 4.    Statutory Conflicts

Even if the FVRA does not prohibit the delegation of the United States Attorney's powers to Ms. Habba, using 28 U.S.C. §§ 509, 510, 515, 519, and 543 to vest an Attorney-General-appointed Special Attorney with all of the powers of the United States Attorney for an unlimited term raises direct conflicts with other, more specific statutes dealing with United States Attorneys.[272] The Government's delegation theory fails for this additional and independent reason. The statutory conflict implicates three related canons of statutory interpretation.

First, as I have already explained, the Surplusage Canon "prevents . . . an interpretation that renders [a provision] pointless."[273] But if the Government's array of provisions empowers the Attorney General to appoint a Special Attorney with all of the powers of a United States Attorney for an unlimited period, then the entirety of the actual United States Attorney provision, section 541, which requires nomination by the President and confirmation by the Senate, sets a term limit of four years, and limits removal to the President, is surplusage which the President may invoke at will.[274]

---

[272] *See* Doc. 121 at 23; *Pina* Doc. 52-1 at 32-34.

[273] Scalia & Garner at 176; *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010) (Reading one statute to negate another "would violate the canon against interpreting any statutory provision in a manner that would render another provision superfluous. . . . This principle, of course, applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." (citing *Corley v. United States*, 556 U.S. 303, 314 (2009) and *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 529-30 (1939)).

[274] 28 U.S.C. § 541.

Appx96

Second, the Government's reading would conflict with the Related-Statutes Canon, which provides that "laws dealing with the same subject . . . should if possible be interpreted harmoniously."[275] That canon is based on the principles "(1) that the body of law should make sense, and (2) that it is the responsibility of the courts, within permissible meanings of the text, to make it so."[276] Reading the Special Attorney statutes to permit supplantation of the United States Attorney statute creates discord between the provisions by employing one to circumvent limits attendant in the other.

Finally, even if the Government's reading were correct, the statutes would conflict, and the General/Specific Canon would advise that "the specific provision is treated as an exception to the general rule."[277] Here, the general provisions dealing with delegable powers must yield to the specific provision describing the rules that attend vesting an officer with the powers of the United States Attorney.

The Government responds that all of these concerns about the continued viability of section 541 are overblown because a Senate-confirmed United States Attorney has more "gravitas" than someone performing the functions and duties of the office pursuant to a delegation.[278] That may be so, but that theoretical limit would

---

[275] Scalia & Garner at 252; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[276] Scalia & Garner at 252.

[277] Scalia & Garner at 183; *see United States v. Rose*, 538 F.3d 175, 183 (3d Cir. 2008) ("[W]e avoid 'applying a general provision when doing so would undermine limitations created by a more specific provision.'" (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996))).

[278] Doc. 127 at 23; Doc. 141 at 133:16-23.

be cold comfort to Congress, which chose to make Senate confirmation mandatory for United States Attorneys,[279] rather than optional if the President wants a bit more gravitas.

Accordingly, the Special Attorney theory fails based on conflicts with section 541.

### D.    Constitutional Claims

The Girauds press several constitutional claims, focusing primarily on the theory that Ms. Habba's appointment violates the Appointments Clause.[280] But I have resolved the statutory claims in their favor and, as previously noted, that entitles them to the only remaining relief that they seek.[281] Because "the statutory grounds [are] dispositive," I do not reach the constitutional issues.[282]

### E.    Final Timeline and Holdings

I have concluded that Ms. Habba has unlawfully acted in the role of the United States Attorney for the District of New Jersey since July 1, 2025. Below, I lay out the relevant timeline of events in table form, incorporating my holdings by including statutory citations.

---

[279]  28 U.S.C. § 541.
[280]  Doc. 121 at 19-22; Doc. 143 at 4-5.
[281]  *Califano v. Yamasaki*, 442 U.S. 682, 692-93 (1979) (citing *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582-83 & n.22 (1979)).
[282]  *Beazer*, 440 U.S. at 582.

71

| Date | Event | Statute |
|------|-------|---------|
| January 8, 2025 | The office of the United States Attorney becomes vacant when Philip Sellinger resigns. | 5 U.S.C. § 3345(a) |
| January 8, 2025 | First Assistant United States Attorney Vikas Khanna becomes Acting United States Attorney as first assistant at the time of the vacancy. | 5 U.S.C. § 3345(a)(1) |
| March 3, 2025 | John Giordano is appointed Interim United States Attorney. | 28 U.S.C. § 546(a) |
| March 28, 2025 | Alina Habba is appointed Interim United States Attorney. | 28 U.S.C. § 546(a) |
| July 1, 2025 | Ms. Habba's appointment as Interim United States Attorney ends. | 28 U.S.C. § 546(c)(2) |
| July 22, 2025 | The United States District Court for the District of New Jersey appoints Desiree Grace United States Attorney. The appointment is effective immediately because Ms. Habba's term as Interim United States Attorney expired on July 1. | 28 U.S.C. § 546(d) |
| July 24, 2025 | Ms. Habba is appointed Special Attorney and First Assistant United States Attorney and unlawfully delegated all of the powers of the United States Attorney. | 5 U.S.C. § 3347(b) |

Appx99

| Date | Event | Statute |
|------|-------|---------|
| July 26, 2025 | Ms. Grace is terminated as United States Attorney by President Trump. Ms. Habba does not become Acting United States Attorney as a post-vacancy-appointed first assistant. | 28 U.S.C. § 541(c); 5 U.S.C. § 3345(a)(1) |

### F.    Dismissal of Mr. Pina's Indictment

The Government argues that Mr. Pina's indictment should not be dismissed, even if Ms. Habba's actions were not statutorily permissible.[283] I have previously determined that Ms. Habba was not lawfully serving as the United States Attorney when she signed Mr. Pina's indictment on July 7, 2025, and I have voided her act of signing that document. That leaves the question of whether an indictment that does not bear a valid signature must be dismissed. I conclude that dismissal is not necessary.

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be signed by an attorney for the government."[284] But precedent states that a defect in this signature is a "technical deficienc[y] that [is] not necessarily fatal to the indictment."[285] That is because "[t]he Supreme Court . . . has long viewed a government lawyer's indictment signing as 'necessary only as evidence of the

---

[283] Doc. 142 at 11-14.

[284] Fed. R. Crim. P. 7(c)(1).

[285] *United States v. Kelley*, 404 F. Supp. 3d 447, 452 (D. Mass. 2019) *aff'd*, 989 F.3d 67 (1st Cir. 2021) (quoting *United States v. Irorere*, 228 F.3d 816, 830-31 (7th Cir. 2000)).

Appx100

authenticity of the document.'"[286] Furthermore, courts have concluded that a defect in the government attorney's signature is "nonjurisdictional" and subject to "harmless error analysis."[287] Under the harmless error rule, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."[288]

This standard makes sense, considering that the grand jury "is a constitutional fixture in its own right," which "belongs to no branch of the institutional Government."[289] Thus, to dismiss an indictment, a defendant generally must show that some kind of misconduct prejudiced him with regard to the grand jury proceeding.[290]

In cases involving the validity of the Government attorney's signature, courts have generally reviewed the facts of the grand jury proceeding to determine whether the indictment signer was acting alone in conducting the grand jury proceeding.[291] Here, the Government has submitted for *in camera* review internal documents

---

[286] *Kelly v. United States*, 989 F.3d 67, 70 (1st Cir. 2021) (quoting *Wheatley v. United States*, 159 F.2d 599, 600 (4th Cir. 1946)).

[287] *United States v. Easton*, 937 F.2d 160, 162 (5th Cir. 1991) (citing *United States v. Boruff*, 909 F.2d 111, 118 (5th Cir. 1990)).

[288] Fed. R. Crim. P. 52(a).

[289] *United States v. Williams*, 504 U.S. 36, 47 (1992) (quoting *United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir. 1977) and *Stirone v. United States*, 361 U.S. 212, 218 (1960)).

[290] *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988).

[291] *Kelley*, 989 F.3d at 70-71; *Kelley*, 404 F. Supp. 3d at 452 ("[M]ultiple courts have held that an indictment is not invalid if the prosecutor was not licensed to practice if other evidence indicates that the government endorsed the prosecution.").

Appx101

relating to the grand jury proceeding, along with grand jury materials.[292] I have reviewed those materials, and they clearly indicate that the Government's investigation into Mr. Pina, which was presented to the grand jury, predated the period during which Ms. Habba was unlawfully serving as the Interim United States Attorney. Furthermore, internal routing documents verify that the line Assistant United States Attorneys prosecuting Mr. Pina's case began receiving supervisory approvals to submit the case to a grand jury before July 1, 2025, when Ms. Habba's service became unlawful. There is no indication that Ms. Habba had a role in any of these decisions, or in the grand jury proceeding other than to ultimately sign the indictment. Accordingly, her invalid signature is a mere technical defect that amounts to harmless error that I should "disregard."[293]

In response to the Government's submission, Mr. Pina submitted a letter speculating that Ms. Habba may have played a role in influencing the charges that were included in his indictment.[294] He contends that he "should have access to those documents and the Government should be compelled to respond to the questions posed about Ms. Habba's role, if any."[295] To gain access to grand jury materials, a defendant must show "that a ground may exist to dismiss the indictment because of

---

[292] *See* Doc. 142 at 13 n.4. *In camera* review is appropriate given the secrecy requirements that attend grand jury proceedings. Fed. R. Crim. P. 6(e)(2).

[293] Fed. R. Crim. P. 52(a).

[294] *Pina* Doc. 67.

[295] *Id.*

a matter that occurred before the grand jury."[296] "Vague allegations, bald assertions of impropriety, or speculation about what the grand jury materials may reveal are insufficient to establish a particularized need for disclosure."[297] Mr. Pina's arguments do not meet the bar for disclosure.

Not only does Mr. Pina merely speculate that Ms. Habba had a role in the proceeding based on a general public statement from Ms. Habba regarding Paterson, New Jersey, and the inclusion of a count alleging that Mr. Pina bribed a Paterson official (who sat on the Zoning Board, an office wholly unrelated to Ms. Habba's statement regarding immigration),[298] he does not account for the fact that Ms. Habba may have validly influenced the preparation of his indictment before July 1, 2025, when her appointment became unlawful. Given that the case was in the process of approval for submission to the grand jury before Ms. Habba's service as Interim United States Attorney became invalid, Mr. Pina has not raised a particularized reason why disclosure may demonstrate impropriety that would result in dismissal.

Accordingly, I deny Mr. Pina's motion to dismiss the indictment despite Ms. Habba's defective signature. I additionally deny his request for access to the grand jury materials.

---

[296] Fed. R. Crim. P. 6(e)(3)(E)(ii); *see United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) ("To support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy." (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1957)).

[297] *United States v. Dudenhoefer*, No. 21-CR-0039, 2023 WL 7411000, at *6 (W.D. Pa. Nov. 9, 2023) (collecting authority).

[298] *See Pina* Doc. 44 ¶ 15-18.

## IV.    CONCLUSION

For the above-stated reasons, the remaining aspects of the Girauds' motion is granted, and Mr. Pina's motion is granted in part and denied in part. I disqualify Ms. Habba from engaging in the prosecutions of the Girauds and Mr. Pina, and from supervising the same. Any Assistant United States Attorney who prosecutes the Girauds or Mr. Pina under the supervision or authority of Ms. Habba in violation of my Order is similarly subject to disqualification.  I deny Mr. Pina's motion to dismiss the indictment and his request for access to the grand jury proceedings. The Court will stay this decision and its effects pending the resolution of any appellate proceedings.

An appropriate Order follows.


BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge for
the Middle District of Pennsylvania
Specially Presiding

Appx104

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:24-CR-00768 |
| v. | (Chief Judge Brann)[*] |
| JULIEN GIRAUD JR., and JULIEN GIRAUD III, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | No. 2:25-CR-00436 |
| v. | (Chief Judge Brann)[*] |
| CESAR HUMBERTO PINA, | |
| Defendant. | |

## <u>ORDER</u>

### AUGUST 21, 2025

In accordance with the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1.    The Girauds' motion to disqualify Alina Habba from prosecuting them and supervising the prosecution of their case[1] is **GRANTED**;

2.    Mr. Pina's motion to dismiss the indictment[2] is **DENIED** with respect to dismissal and **GRANTED** with respect to disqualifying Alina Habba from prosecuting him and supervising the prosecution of his case;

---

[*]    The Honorable Matthew W. Brann, Chief United States District Judge for the Middle District of Pennsylvania, sitting by designation.
[1]    Doc. 99 in No. 1:24-CR-0768.
[2]    Doc. 52 in No. 2:25-CR-0436.

3.      Ms. Habba's signature of Mr. Pina's indictment is **VOID**;

4.      Ms. Habba is **DISQUALIFIED** from participating in the prosecution of these matters and supervising any Assistant United States Attorney prosecuting these matters;

5.      Any Assistant United States Attorney prosecuting these matters who is acting under the supervision of Ms. Habba in violation of this Order is subject to disqualification upon motion and cause shown;

6.      The pending motions to appear as *amicus curiae*[3] are **GRANTED**;

7.      This Order and its effects are **STAYED** pending appellate proceedings in these matters.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge for
the Middle District of Pennsylvania
Specially Presiding

---

[3]    Docs. 129, 135, 138 in No. 1:24-CR-0768.

Appx106

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JULIEN GIRAUD JR. and<br>JULIEN GIRAUD III,<br>　　　　Defendants | Crim. No. 24-768 (MWB) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>CESAR HUMBERTO PINA,<br>　　　　Defendant | Crim. No. 25-436 (MWB) |

NOTICE OF APPEAL

The United States hereby appeals the orders of the District Court [Docket Entry 145 in Crim. No. 24-768 and Docket Entry 69 in Crim. No. 25-436] entered on August 21, 2025. Those orders are immediately appealable under 28 U.S.C. § 1291 under the collateral order doctrine. *See, e.g.*, *United States v. Whittaker*, 268 F.3d 185, 191–93 (3d Cir. 2001).

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
U.S. Deputy Attorney General

HENRY C. WHITAKER
Counselor to the Attorney General

ALINA HABBA
Acting U.S. Attorney
Special Attorney

Mark E. Coyne
Supervisory Assistant U.S. Attorney
Chief, Appeals Division
(973) 297-2002

Appx107

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:24-CR-00768 |
| v. | (Chief Judge Brann)[*] |
| JULIEN GIRAUD JR., and<br>JULIEN GIRAUD III, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | No. 2:25-CR-00436 |
| v. | (Chief Judge Brann)[*] |
| CESAR HUMBERTO PINA, | |
| Defendant. | |

### ORDER

#### AUGUST 21, 2025

In accordance with the accompanying Memorandum Opinion, **IT IS
HEREBY ORDERED** that:

1.    The Girauds' motion to disqualify Alina Habba from prosecuting them
and supervising the prosecution of their case[1] is **GRANTED**;

2.    Mr. Pina's motion to dismiss the indictment[2] is **DENIED** with respect
to dismissal and **GRANTED** with respect to disqualifying Alina Habba
from prosecuting him and supervising the prosecution of his case;

---

[*]   The Honorable Matthew W. Brann, Chief United States District Judge for the Middle District
of Pennsylvania, sitting by designation.
[1]   Doc. 99 in No. 1:24-CR-0768.
[2]   Doc. 52 in No. 2:25-CR-0436.

3.    Ms. Habba's signature of Mr. Pina's indictment is **VOID**;

4.    Ms. Habba is **DISQUALIFIED** from participating in the prosecution of these matters and supervising any Assistant United States Attorney prosecuting these matters;

5.    Any Assistant United States Attorney prosecuting these matters who is acting under the supervision of Ms. Habba in violation of this Order is subject to disqualification upon motion and cause shown;

6.    The pending motions to appear as *amicus curiae*[3] are **GRANTED**;

7.    This Order and its effects are **STAYED** pending appellate proceedings in these matters.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge for
the Middle District of Pennsylvania
Specially Presiding

---

[3]    Docs. 129, 135, 138 in No. 1:24-CR-0768.

Appx109

<b>UNITED STATES DISTRICT COURT</b><br/>
<b>FOR THE DISTRICT OF NEW JERSEY</b>

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JULIEN GIRAUD JR.** and<br>**JULIEN GIRAUD III,**<br>          **Defendants** | **Crim. No. 24-768 (MWB)** |
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**CESAR HUMBERTO PINA,**<br>          **Defendant** | **Crim. No. 25-436 (MWB)** |

<b>NOTICE OF APPEAL</b>

The United States hereby appeals the orders of the District Court [Docket Entry 145 in Crim. No. 24-768 and Docket Entry 69 in Crim. No. 25-436] entered on August 21, 2025. Those orders are immediately appealable under 28 U.S.C. § 1291 under the collateral order doctrine. *See, e.g.*, *United States v. Whittaker*, 268 F.3d 185, 191–93 (3d Cir. 2001).

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
U.S. Deputy Attorney General

HENRY C. WHITAKER
Counselor to the Attorney General

ALINA HABBA
Acting U.S. Attorney
Special Attorney

Mark E. Coyne
Supervisory Assistant U.S. Attorney
Chief, Appeals Division
(973) 297-2002

Appx110